**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO**


RIO GRANDE SILVERY MINNOW, et al.,

      Plaintiffs,

vs.                                       CIV No. 99-1320 JP/RLP-ACE

JOHN W. KEYS III, et al., ,

      Federal Defendants,

MIDDLE RIO GRANDE CONSERVANCY
DISTRICT, et al.,

      Defendant-Intervenors.


**MEMORANDUM OPINION
AND
FINDINGS OF FACT AND CONCLUSIONS OF LAW**


<u>The Endangered Species Act -- Congressional Mandates and the Sole Exception</u>

      Congress enacted the Endangered Species Act ("ESA") in order to conserve endangered and threatened species and the ecosystems on which they depend. The ESA prohibits federal agencies from pursuing actions that "jeopardize the continued existence of any endangered species" or that result in the "take" of any endangered species. The words "jeopardize," "jeopardy," and "take" are statutory terms of art used in the ESA. The Supreme Court has emphasized that the language of the ESA "admits of no exception" to the requirement to give endangered species the highest priority. *See* <u>TVA v. Hill</u>, 437 U.S. 153, 173 (1978). The ESA requires federal agencies "to afford first priority to the declared national policy of saving

endangered species" and "to halt and reverse the trend toward species extinction, **whatever the cost.**" Id. at 184, 185 (emphasis added). In enacting the ESA, Congress required the federal courts to give greater protection to endangered species over human interests. Also, Congress did not allow federal courts to apply the ESA differently in different regions of the nation. Congress' mandate, expressed in the ESA, to protect endangered species applies equally in wet and in desert regions of the United States.

Concerned about the broad ramifications of the ESA after the Supreme Court's ruling in TVA v. Hill, Congress amended the ESA to create a single exception to the stringent requirements of the ESA. The amendment established the Endangered Species Committee (commonly known as "the God Squad"). The God Squad is composed of six high-level members from the Executive branch of the federal government and presidential appointees: (1) the Secretary of Agriculture, (2) the Secretary of the Army, (3) the Chairman of the Council of Economic Advisors, (4) the Administrator of the Environmental Protection Agency, (5) the Secretary of the Interior, (6) the Administrator of the National Oceanic and Atmospheric Administration, and (7) a presidential appointee from each affected state. 16 U.S.C. § 1536(e)(3). The God Squad is authorized to balance the interests of the public and the interests of the endangered species. If the God Squad determines that the public interests outweigh the interests of the endangered species, then it can grant a federal agency an exemption from following the mandates of the ESA. 16 U.S.C. § 1536(e)-(h). In amending the ESA, Congress specifically and exclusively delegated this balancing power to the God Squad, not to the federal courts. The lower federal courts, therefore, must continue to apply the ESA as interpreted by the Supreme Court, i.e., they must continue to give the highest priority to protecting endangered species

**"whatever the cost."**

In order for the God Squad to grant an exemption from the ESA's prohibition against "jeopardy" and "take" of an endangered species, someone must apply to the Secretary of the Interior. The following are authorized to seek an exemption: "A federal agency, the Governor of the State in which an agency action will occur, if any, or a permit or license applicant." 16 U.S.C. § 1536(g). Congress did not grant the federal courts the ability to seek such an exemption. By asking this Court to uphold a jeopardy determination with no reasonable and prudent alternative, the Federal Defendants are, in effect, asking this Court to perform the function of the God Squad. Congress has determined that, if the Federal Defendants or other authorized persons want an exemption, they must petition the God Squad, and neither the Federal Defendants nor others authorized by statute have done so.

Background of the Current Crisis

The Fish and Wildlife Service ("FWS") issued its first Biological Opinion ("BO") on June 29, 2001. Rejecting the Plaintiffs' challenge, this Court upheld that BO in an April 19, 2002 Memorandum Opinion and Order. This Court found that although the BO said the silvery minnow was in jeopardy, the BO set forth a sufficient Reasonable and Prudent Alternative ("RPA") to protect the minnow. This Court concluded, therefore, that in issuing the June 29, 2001 BO, FWS had not been arbitrary and capricious. The Bureau of Reclamation ("BOR") then operated under the terms of the June 29, 2001 BO.

In early 2002, the BOR became aware of the strong possibility of severe drought conditions throughout 2002. This was confirmed during April 2002 when the levels of snowpack that supplied water to the Rio Grande basin were determined to be far lower than normal. Hence,

as early as the spring of this year, the BOR knew or should have known that it would be unable to meet the June 29, 2001 BO flow requirements for the remainder of the year. Likewise, as early as April 2002, the BOR knew or should have known that it would have to reinitiate consultation with FWS and that a jeopardy opinion without a reasonable and prudent alternative might result. Nonetheless, the BOR delayed until August 2002 to request reinitiation of consultation. But, during the four or five month interim, the BOR had already released from the upstream reservoirs and delivered nearly all of the 2002 contracted water under the San Juan-Chama Project ("SJCP") and the Middle Rio Grande Project ("MRGP").

If the BOR had earlier alerted FWS to BOR's predicament, which belatedly (only a little over a week ago) resulted in a finding by FWS of jeopardy to the silvery minnow with no reasonable and prudent alternative, the BOR, FWS, or others authorized by law could have applied quite a while ago for a God Squad exemption. The BOR still has not pursued the Congressionally-prescribed procedure for obtaining an exemption from the ESA. Instead, it has, in substance, turned to this Court for an exemption, which this Court is powerless to grant.

The actions and inactions of the BOR resulted in a crisis that was then thrust upon this Court a few days ago. This Court had to make very difficult choices with limited ESA options on an emergency basis. The Court believes this crisis situation could have been avoided if the Federal Defendants, especially the BOR, had properly performed their statutory duties.

An important justification for affirming the June 29, 2001 BO was that it provided for reinitiation of consultation should drought conditions occur. This Court reasonably understood and expected that, when faced with severe drought, BOR would quickly request reinitiation of consultation which would result in a proposed action and an RPA that would avoid jeopardy to

the silvery minnow, most likely by BOR using its full discretion to provide more, not less, water releases for the benefit of the silvery minnow.  The Court did not expect that BOR would continue to insist that it lacked legal authority to restrict contract deliveries.  This Court had given BOR clear guidance that it had discretion to consult with FWS about limiting or reducing contract deliveries under the SJCP and the MRGP.  This Court's intent was that BOR would use that discretion if, and as soon as, it was necessary to avoid jeopardy to the silvery minnow in a drought year.  By April 2002, it was readily apparent that 2002 would likely be a record drought year. The Court had not specifically ordered BOR to use its discretion to release water.  The effect of the ruling just required consultation when necessary.  This was because the Court thought it might be possible for the agency to devise a plan to avoid jeopardy without actually using BOR's authority to restrict contract deliveries in order to release additional water to protect the silvery minnow.  Indeed, BOR has tried to acquire enough supplemental water for the silvery minnow from willing suppliers without reducing contract deliveries.  The City of Albuquerque ("City") and the Middle Rio Grande Conservancy District ("MRGCD") had, for a long time, been very cooperative with, and most accommodating of, the BOR in its effort to obtain additional water. However, this Court did not expect that, having made all contract deliveries in 2002, BOR would simply refuse to consider releasing any more water from Heron Reservoir to benefit the silvery minnow.

By the time the April 19, 2002 Memorandum Opinion and Order was filed, the BOR knew or should have known that it was facing potentially disastrous drought conditions in 2002 and that it would run out of voluntarily acquired supplemental water for the minnow sufficient to meet the flow requirements in the June 29, 2001 BO.  Yet it failed to request reinitiation of consultation

until August 2002.  And, after making an early August proposal that BOR said would avoid jeopardy to the silvery minnow, at the end of August 2002 BOR substituted a new proposal that FWS concluded created jeopardy.  This forced FWS to issue a hastily prepared BO on September 12, 2002, that proclaimed jeopardy with no RPA to avoid the demise of the silvery minnow.

There appears to be no precedent, and the parties have presented none, for a Court to affirm a BO that has a finding of jeopardy with no RPA, especially where a Court has signaled an agency that it has discretionary authority that it previously had not considered using, and the agency then continued to refuse to utilize that authority without adequate explanation.  It should be stressed that the September 12, 2002 BO, which is currently at issue in this case, contains an Incidental Take Statement that provides:

> This biological opinion finds the proposed action will result in jeopardy to the species and destruction or adverse modification of critical habitat, and no reasonable and prudent alternative can be identified.  Any incidental taking is prohibited by section 9 of the Act.

*FWS Supp. 481 at 29.*

The options now are limited, making the decisions much more difficult.  The silvery minnow, which has been on the brink of extinction for several years, has continued on a downward spiral towards extinction.  If the Court allows the Rio Grande to dry this year as proposed by the FWS and BOR, the federal agencies will have violated the ESA, and the Court will have failed in its Congressionally-mandated duty to afford injunctive relief to prevent further harm to the species.  *See* <u>TVA v. Hill</u>, 437 U.S. at 194.

In a brief filed in July 2000 in response to Plaintiffs' Motion for Preliminary Injunction (Doc. No. 43), the Federal Defendants acknowledged that the federal agencies and this Court

must give priority to endangered species:

> Where, as here, the requested injunction alleges potential injury to an endangered species, any equitable balancing of harms favors protecting the species over competing economic interests. With the ESA, Congress has altered the district courts' exercise of traditional equitable discretion when claims allege adverse impacts to protected species. As the Supreme Court stated in <u>Tennessee Valley Authority v. Hill</u>, 437 U.S. 153, 194 (1978), 'Congress has spoken in the plainest of words, making it abundantly clear that the balance has been struck in favor of affording endangered species the highest of priorities.' For claims involving endangered species, the 'balance of hardships and the public interest tip heavily in favor of endangered species.' <u>Sierra Club v. Marsh</u>, 816 F.2d 1376, 1383 (9th Cir. 1987) . . . .

Fed. Def. Resp. at 5-6 (Doc. No 101).

While it is acceptable under the ESA for the federal agencies to consider the interests of others besides an endangered species if they can at the same time avoid jeopardy to the endangered species, it is not allowable for agencies to give paramount weight to the interest of others when by doing so they have no proposal to avoid jeopardy. Under a part of the Court's Order, the agencies must resume consultation in an effort to devise a proposal that will avoid jeopardy. This will also afford them an opportunity to discuss, if they wish to do so, seeking an exemption under the ESA.

In its oral findings, announced on September 18, 2002, this Court stated that the Federal Defendants did not fully consider a reasonable and prudent alternative, supported by evidence in the record, that would avoid jeopardy to the silvery minnow. Upon reconsideration, the Court believes it may have made that finding unnecessarily. The record neither establishes nor negates that the BOR's proposed flow requirements, set forth in its August 2, 2002 memorandum, constitute a RPA that would avoid jeopardy.

Although FWS was presented with the August 2, 2002 proposal, it did not finish its

evaluation under the ESA before BOR superseded it with the alternative proposal on August 30, 2002. BOR stated in its August 2, 2002 memorandum that the proposed action "could . . . avoid jeopardy . . . ," *FWS Supp. 362 at 2*, and that "Reclamation believes that this proposed action would . . . limit the effects on the silvery minnow during the exceptional drought conditions." *Id. at 3*.

Admittedly, the crisis situation in which FWS found itself -- when BOR first formally requested consultation with a proposal to reduce flows required by the June 29, 2001 BO -- was not conducive to reasoned decision-making by FWS. FWS's problem was compounded when BOR soon changed its mind and proposed another alternative on August 30, 2002, which led Plaintiffs to file their Motion for Emergency Injunctive Relief on Wednesday, September 4, 2002. The Court promptly set a hearing for Monday, September 9, 2002. In the meantime, FWS was scrambling to evaluate BOR's second alternative. In open court on September 9, 2002, FWS's attorney committed the agency to completing a final BO by Thursday, September 12, 2002, and FWS actually complied with that deadline. Certainly, more deliberation would have been desirable. FWS was working under an incredible time crunch, but this was brought on by BOR's failure to request much earlier a more timely reinitiation of consultation. This time pressure probably contributed to why the April 12, 2002 BO is arbitrary and capricious, and one that the Court cannot affirm. However, it does not excuse BOR and FWS from performing their ESA duties.

Considering all the evidence of record, I have concluded that having BOR continue to comply with the June 29, 2001 BO flow requirements at this time would take too much water from future needs. The August 2, 2002 proposal, although it has not been shown by the agencies

to meet the standard of a reasonable and prudent alternative that will avoid jeopardy to the silvery minnow, seems the best Court-imposed temporary solution in this vacuum, for several reasons. Most of the remaining silvery minnows are located in the San Acacia reach (indicated by the fact that the catch rates there are over 95%), and the Court's Order ensures delivery of 50 cfs of water to that reach, which is the lowest flow rate at San Acacia the FWS deemed adequate, in the June 29, 2001 BO, to protect the silvery minnow in the San Acacia Reach. Additionally, although the habitat in the Albuquerque Reach is less hospitable for the silvery minnow, that is where relocation efforts have been aimed, and the BOR's August 2, 2002 proposal keeps that reach wet. It is reasonable to expect that any silvery minnows that survive in the Albuquerque Reach will spawn in the spring of 2003, perhaps augmented by captive populations, and will provide some repopulation to the Isleta Reach in 2003. The Isleta Reach may be completely dewatered most of the remainder of this year, and the small existing minnow population there likely will expire.

Another factor that enters into the Court's decision to adopt the flow requirements of the BOR's August 2, 2002 memorandum on a temporary basis is that this may extend for a crucial period the use of what little supplemental water BOR has remaining. There was testimony that the rains which occurred in New Mexico the week of September 9, 2002, helped prolong the supply of that supplemental water by allowing BOR to ramp down the flow out of upstream storage from 600 cfs to 300 cfs. There has been some rain since the week of September 16, 2002 (it rained during the hearing on September 18), which may help to prolong further that supply. But barring significant additional precipitation soon, it is likely that the supplemental water will still run out before the end of September, at which time BOR must use some other source or sources of water, even if it cannot find that water from a willing seller.

It is the Court's intent to avoid the excessive use of water that would be required to keep the June 29, 2001 BO in place in this exceptional drought year. For that reason, the Court announced its ruling -- that BOR would no longer have to abide by the flow requirements of the June 29, 2001 BO -- in open court on Wednesday, September 18, 2002. Additionally, the Court asked Plaintiffs to agree that BOR could immediately ramp down flows, and to their credit, Plaintiffs agreed not to challenge that action. Therefore, beginning September 18, 2002, BOR was able to reduce the flow of the remaining supplemental water to the levels BOR proposed in its August 2, 2002 memorandum.

The following Findings of Fact and Conclusions of Law support the Court's decision to relieve the BOR from continuing to meet the flow requirements of the June 29, 2001 BO, to require the BOR, temporarily, to use the lesser flows proposed in BOR's August 2, 2002 memorandum, and to have the BOR consult right away with the FWS about avoiding jeopardy or, if they choose, to seek an exemption under the ESA from having to protect further the silvery minnow.

**Findings of Fact**

A. Silvery Minnow Background

1.     The Rio Grande Silvery Minnow formerly was one of the most widespread and abundant fish species in the Rio Grande basin. Before the construction of dams and diversion structures, the silvery minnow was found in the Rio Grande basin as far north as Espanola, New Mexico, down to the mouth of the river at the Gulf of Mexico. The silvery minnow was also located in the Pecos River, a major

tributary of the Rio Grande, from Santa Rosa, New Mexico, downstream to its confluence with the Rio Grande in Texas.

2.   Currently, the silvery minnow is found only in parts of the 176-mile stretch of the middle Rio Grande between Cochiti Dam and the headwaters of Elephant Butte Reservoir, which is about 5% of its historic range. The silvery minnow has been extirpated from the Pecos River entirely. Diversion dams in the middle Rio Grande restrict the upstream movement of the silvery minnow, and the silvery minnow's only remaining habitat has been degraded significantly, making it less and less hospitable to the silvery minnow.

3.   The silvery minnow is the last-remaining endemic pelagic spawning minnow in the Rio Grande basin, and it has been steadily declining since it was listed as endangered under the Endangered Species Act in 1994, only eight years ago. Four other pelagic spawning minnow species formerly found in the Rio Grande basin have already gone extinct.

4.   Pelagic spawners lay semi-buoyant eggs that float downstream. Historically, they repopulated areas upstream by the young and adult fish swimming upstream. The dams and diversion structures have restricted natural upstream repopulation, resulting in more and more concentration of the remaining silvery minnow population in the San Acacia Reach, the lowest reach of the middle Rio Grande.

5.   The silvery minnow is a short-lived fish that requires sufficient flowing water with low to moderate currents to sustain it through each of its life stages.

6.   The alarming decline in abundance of the silvery minnow during the last eight

years, from 1994 to the present, is well-documented. The steady decline in the cumulative catch rate of the silvery minnow continued between 1999 and 2000 and remains "exceedingly low today." Robert K. Dudley and Steven P. Platania, "Summary of Population Monitoring of Rio Grande Silvery Minnow (1994-2002)" (Sept. 10, 2002). *FWS Supp. 469.*[1] Moreover, the number of silvery minnows collected in August 2002 is one of the lowest ever and "is indicative of alarmingly small population levels." *Id.* The most recent monitoring data indicate that the great majority of silvery minnows now are located in the San Acacia Reach, a stretch of the river very susceptible to drying. *See id.* In fact, in 1998, over 98% of the silvery minnow catch, by number, was from the San Acacia Reach. *Id.* This indicates that a "significant" portion of the silvery minnow population resides in the San Acacia Reach. *Id.*

7. FWS last searched for silvery minnows in the Cochiti Reach during 1994. There is no evidence in the record that any silvery minnows remain in the Cochiti Reach.

8. The 2002 Dudley and Platania report concludes that "ensuring the continued long-term existence of viable, self-sustaining wild populations must be the overriding goal prior to the initiation of a myriad of recovery efforts." *FWS Supp. 469.*

## B. River Sections

9. The 176-mile stretch of the middle Rio Grande now occupied by the silvery minnow has three diversion dams that span the river: the Angostura diversion

---

[1] References "*FWS Supp. __*" are to documents in the Administrative Record lodged with the Court in support of the Biological Opinion of September 12, 2002.

dam, located north of Bernalillo; the Isleta diversion dam, located south of Albuquerque, and the San Acacia diversion dam, located north of Socorro. In the documents that form the recently-lodged Administrative Record, the various segments of the middle Rio Grande are referred to by different names. The Court will use the following terms to describe sections of the middle Rio Grande from the upstream end at Cochiti Dam to the downstream end at Elephant Butte Reservoir:

    a.    the "Cochiti Reach" will refer to the stretch between Cochiti Dam and Angostura diversion dam (about 23 river miles);

    b.    the "Albuquerque Reach" will refer to the stretch between Angostura and Isleta diversion dams (about 40 river miles);

    c.    the "Isleta Reach" will refer to the stretch between Isleta and San Acacia diversion dams (about 53 river miles); and

    d.    the "San Acacia Reach" will refer to the stretch between San Acacia diversion dam and the headwaters of Elephant Butte Reservoir (about 60 river miles).

## C. BOR's Response to the 2002 Drought and Eventual Reinitiation of Consultation

10.    In early 2002, the BOR knew about the prospect of extreme drought conditions. This was confirmed in April 2002 when the snow pack levels were determined to be far lower than normal.

11.    Despite its authority to reduce releases, the BOR nevertheless made all contracted deliveries of water under the San Juan-Chama Project and the Middle Rio Grande Project in 2002.

12.     The BOR attempted to find supplemental water for the silvery minnow by

        acquiring it from willing sellers.  In June 2002, the City of Albuquerque agreed to

        provide 40,000 acre-feet ("a-f") of water to the BOR for the silvery minnow and

        70,000 a-f to the MRGCD to prolong its irrigation season.  The water used by

        MRGCD irrigators provides "carriage" for the supplemental water that BOR

        provides for the silvery minnow.  The BOR knew that 70,000 a-f would not be

        enough for MRGCD to irrigate throughout the 2002 season.  Rather, the BOR had

        estimated that 86,000 to 106,000 a-f would be needed.

13.     As the drought continued, and after BOR had made virtually all 2002 contract

        deliveries under the SJCP and the MRGP, BOR woke up to the fact, previously

        apparent, that there was not enough water to avoid jeopardy to the silvery minnow

        this year and to provide for the needs of the silvery minnow and the water users in

        the Rio Grande basin in 2003.

14.     On August 2, 2002, the BOR finally requested reinitiation of consultation with the

        FWS, long after BOR knew or should have known that it would run out of 2002

        supplemental water needed to meet the flow requirements of the June 29, 2001

        programmatic Biological Opinion.

15.     In an August 2, 2002 memorandum from BOR Area Manager Kenneth G. Maxey

        to FWS Field Supervisor Dr. Joy Nicholopoulos, Mr. Maxey stated that the San

        Acacia Reach (which he referred to as the Socorro Reach) is the "most vital" to

        the silvery minnow's survival because "the majority of the population is there."

        The BOR proposed to direct water resources so that through October 31, 2002,

the Albuquerque Reach would remain wet with continuous flow, the Isleta Reach would be allowed to dry, and a minimum flow of 50 cfs would be provided to the San Acacia Reach at the San Acacia diversion dam. To reduce transport loss, the Middle Rio Grande Project conveyance channels would be used to bypass the Isleta Reach.

16.     The FWS began investigating and analyzing BOR's August 2, 2002 proposal but had not completed its review by August 30, 2002.

17.     On August 30, 2002, the BOR sent FWS another memorandum requesting reinitiation of consultation and proposing an alternative action to that proposed in the August 2, 2002 memorandum. This latest proposal was to keep only the Albuquerque Reach wet with supplemental water through September 2002, and to attempt to keep that reach wet through October 2002, if BOR were able to obtain additional water from the City of Albuquerque. Thus, the river would be allowed to dry through both the Isleta Reach and through what BOR had identified as the all-important San Acacia Reach.

18.     The BOR, however, has been unable to obtain additional supplemental water from the City of Albuquerque. Therefore, under the August 30, 2002 proposal, only the Cochiti Reach could remain wet after October 1, 2002, and the rest of the Albuquerque Reach would dry all the way to the City of Albuquerque's Rio Bravo sewage treatment plant, where effluent from the plant is discharged into the riverbed.

19.     When BOR submitted its August 30, 2002 memorandum, BOR withdrew the

proposal in its August 2, 2002 memorandum.

20.     The FWS reinitiated consultation with BOR under Section 7 of the ESA in
        response to the BOR's August 30, 2002 memorandum.  Consultation was over the
        proposed action in that memorandum that could allow up to 150 miles of the
        middle Rio Grande to dry during the remainder of 2002.

21.     The BOR has adopted an agency policy that it will not release water from Heron
        Reservoir in 2002, will not reduce contract deliveries under the SJCP and the
        MRGP in 2003, and will not restrict diversions by MRGCD in 2003 to benefit the
        silvery minnow without a court order.  The FWS accepted this policy without
        questioning its legal basis.

22.     BOR and FWS did not fully consider releasing water from Heron Reservoir for the
        remainder of 2002 to provide water for the silvery minnow to meet the
        requirements of the ESA, even though BOR has the legal authority to do so.

D.  Rights to Water Currently Stored in Heron Reservoir

23.     The SJCP contracts are annual contracts under which the contractors cannot carry
        one year's unused water forward into succeeding years.

24.     The City of Albuquerque has no present claim to water now stored in Heron
        Reservoir because it has received all of its 2002 contract deliveries.  At most, the
        City has an inchoate expectation to receive the full amount of its 2003 contract
        deliveries during 2003.  That expectation, however, is subject to factors that affect
        the amount of water available.

25.     The MRGCD, too, has no present claim to water now stored in Heron Reservoir

16

because it has received all of its 2002 contract deliveries. Some of the 2002 water released from Heron Reservoir to MRGCD may still be stored downstream in El Vado Reservoir for irrigation purposes, including the purpose of supplying water to satisfy the prior and paramount rights of Indian Pueblos in the middle Rio Grande basin during the rest of the Pueblos' irrigation season, which ends mid-November, 2002.

## E. Analysis of the Biological Opinion of September 12, 2002

26. The BO of September 12, 2002, proposes to "target" flows in the Albuquerque Reach and provide no flows elsewhere downstream. The BO finds that this action will likely jeopardize the continued existence of the silvery minnow, but the BO contains no reasonable and prudent alternative to avoid jeopardy, and it provides no coverage for incidental take. The September 12, 2002 BO states: "Any incidental taking is prohibited by section 9 of the Act."

27. The BOR relied on hydrological calculations for the middle Rio Grande in 2003 and beyond to justify not releasing any water stored in Heron Reservoir to meet the flow requirements contained in the June 29, 2001 BO, or even to meet a target flow in the Albuquerque Reach for the remainder of 2002.

28. The BOR's calculations that it used to project the hydrograph for Heron Reservoir and the middle Rio Grande in 2003 and beyond:

 a. assumed that BOR would deliver the full annual San Juan-Chama Project contracted volume of 91,210 a-f and would not reduce contract deliveries in 2003 for SJCP contractors,

17

b.  assumed that BOR would deliver the full annual MRGP volume and would not reduce deliveries under the MRGP or restrict diversions by MRGCD in 2003,

c.  were premised upon unspecified weather predictions of a long-term dry spell for the next 10-15 years, and

d.  indicated the need for a spike of water in the spring of 2003 to induce spawning.

29.  FWS based its September 12, 2002 Biological Opinion in part on the ability to "ensure the silvery minnow's survival during this drought of record through artificial assistance." FWS stated that it has 150,000 to 200,000 silvery minnows safely held in captivity in five different locations that can be stocked into the river to augment populations when water conditions allow.

30.  The degree of river drying allowed by the September 12, 2002 BO could eliminate well over 95% of the small remaining wild silvery minnow population in the Rio Grande.

31.  The present biological condition of the silvery minnow is so severe that extensive river drying in the San Acacia Reach could result in the extinction of the silvery minnow in the wild.

32.  No biologists have estimated the number of silvery minnow in each reach. The only evidence in the record is of silvery minnow catch rates or densities in each reach. The catch rates or densities have been declining significantly in every reach of the middle Rio Grande.

33.	Without a sufficient wild silvery minnow population, augmentation from a captive silvery minnow community will not assure survival.

34.	The report from minnow genetic expert Thomas F. Turner, Ph. D., states that the "goals for hatchery augmentation should seek to contribute sufficient numbers to maintain 100,000 to 1,000,000 adult fishes (e.g., sexually mature and capable of reproduction) in the wild to ensure sufficient genetic variability to minimize long-term risk of extinction." *FWS Supp. 13*.  The record is devoid of evidence that, with the drastically limited flows resulting from the September 12, 2002 proposal, it can reasonably be expected that enough silvery minnow will survive in the wild to maintain, with augmentation, 100,000 to 1,000,000 adult silvery minnows capable of reproduction in the wild.

35.	Dr. Turner also noted that domestication selection conducted in the hatchery "will result in the introduction of genotypes that have reduced fitness when repatriated into the wild." *Id.*

36.	Moreover, Dr. Turner cautioned that current estimates of the number of fish held in captivity are based on "pre-reproductive life stages," resulting in a "substantial reduction in the actual number of adult, sexually mature fishes that are successfully repatriated." *Id.*  Nothing in the record states how many of the 150,000 to 200,000 silvery minnows that FWS says are safely held in captivity are sexually mature and capable of reproduction and can be successfully repatriated in the wild.

37.	The best scientific data available does not support FWS's assertion that it can "ensure the silvery minnow's survival during this drought through artificial

assistance." *FWS Supp. 481 at 28.*

38. During their consultation, BOR and FWS also assumed that drought conditions would persist for 10-15 years.

39. The record does not support the assumption that drought conditions will persist for the next 10-15 years. Rather, historical data in the Administrative Record suggest that the next 10 years will not be as dry as the drought years of 2000 and 2002. There are no reliable meteorological predictions in the Administrative Record indicating the drought will continue in the future. BOR's assumption about long-term dry conditions was based on current drought conditions, Mr. Maxey's distrust of meteorological weather predictions, and Mr. Maxey's self-described "conservative nature."

40. Although the September 12, 2002 BO at page 26 contains the conclusory statement, "Meteorological predictions appear to indicate that we are actually entering a dry weather cycle, not a wet one," no witness was able to point to factual support in the record for this conclusion.

41. The BOR gives the benefit of the doubt to a dire drought prediction, not to the silvery minnow. BOR and the FWS propose to put the silvery minnow in certain jeopardy now based on the assumption of continued drought conditions in the future.

42. FWS, in consultation with BOR, rejected the notion of releasing Heron Reservoir water to avoid jeopardy to, and take of, the silvery minnow during the rest of 2002, pointing to the biological need of the silvery minnow for a spring spawning

spike in 2003.

43.     A one-time release of only 1,850 cfs of water at Cochiti Dam, which equates to less than 4,000 a-f, was needed in the spring of 2002 to induce a cue for successful silvery minnow spawning.

44.     BOR and FWS did not fully consider reducing and prorating SJCP and MRGP contracted water deliveries in 2003 in order to make water available during the remainder of 2002 to meet the requirements of the ESA, even though this Court previously determined that BOR has the legal authority to do so.

45.     The policy of the BOR not to prorate water deliveries to San-Juan Chama Project contractors and/or not to restrict deliveries to MRGCD absent a court order, a policy that was accepted as given by the FWS, demonstrates that the federal agencies did not fully and meaningfully consult about all possible options and alternatives available to protect the silvery minnow and its habitat.

46.     In the consultation between FWS and BOR leading up to the September 12, 2002 BO, the potential harm to SJCP and MRGP contractors in releasing water from Heron Reservoir was emphasized while the harm to the silvery minnow was downplayed.

47.     If FWS and BOR simply return to the June 29, 2001 programmatic BO at the beginning of 2003 without fully considering using their legal authority to reduce SJCP and MRGP contract deliveries and restricting MRGCD diversions, and if 2003 is another drought year or water supply is still reduced, as BOR has assumed, BOR will not be able to meet the flow requirements contained in the June 29, 2001

BO without reducing the Firm Yield pool in Heron Reservoir.

48.     This scenario might be avoided in 2003 with proper planning and use by BOR of
        its legal authority to reduce Project contract deliveries before they are made, if
        necessary to avoid jeopardizing the continued existence of the silvery minnow.

49.     The BOR and FWS have exceeded, or are in imminent danger of exceeding, the
        amount of dead silvery minnow identified as incidental take in the Incidental Take
        Statement of the June 29, 2001 BO.

F.  Court's Rationale for Injunctive Relief Chosen

50.     There is evidence in the Administrative Record that letting the Isleta Reach dry
        while still maintaining a flow of 50 cfs at San Acacia Diversion Dam during the
        remainder of 2002 will require considerably less water than the flow requirements
        of the June 29, 2001 BO.  Record evidence, supplemented by testimony, indicates
        that 40,000 a-f to 80,000 a-f would be required to meet the flow requirements of
        the June 29, 2001 BO; 30,000 a-f to 34,000 a-f would be required to meet the
        flow requirements of the August 2, 2002 proposal; and 16,000 a-f to 18,000 a-f
        would be required to keep the Albuquerque stretch flowing, which is the "target"
        of the August 30, 2002 proposal.

51.     BOR had stated in the August 2, 2002 memorandum that its August 2, 2002
        proposal would avoid jeopardy.  During the hearing on September 18, 2002, the
        Area Manager for BOR opined that the August 2, 2002 proposal would avoid
        jeopardy.

52.     Release of water from Heron Reservoir in 2002 to meet the flow requirements in

the August 2, 2002 proposed action by BOR is economically and technically feasible, even if there is no more rain this year.

53.    Release of water from Heron Reservoir in 2002 to meet the flow requirements in the August 2, 2002 proposed action by BOR has a reasonable chance of avoiding jeopardy to the silvery minnow.

54.    The option of keeping only the Albuquerque Reach wet through September 2002 allows the death of all or most minnows in the San Acacia Reach, where they are most populous and where habitat appears to be most favorable.  That option presents too great a risk to the silvery minnow because of the weak evidence that there are sufficient minnows remaining in the Albuquerque Reach to enable wild repopulation in future years, even with augmentation and successful spring spawns.

55.    The proposed flow levels in BOR's August 2, 2002 memorandum use less water than the flow requirements in the June 29, 2001 BO, while leaving enough water in upstream reservoir storage, which will be available in 2003, for BOR to have sufficient flexibility in planning releases in 2003 to meet its ESA duties and to maximize contract deliveries of water needed by users in the middle Rio Grande.

56.    The proposed flow levels in BOR's August 2, 2002 memorandum require that 50 cfs of water be delivered to the San Acacia Reach, which is reasonable because that is where the minnows are found in greatest concentrations and where minnow habitat appears to be most favorable.  In the June 29, 2001 BO, FWS determined that this was a sufficient minimal flow to protect the silvery minnows in the San

Acacia Reach.

57. The proposed flow levels in BOR's August 2, 2002 memorandum require that the Albuquerque Reach remain wet, and information in the record indicates that some spawning occurred in this reach during the spring of 2002. Also, this is where rescued silvery minnows are being relocated. In addition, this option offers a reasonable potential for some repopulation of the Isleta Reach, which is being allowed to dry in 2002, through an upstream Albuquerque Reach spawn in the spring of 2003.

58. The part of the Court's Order that requires flows as proposed in BOR's August 2, 2002 proposal is temporary in nature. The Court's Order also will require BOR and FWS to begin further consultation immediately in an effort to develop a new BO that may require less water to protect the silvery minnow.

59. If BOR and FWS conclude that 2003 water deliveries to contractors must be reduced in order to avoid jeopardy to the silvery minnow, under the Court's Order, the contractors must be compensated for the amount of contracted water not delivered to them.

**Conclusions of Law**

A. The Court has jurisdiction over the subject matter of this action.

B. A BO issued under the ESA is entitled to deference and is reviewed under Administrative Procedures Act standards to determine whether the BO is arbitrary,

capricious, an abuse of discretion, or otherwise not in accordance with law. A BO is arbitrary and capricious if the agency has entirely failed to consider an important aspect of the problem or has offered an explanation for its decision that runs counter to the evidence before the agency. A BO also may be arbitrary and capricious if it is so implausible that it could not be ascribed to a difference in view or to agency expertise.

C. The Court cannot affirm a BO unless it is convinced the agencies relied on the "best scientific data available " and fully considered all available options for avoiding jeopardy.

D. The September 12, 2002 BO is arbitrary and capricious because the agencies did not fully consider all available options in order to meet their obligations under the ESA.

E. The September 12, 2002 BO is arbitrary and capricious because it did not fully consider releasing water from Heron Reservoir during the remainder of 2002 to benefit the silvery minnow.

F. Release of water from Heron Reservoir in 2002 to meet the flow requirements in the August 2, 2002 proposed action by BOR is consistent with the intended purposes of the San Juan-Chama Project legislation.

G. The September 12, 2002 BO is arbitrary and capricious because it did not fully consider prorating 2003 contract deliveries to San Juan-Chama Project and Middle Rio Grande Project contractors and/or restricting 2003 deliveries to MRGCD in order to make water available during the remainder of 2002.

H.  The September 12, 2002 BO is arbitrary and capricious because it proposes to allow jeopardy to the silvery minnow by allowing excessive drying in the middle Rio Grande during the remainder of 2002 based on dire drought predictions for the coming years that are not supported by sufficient evidence in the record.

I.  The September 12, 2002 BO is arbitrary and capricious insofar as it proposes to revert, as of January 1, 2003, to the June 29, 2001 BO, which contains no provision for drought conditions other than reinitiation of consultation. Reinitiation of consultation is meaningless unless BOR is willing to consider fully using its legal authority to manage the river operations.

J.  The September 12, 2002 BO is arbitrary and capricious in that the FWS relies on artificial assistance as a means of assuring that the silvery minnow will not go extinct, which is not supported in the record by the best available scientific data.

K.  The BOR has legal authority to release water from Heron Reservoir during the rest of 2002.

L.  The BOR has discretion and authority to restrict and prorate future contract deliveries under the SJCP and MRGP.

M.  The BOR has discretion and authority to restrict diversions by MRGCD under the MRGP.

N.  Under the traditional standard of the Court of Appeals for the Tenth Circuit, a court must balance the following factors in determining whether a preliminary injunction should be granted: (1) the likelihood of success on the merits, (2) the potential for irreparable harm if the injunction is denied, (3) the balance of

interests, and (4) the public interest.

O.     Two other Circuit Courts have held that, when a preliminary injunction concerns the ESA, the traditional balancing of hardships is inapplicable because Congress, in enacting the ESA, decided that the balance of hardships and the public interest tips heavily in favor of protected species.  *See National Wildlife Federation v. Burlington Northern R.R., Inc*., 23 F.3d 1508, 1511 (9th Cir. 1994) (citing *TVA v. Hill*, 437 U.S. at 174); *Strahan v. Coxe*, 127 F.3d 155, 160 (1st. Cir. 1994).

P.     Plaintiffs have succeeded on the merits of their Eighth Claim for Relief in their Third Amended Complaint because the Court has found the September 12, 2002 BO to be arbitrary and capricious.

Q.     Plaintiffs are likely to succeed on the merits of their First (jeopardy), Second (failure to conserve), and Fourth (take) Claims for Relief in their Third Amended Complaint.

R.     Based on clear and convincing evidence, the potential harm to the silvery minnow if injunctive relief is denied is imminent and irreparable.

S.     A balancing of interests favors the immediate and long-term needs of the silvery minnow over the long-term interests of the water users in the middle Rio Grande basin.

T.     The public interest, as expressed by Congress in the ESA, weighs heavily in favor of granting an injunction.

U.     Plaintiffs have met their burden under either the traditional test or the modified ESA test, as adopted by two Circuit Courts, for determining whether a preliminary

injunction should be granted.

V.    Given the Department of Reclamation's and the Department of Interior's express policy not to release water from Heron in 2002 to benefit the silvery minnow without a Court Order, coupled with FWS's acquiescence in that policy, a remand to FWS is not warranted at this time because of the threat of imminent and irreversible harm to the survival and recovery of the silvery minnow.

W.    A stay by this Court of its Order pending appeal is not justified because of the dire condition of the silvery minnow and the need for the immediate implementation of this Court's Order in order to avoid immediate and irreparable harm to the silvery minnow.


_____
CHIEF UNITED STATES DISTRICT JUDGE