## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

| | | |
|---|---|---|
| RIO GRANDE SILVERY MINNOW, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| v. | ) | CIV 99-1320 JP/RHS-ACE |
| | ) | |
| JOHN W. KEYS III, et al., | ) | |
| | ) | |
| Federal Defendants, | ) | |
| and | ) | |
| | ) | |
| MIDDLE RIO GRANDE CONSERVANCY | ) | |
| DISTRICT, et al., | ) | |
| | ) | |
| Defendant-Intervenors. | ) | |
| _____ | ) | |

## FEDERAL DEFENDANTS' AND PLAINTIFFS' PROPOSED FINDINGS

## OF FACT REGARDING MRGCD'S SECOND AMENDED CROSS CLAIMS

Pursuant to the Court's July 26, 2004 "Scheduling Order" [Doc. No. 624], Federal

Defendants and Plaintiffs hereby submit the following joint proposed Findings of Fact relating to

the Second Amended Cross-Claims of the Middle Rio Grande Conservancy District

("MRGCD") for the October 19, 2004 trial on the merits in this matter:

## SUMMARY FINDINGS OF FACT

1.     The record before the Court demonstrates that MRGCD knew before entering into

the 1951 Repayment Contract that it was required to transfer title to all Middle Rio Grande

Project properties to the United States, and that title to those properties would remain with the

United States until Congress provided otherwise.  MRGCD executed the 1951 Contract, the

1953 "Grant of Easement," hundreds of additional conveyance instruments including the 1960

grant of easement for El Vado Dam and Reservoir and the 1962 blanket county-by-county grants

of easements, with the understanding and intent of conveying title to Project properties to the United States.

2.      From 1951 through 1999, MRGCD almost invariably recognized that the United States held title to Project properties and that the United States would hold such title until Congress authorized conveyance of that title to MRGCD. MRGCD acknowledged and promoted the United States' interests in title to its advantage in numerous court cases all the way to the United States Supreme Court, in dealings with the public and with federal agencies including Reclamation, and in testimony before Congress and the New Mexico State Legislature.

3.      Likewise, the United States also understood and intended to acquire title to Middle Rio Grande Project properties in accordance with federal Reclamation Law, the United States Constitution, the Acts of Congress creating the Middle Rio Grande Project, and the 1951 Repayment Contract. The United States requested that MRGCD convey title to existing works and real property to the United States prior to beginning the reimbursable portions of the Project, and the United States understood and relied on the 1953 "Grant of Easement" to be that conveyance instrument. The United States relied on the 1953 "Grant of Easement" throughout the construction phase of the Project to expend millions of dollars on the Project, even after execution of the 1962 county-by-county grants of easement that MRGCD argues replaced the 1953 "Grant of Easement."

4.      In sum, the record demonstrates that both MRGCD and the United States understood that title to all Middle Rio Grande Project properties rested with the United States, including El Vado Dam and Reservoir, Angostura and San Acacia Diversion Dams, and the Albuquerque Main Canal and Riverside Drain. MRGCD's arguments that the United States never acquired title to Project works and properties are at odds with the facts.

-2-

## HISTORY OF THE MIDDLE RIO GRANDE PROJECT

## I.   ESTABLISHING A PLAN FOR THE FEDERAL MIDDLE RIO GRANDE PROJECT

5.      With a few minor exceptions, ownership of the works of the MRGCD is based upon titles dating back to the 1920s and 1930s wherein the MRGCD acquired the land needed for ditches, drains, dams, reservoirs, and other purposes in fee simple or through easement interests through purchases from fee simple title holder individuals.  See, e.g., Trial Exhs. 6, 9-49 (Exhs. 14-17 to MRGCD's March 25, 2002 Second Amended Cross-Claims, Doc. No. 366).

6.      Many Middle Rio Grande Project properties were not acquired through purchase but by operation of law and other means.  For example, title to property interests in thousands of additional Project properties that MRGCD did not hold prior to the 1950s were acquired thereafter for the United States' rehabilitation of the Project pursuant to federal law.  See Trial Exh. 402 (Declaration of Rik Arndt ("Arndt Decl."), US-A) ¶ 22.  Title to many of these additional Project property interests was acquired directly by the United States through condemnation actions or by direct conveyance to the United States from third parties.  See, e.g., Trial Exhs. 249, 250 (US146, US147).  The majority of the title interests, however, were acquired by MRGCD (either through direct conveyances or condemnation actions) pursuant to Article 27 of the 1951 Repayment Contract and assigned to the United States pursuant to Article 26.  See, e.g., Trial Exh. 402 (Arndt Decl. US-A) ¶ 22.

7.      MRGCD originally constructed the major diversion dams of the Middle Rio Grande Project in the 1920s and 1930s.  MRGCD was formed as a quasi-state agency in the mid-1920's, pursuant to the New Mexico Conservancy Act, for purposes of "flood control, drainage, storage of water with a proper distribution system, and river control."  Ira Clark, Water in New

Mexico: A History of Its Management and Use (1987) at 209.  MRGCD consolidated water

rights and irrigation systems in the Middle Valley during the 1920's and 1930's.  By the 1940's,

however, MRGCD was essentially bankrupt and in default on its bonds, with many of its

facilities in disrepair. Bureau A.R. 305 (1947 Plan excerpts); TrialEXs 50, 350 (US004 (1947

Plan excerpts), US199 (1993 MRGCD Water Policies Plan)) at 21-3.  This fact, coupled with

flooding on the Rio Grande in the early 1940's, led to pressure for a federal government takeover

of the District and expansion of federal flood control and river management activities through

the Middle Rio Grande Project.  Id.

       8.      The Middle Rio Grande Project was launched on November 21, 1947, when the

Bureau of Reclamation and the Corps of Engineers agreed to a "unified plan for control of

floods, irrigation, and use of water in the Middle Rio Grande Basin."  Bureau A.R. 305, p.8938

(1947 Plan excerpts); Trial Exh. 50 (US004 (1947 Plan excerpts)).  Pursuant to that agreement,

the Bureau and the Corps released detailed studies in 1947 and 1948, respectively, proposing the

Middle Rio Grande Project Plan to reconstruct and expand irrigation facilities in the Middle Rio

Grande and to develop flood/sediment control facilities.  Trial Exhs. 50, 51 (US004, US005

(1948 Flood Control Act)); Bureau A.R. 305 (1947 Plan excerpts); Exh. 12 to Ptfs' Motion for

Partial SJ (excerpts from 1948 Corps Plan) (Doc. No. 13).

       9.      In his cover letter transmitting the Plan to the Secretary of the Interior, the

Commissioner of Reclamation stated that despite the efforts of MRGCD since its establishment

in 1925,

> the economic stability of the Middle Rio Grande Valley is again being threatened
> by a combination of problems with which the local people can no longer cope.
> Progressive aggradation of the river channel has caused, and is continuing to
> cause, a general rise in water table throughout much of the valley floor where
> practically all of the cultivated lands are located. This has resulted in excessive

water-logging and abandonment of productive land, reduction in crop yields on the remaining affected lands, delinquency in repayment of charges with resultant financial difficulties on the part of [MRGCD], a progressive increase in flood damages, and an increase in uncontrolled non-beneficial consumptive use of water to a point where New Mexico will soon be unable to make water deliveries to Texas required by the Rio Grande Compact, and at the same time be able to continue the present irrigation uses of water.

* * *

The plan provides for the rehabilitation and extension of the existing irrigation and related drainage systems . . ., major drainage works, and channel rectification and levee improvements to control sedimentation and flooding in the Middle Rio Grande Valley. *An important and necessary part of the plan is the acquisition by the Government of the existing works of the Conservancy District*, the proceeds accruing to the District from this purchase by the Government would be used to retire the outstanding indebtedness of the District which now amounts to $7,426,280.

* * *

In view of the critical nature of the consequences of accelerated erosion of the sedimentation of the reservoirs and aggradation of the river bed, it is most desirable that immediate steps be taken to institute proper control measures on the watershed, and it is recommended that the present programs to accomplish this purpose be enlarged and that a comprehensive program be undertaken by the appropriate federal agencies at the earliest practicable date.

* * *

The day by day assistance and full cooperation of [MRGCD] has been not only helpful, but essential to the prudent consideration of several features of the plan.

Trial Exh. 50 (US004) (emphasis added).

10.     The 1947 Plan states:

Rehabilitation of the Conservancy District would involve: *first, the acquisition of the existing works*, free from indebtedness, . . .; second, rehabilitation and extensions of distribution and drainage works to restore maximum productive capacity to the irrigated lands; and third, a development program consisting of adapting the land to irrigation and construction or rehabilitation of farm laterals.

Trial Exh. 50 (US004) at 8 (emphasis added).

11.     The 1947 Plan states:

*Acquisition of the existing irrigation, drainage, and flood control works of the Conservancy District is an essential part of the plan* and the total project cost includes a sum for this purpose.

-5-

Trial Exh. 50 (US004) at 15 (emphasis added).

12.     The 1947 Report describes in detail the MRGCD facilities to be acquired by the

federal government:

> The principal features of the district works are as follows:
>     1. El Vado Dam and Reservoir--capacity 200,300 acre-feet.
>     2. Cochiti, Angostura, Isleta, and San Acacia Diversion Dams.
>     3. Atrisco and San Juan Canal Headings.
>     4. Corrales Siphon across Rio Grande.
>     5. 767 miles of canals, acequias, and laterals.
>     6. 342 miles of drains.
>     7. 180 miles of riverside levees.
>     8. Jetties and other river control works.

Trial Exh. 50 (US004) at 32.

13.     The 1947 Report also describes in detail the new construction or improvements

which the Bureau would undertake as part of the Middle Rio Grande Project.  Trial Exh. 50

(US004); Bureau A.R. 305, Bureau A.R. 374 (1999 Bureau Summary of references to MRG

property interests).  The 1947 Plan states:

> The works agreed upon by the Corps of Engineers and the Bureau of Reclamation
> would consist of the existing works of the Middle Rio Grande Conservancy
> District, as modified by rehabilitation. . . .  Rehabilitation of the works would
> include needed repairs to the El Vado Dam, spillway, and outlet works, and
> revision of the auxiliary dike southwest of the dam to permit emergency spills for
> floods. . . Necessary repairs would be made to the concrete-lined settling basin of
> the desilting works at the Angostura Dam. . . The Isleta diversion dam. . . would
> be rehabilitated for permanent use. . . Of the existing 180 miles of canals, 175
> miles would be rehabilitated. . . of the 587 miles of existing laterals, 499 miles
> would be rehabilitated. . . Rehabilitation of the canal and lateral system would
> involve cleaning the system of accumulated sediment and brush; acquisition, for
> maintenance purposes, of rights-of-way on non-Indian acequias; installation of
> concrete turnouts; installation of measuring devices. . . replacement of timber
> structures with concrete [and other work]."

Trial Exh. 50 (US004) at 64-5.

14.     The 1947 Plan further indicates the overall steps that were necessary for a

successful Project:

> In general, any contract between the district and the United States should be made
> in pursuance of the Federal Reclamation Laws. * * * By the terms of such
> agreement it should be provided among other things that:
>
> (1) *The United States will agree to acquire the district's works at prices and on
> terms satisfactory to the Secretary,* the proceeds of which will be required to
> procure and cancel all outstanding obligations of the district, and no construction
> will be initiated until the United States has so acquired said works and all
> outstanding obligations of the district are retired and cancelled . . .;
>
> (2) *The district will agree to convey to the United States all of its property rights,
> including reservoirs, canals, dams, and flood control works* together with its
> water rights . . . with evidence of title and ownership thereto . . .; *such property so
> conveyed to the United States shall be so held until Congress otherwise directs*;"
> 　　　　　　　　　　　　　　* * *

Trial Exh. 50 (US004) at 97 (emphasis added).

15.     The 1947 Bureau Report repeatedly emphasized that transfer of all MRGCD

works to the Bureau was required in return for the federal bailout and improvements under the

Middle Rio Grande Project—including transfer not only of physical structures, but also of the

District's water rights.  Trial Exh. 50 (US004).  The 1947 Bureau Report states:

> The plan provides for the rehabilitation and extension of the existing
> irrigation and related drainage systems and the construction of three sediment and
> flood control reservoirs, major drainage works, and channel rectification and
> levee improvements to control sedimentation and flooding in the Middle Rio
> Grande Valley.  *An important and necessary part of the plan is the acquisition by
> the Government of the existing works of the conservancy district*; the proceeds
> accruing to the district from this *purchase* by the Government would be used to
> retire the outstanding indebtedness of the district. . .
> 　　　　　　　　　　　　　　* * *
> (2) *The district will agree to convey and assign to the United States all of
> its property rights, including reservoirs, canals, dams, and flood-control works,
> together with its water rights . . . such property so conveyed to the United States
> shall be so held until Congress directs otherwise. . . ."*

Id. at 148, 251 (emphasis added).

-7-

16.     An April 19, 1948, letter from the Bureau Commissioner to the Secretary of Interior stated that the process for retiring MRGCD's debt would be slightly different than originally thought.  Trial Exh. 57.  Rather than require that MRGCD use federal funds to retire its debt, the Interior Department decided to simply retire the debt directly itself.  Id. at 8.

17.     Congress authorized the federal Middle Rio Grande Project in the Flood Control Act of 1948, P.L. No. 858, 80th Cong., 62 Stat. 1171 (June 30, 1948), and Flood Control Act of 1950, P.L. 516, 81st Cong., 64 Stat. 163 (May 17, 1950).  Trial Exhs. 51, 56 (US005 and US006).  In so doing, Congress made clear that it was adopting the Project plan set forth in the Bureau and Corps reports.  Id.  The 1948 Act states:  "Middle Rio Grande Project.  The comprehensive plan for the Rio Grande Basin as set forth in the report of the Chief of Engineers dated April 5, 1948, and in the report of the Bureau of Reclamation dated November 21, 1947 . . . is hereby approved except insofar as the recommendations in those reports are inconsistent with the provisions of this Act and subject to authorizations and limitations set forth herein."  Trial Exh. 56 (US005) § 203.

18.     The provision also states that "at all times all project works shall be operated in conformity with the Rio Grande Compact as it is administered by the Rio Grande compact commission" and that "the Secretary of the Interior shall be governed by and have the powers conferred upon him by Federal reclamation laws . . . *except* as is otherwise provided in this Act *or in the reports referred to above*."  Id. § 203 (emphasis added). The Act grants the Secretary the approval to acquire the "bonds and other evidences of indebtedness of the [MRGCD] for the protection of the investment of the United States."  Id.

19.     The 1948 and 1950 Flood Control Acts authorized appropriation of $42,500,000 to the Corps and $30,179,000 to the Department of Interior for work on the Middle Rio Grande

Project.  Trial Exhs. 51, 56 (US005, US006).  The Bureau would also operate and maintain all facilities of Middle Rio Grande Project, including former MRGCD diversion dams and irrigation canals.  Id.   Many of the ditch alignments follow historic Pueblo Indian ditches. The ditch works operate by gravity flow in the same method used for centuries.  MRGCD Second Am. Cross – Cl. at ¶ 7; Fed. Defs' Answer at ¶ 7.

## II.   THE SEPTEMBER 24, 1951 REPAYMENT CONTRACT

20.   On September 24, 1951, MRGCD and the United States executed Contract 178r-423 entitled "Contract between the United States and the Middle Rio Grande Conservancy District for Rehabilitation and Construction of Project Works, and Repayment of Reimbursable Construction Costs Thereof" ("1951 Repayment Contract").  Trial Exh. 67 (US001).  The 1951 Repayment Contract was executed "in pursuance of the Act of Congress of June 17, 1902 (32 Stat. 388), and acts amendatory thereof and supplementary thereto and particularly the Acts of Congress of June 30, 1948, (62 Stat. 1171) and Act of May 17, 1950 (64 Stat. 163)."  Id. at 1.

21.   The New Mexico Supreme Court upheld the validity of the 1953 Repayment Contract, with the exception of a single provision that is not at issue in this litigation.  See Middle Rio Grande Water Users Assn. v. Middle Rio Grande Conservancy Dist., 57 N.M. 287, 258 P.2d 391 (N.M. 1953).  The United States and MRGCD deleted the offensive provision by amendment to the 1951 Repayment Contract dated June 19, 1953.  See Trial Exh. 76 (US018). After that amendment, the New Mexico Supreme Court validated the Contract.

22.   The 1951 Repayment Contract contains numerous provisions, including Article 9(a), which obligated the United States to acquire directly and retire MRGCD's outstanding bond indebtedness as a reimbursable cost of the Middle Rio Grande Project.  Trial Exh. 67 (US001) ¶ 9(a).  "[T]he District agrees to repay . . . the costs incurred by the United States in

acquiring said bonds through the District as described in Article 9(a) hereof, not exceeding a maximum of $7,560,000." Id. ¶ 11.

23.      The conveyance of title to property interests in Middle Rio Grande Project properties to the United States was contemplated and understood by MRGCD to be a necessary prerequisite to the initiation of the Bureau of Reclamation's construction and rehabilitation of the Project pursuant to federal reclamation law. See, e.g., Trial Exh. 61 (US008) at 3 (MRGCD Board being advised that the "United States will not do any work on any property for which they do not hold title," and indicating that "Reclamation Law, Section 7 was read by Mr. Macpherson [MRGCD's counsel], wherein it states that the Secretary has no authority to perform work on projects to which title is not vested in the United States"). This requirement is set forth in Article 27 of the Repayment Contract. See Trial Exh. 67 (US001) ¶ 27 ("The United States shall not commence construction of any feature of the project within the boundaries of the District until all necessary rights of way therefor have been secured, or satisfactory contracts entered into for the purchase thereof").

24.      Article 26 of the 1951 Repayment Contract--titled "DISTRICT WILL CALL AND CONVEY OUTSTANDING BONDS AND PROJECT WORKS TO THE UNITED STATES"--states that "[t]he District shall convey to the United States with title satisfactory to the Contracting Officer such of the District works now owned by the District, as shall be required to be conveyed to the United States as determined by the Contracting Officer"). Trial Exh. 67 (US001) ¶ 26. The Secretary of the Interior designated the Regional Director of the Bureau of Reclamation to execute the 1951 Repayment Contract on behalf of the United States. See Trial Exh. 66 (US011) at 1.

25.     The 1951 Contract anticipated that conveyance of title would occur both by operation of the contract itself and by way of future conveyance instruments, as it referred to title conveyed to the United States "under the terms of this contract or by any separate instruments executed pursuant to its terms."  Trial Exh. 67 (US001) ¶ 26.

26.     In addition to conveyance of pre-existing MRGCD works to the United States, the 1951 Contract also provides that the United States owns all works that it "constructed" as part of the Middle Rio Grande Project.  Trial Exh. 67 (US001) ¶ 29.  The contract defines "construction" broadly to include not just construction of new facilities, but also all the repairs and improvements undertaken by the Bureau on existing works – including work done on El Vado Dam, diversion dams, irrigation ditches and canals, and drains.  Trial Exh. 67 (US001) ¶ 8.[1]  Accordingly, as the Bureau itself has determined, "title to any facility or portion thereof which was constructed by the United States is vested in the United States," regardless whether any title was transferred from MRGCD to the United States.  Trial Exh. 359 (Dec. 1994 Bureau memo).

27.     The fact that the federal government never abandoned its plan to acquire MRGCD's assets is confirmed both by the 1951 Contract between MRGCD and the federal government (discussed below), and by reports prepared on the Middle Rio Grande Project in 1952 and 1953.  One appendix to the Definite Plan Report on the Middle Rio Grande Project that

---

[1]  The 1951 Contract states:  "The term construction, as used in this contract, shall consist of rehabilitation and extension of the irrigation and drainage system of the District, rehabilitation and repair of El Vado Dam, repairs to diversion dams and related irrigation and drainage structures; acquisition of outstanding bonds; and rectification of the Rio Grande Channel."  Trial Exh. 67, ¶ 8.

-11-

was prepared by the Bureau in June of 1952 states: "Rehabilitation would involve the following actions. *The existing works would be acquired, free of indebtedness . . .*"  Bureau A.R. 307 (1952 Bureau Definite Plan Report) at C-2 (emphasis added).  Another appendix to the Definite Plan Report prepared in August, 1953, makes reference to "the existing works [of MRGCD] *which are to be acquired by the United States.*"  Bureau A.R. 308 (1953 Bureau Definite Plan Report Appendix) at D-66 (emphasis added).

28.    Numerous documents in the records of both MRGCD and the United States indicate that the Contracting Officer specified Project properties that MRGCD conveyed to the United States pursuant to Article 26 of the 1951 Repayment Contract, including the properties identified in Count III of MRGCD's Second Amended Cross-Claims (El Vado Dam and Reservoir, San Acacia Diversion Dam, Angostura Diversion Dam, and properties associated with the Albuquerque Main Canal and Riverside Drain).  For example, during the construction phase of the Project, Reclamation and MRGCD were in almost constant communication about work Reclamation was planning to undertake.  These communications included identification of the property interests that MRGCD would need to acquire from third parties and assign to the United States in *addition* to properties conveyed by operation of the 1951 Repayment Contract and the 1953 "Grant of Easement."  See, e.g., Trial Exhs. 64, 78, 85, 95, 96, 97, 99, 102, 126, 131, 132, 133, 151, 154, 165 (US010; US019; US022 (1954 specifications for El Vado Dam rehabilitation); US026; US027; US028; US029, US032, US049, US051, US052, US053, US070 (1957 specifications for rehabilitation of Angostura Diversion Dam), US073, US082).

29.    For instance, even before the 1951 Contract was executed, Reclamation advised MRGCD in a letter dated August 10, 1951 that it was going to proceed with channelization on a stretch of the Rio Grande above Elephant Butte Reservoir at a cost of approximately $4 million,

and that "certain lands, easements, or rights-of-way will be required by the United States to permit construction and utilization of floodways, levees, channels, drains, and related facilities for regulating river waters." Trial Exh. 64 (US010) at 1. This letter includes a reference to a plat identifying the location of the properties "that must be conveyed to the United States prior to the start of the work on the channel," and indicates that the "character of the title obtained shall be at [MRGCD's] option, so long as it permits all proposed operations, etc., without liability, with the exception of the approximate 10-acre tract identified on the plat for use as a maintenance headquarters site, which must be conveyed in fee simple." Id. at 1-2.

30.     On October 22, 1951, Reclamation provided MRGCD with additional maps and descriptions of the properties required for this project and reminded MRGCD that "[b]efore any of this contract work can be started, the title must be conveyed to the United States." Trial Exh. 69 (US012) at 1. In accordance with Reclamation's request, MRGCD acquired title to numerous rights-of-way from the State Tax Commission of New Mexico for required for channelization work above Elephant Butte Reservoir and assigned that title to the United States. See Trial Exhs. 73, 74 (US015 and US016).

31.     Similarly, on September 8, 1953, Reclamation wrote to MRGCD concerning the construction of "approximately 3.3 miles of drain and low water dike in the Escondida area on the east side of the Rio Grande." Trial Exh. 78 (US019) at 1. The letter specifically refers to drawings identifying the work to be accomplished, references to "[MRGCD] maps No. 157, 158, and 159, showing the 300' strip of right-of-way required," a "right-of-way description," and a "Form of 'Grant of Easement.'" Id. at 1-2. The letter further notes that "[Reclamation] recently discussed the details of this work and the rights-of-way requirements with [MRGCD]." Id. at 1. Part of MRGCD's acquisition activities for this feature of the Project included a condemnation

-13-

action in state district court, in which MRGCD used the United States' interest in the Project as the basis for its need to acquire the properties at issue.  See Trial Exh. 91 (US024).

32.     The federal Middle Rio Grande Project included rehabilitation and extension of works originally constructed by MRGCD.  Trial Exh. 67 (US001) ¶ 9(b).

33.     The 1947 Plan for the Project contemplated that the United States would purchase existing MRGCD assets, and the proceeds would be used to pay off its existing bonded indebtedness.  Trial Exh. 57 (Report of the Regional Director, Bureau of Reclamation (August 30, 1947) in H. Doc. 653, 81st Cong., 2nd Sess. (July 24, 1950)) at 251-52.

34.     The proposed plan was modified such that the United States would pay off MRGCD's bonded indebtedness directly.  Trial Exh. 57 (Letter from the Commissioner of the Bureau of Reclamation to the Secretary of the Interior (April 19, 1948)) at 8.  Acquisition of MRGCD's existing works and property interests is contemplated in Article 26 of the Repayment Contract.  Trial Exh. 67 (US001) ¶ 26.

35.     Article 28 of the 1951 Contract called for MRGCD to assign "any and all" filings "for storage and use of water in the El Vado Reservoir" to be assigned to the United States.  Trial Exh. 67 (US001) ¶ 28.  On May 28, 1963, MRGCD conveyed to the United States permit 1690. Trial Exh. 225.  The conveyance contained no termination or reverter clauses, and specified no conditions under which the rights would be reconveyed to MRGCD.  MRGCD informed the New Mexico State Engineer Office of this transfer on June 27, 1963.  Trial Exh. 228 (US133). Reclamation acknowledged this transfer on July 11, 1963.  Trial Exh. 229 (US134).

36.     On January 29, 1951, the MRGCD Board discussed whether Project properties needed to be conveyed to the United States.  Trial Exh. 61 (US008) at 3.  The Board was informed that conveyance of Project properties to the United States was a necessary prerequisite

to initiation of construction by the Bureau of Reclamation pursuant to federal reclamation law, and that properties so conveyed could not be reconveyed to MRGCD without the consent of Congress. Id. The Honorable Sam Bratton suggested a provision whereby title conveyed to the United States would automatically revert to MRGCD upon MRGCD's repayment of its financial obligations under the Contract. Id. at 4. Lawyers for MRGCD proposed that the following language be added to Article 29 so that no congressional action would be required to return the works to MRGCD after repayment was completed:

> but that conveyance is upon the express understanding and condition that upon repayment or reimbursement to the United States, all equitable right and interest in the property conveyed to the United States under or pursuant to this contract shall be extinguished and shall revert to the District or its assignees.

Id.

37.    No such provision was included in the 1951 Repayment Contract. On the contrary, Article 29 of the Contract expressly states that title to all Project works constructed by the United States *and* all works conveyed to the United States "shall, as provided in Article 26, be and continue to be vested in the name of the United States *until otherwise provided for by Congress*," even after the transfer of operation and maintenance of any works to MRGCD. Trial Exh. 67 (US001) ¶ 29 (emphasis added).

38.    There is no evidence that the January 29, 1951 MRGCD Board discussion resulted in any change in what properties MRGCD was required to convey to the United States. In language nearly identical to the language of the final Repayment Contract, the January 25, 1951 draft of the Contract already stated that MRGCD "shall convey to the United States at prices and with title satisfactory to the Secretary, such of the project works now owned by the District, as shall be required to be conveyed to the United States as determined by the

Secretary."  Trial Exh. 59 (US007) at 12.  The only substantive change to this clause was the deletion of the "at prices" language, thereby indicating that the United States was not obligated to pay MRGCD directly for the conveyance of title to Project properties.  Trial Exh. 67 (US001) ¶ 26.  A provision was added to Article 26 recognizing that title to Middle Rio Grande Project properties "and additions thereto" would be reconveyed after MRGCD completed its repayment obligations, but only (and expressly) "*on consent of Congress,*" and only if such reconveyance is found not to adversely affect interests of the Indian Pueblos.  Id. ¶ 26 (emphasis added).

39.     Article 26 and Article 29 state that reconveyance back to MRGCD of the property conveyed to the United States would occur only after payment under the contract was complete *and* "on consent of Congress."  Article 26 states:

> This contract is executed upon the express understanding and condition that while the legal title to the District works conveyed to the United States under the terms of this contract or by any separate instruments executed pursuant to its terms may continue thereafter in the United States, upon full compliance by the District with all covenants required to be performed by it under the terms hereof, including the repayment in full to the United States of all sums of money and at times, and on conditions as herein provided, *and on consent of Congress, the United States will reconvey to the District all District works transferred to the United States, under the provisions of this contract, and additions thereto*; Provided, however, that any such reconveyance shall not adversely affect any common property right of the United States held for and on behalf of the Pueblo Indians.

Id. ¶ 26 (emphasis added).

40.     Similarly, Article 29  provides that the United States will retain title to both the "constructed" works and the other works conveyed to the United States "until otherwise provided for by Congress, notwithstanding the transfer hereafter of any such works to the District for operation and maintenance."  Id. ¶ 29.

## III.    THE NOVEMBER 24, 1953 "GRANT OF EASEMENT"

-16-

41.    The document labeled "Grant of Easement" executed by MRGCD on November 24, 1953, is but one of thousands of documents conveying title to Project property interests to the United States.  See, e.g., Trial Exh. 402 (Arndt Decl., US-A) ¶ 22.  The 1953 Grant of Easement states:

> [MRGCD] *assigns and conveys* to the United States of America all District works and real property required for accomplishment of the purposes set forth in [the 1951 Repayment Contract], *together with* the right, privilege and easement to construct, replace, operate, and maintain any structure the United States of America may deem necessary or desirable for the construction, operation and maintenance of the Middle Rio Grande Project *and* the right, privilege and easement to remove from or place on earth or rock, with the right of ingress and egress for men, materials and equipment for the purposes of carrying out the provisions of [the 1951 Contract] in and upon the real estate described in the official maps of [MRGCD], together with all structures on said real estate necessary to the operation of the irrigation and drainage system.

See Trial Exh. 82 (US002) at 1 (emphasis added).

42.    This 1953 Grant of Easement contained no reverter or termination clauses.  It was signed by the Vice-President of MRGCD, attested by the Secretary of MRGCD, and notarized. Although it was labeled "Grant of Easement," its terms are not limited to an easement but fee title to all District works and real property needed to carry out the 1951 Contract.  Trial Exh. 82 (US002) at 1.  By its terms, this Grant is not conditioned on any subsequent action by the United States; it is simply a conveyance of all Project works and real property needed to carry out the 1951 Contract.  Other than the diversion dams and El Vado Dam and Reservoir, most of the Project "works" consist of right-of-way easements for ditches, canals, drains, and channels.

43.    In his annual report dated November 23, 1954, MRGCD's Chief Engineer stated: "Pursuant to [the 1951 Repayment Contract], on November 24th, 1953, the District executed and delivered to the Government a Grant of Easement covering all District works and real property

-17-

required for accomplishment for the purposes set forth in the reclamation contract." Trial Exh. 87 (US023) at 9.

44.    The works and real properties that were necessary for the Middle Rio Grande Project are plainly identified in thousands of documents in the records of both MRGCD and the Bureau of Reclamation.  See generally, e.g., Trial Exh. 403 (Gorbach Decl., US-B).

45.    In reliance on the November 24, 1953 Grant of Easement, Reclamation officially initiated construction of the reimbursable aspects of the Middle Rio Grande Project less than a week later, on November 30, 1953.  Trial Exh. 139 (US059) at 1.

46.    In a memorandum dated December 1, 1954, the Field Solicitor from the Department of the Interior advised Reclamation that:

> [The 1953 Grant of Easement] was recommended originally as the only practical means of compliance with Article 27 of the [1951] Repayment Contract which prohibits initiation of construction until all necessary right of way therefor have been secured.  The features of the District to be rehabilitated include hundreds of miles of drains, laterals, and canals and an adequate description of the several units is itself a major project.  By this [1953 Grant of Easement] the District has guaranteed to the United States that it has acquired good title to the lands in question.  It is my understanding that since construction and rehabilitation activities were commenced every effort has been made to prepare an adequate description of each particular feature being worked upon prior to initiation of that work.  It is my understanding that this process is continuing.

Trial Exh. 88 (US207) (emphasis in original) (filed September 10, 2004).

47.    In a December 10, 1954 Memorandum to Reclamation's Regional Director, the Project Engineer wrote:

> Conveyances covering new rights-of-way are supported by drawings and adequate legal descriptions.  All rights-of-way which the Middle Rio Grande Conservancy District owned prior to the initiation of construction work on the Middle Rio Grande Project was [sic] assigned by a blanket grant of easement on November 24, 1954 [sic].  It is our understanding that this blanket easement is only an interim agreement to be used until the legal descriptions can be prepared

to support a conveyance document complying with Article 27 of the Repayment Contract.

Trial Exh. 89 (US208) (filed September 10, 2004).  See also Trial Exh. 90 (US208) (filed September 10, 2004) (December 10, 1954 Reclamation Memorandum to Files stating that "[i]n meeting November 24, 1953, an interim easement was prepared to convey [MRGCD] rights-of-way to the United States in order that we would have some instrument on file to substantiate our certification that rights-of-way were available on bid opening reports").

48.     Amendment #2 to the 1951 Repayment Contract, dated January 4, 1955, called for the United States to assume operation and maintenance of all Project works--except El Vado Dam and Reservoir--effective February 1, 1955. Trial Exh. 93 (US025).  Amendment #3, dated May 22, 1956, called for the United States to assume operation and maintenance of El Vado Dam and Reservoir. Trial Exh. 138 (US058).

49.     In a legal memorandum dated August 19, 1955, an attorney-advisor in the Field Solicitor's office indicates that he did not believe that recording the 1953 Grant of Easement would have been effective notice to third parties and that additional documents with more specific descriptions should be prepared and recorded in lieu of recording the 1953 Grant of Easement.  Trial Exh. 116.

50.     At the same time that the attorney-advisor drafted this August 19, 1955 internal memorandum, MRGCD's counsel expressed his view to both the MRGCD Board and Reclamation that the 1953 "Grant of Easement" was sufficient to put third parties on notice of the United States' interests in Middle Rio Grande Project properties and thus should be recorded: "The recordation of this transfer of title would serve notice upon the public that the United States is now the owner of the works, which is absolutely necessary in order to relieve the District from

any liability to third parties for damages flowing from the operation of the works of the District."
Trial Exh. 100 (US030) at 1.

51.     MRGCD requested that the 1953 Grant of Easement be recorded.  Trial Exh. 103
(US033) (Minutes of the Meeting of the Board of Directors of MRGCD, June 28, 1955); Trial
Exh. 109 (Memo from Regional Director to Commissioner re: conveyance of MRGCD works to
Bureau of Reclamation (July 28, 1955)).

52.     A July 28, 1955 memorandum from the Regional Director to the Project Manager
indicates that the Regional Director was seeking the Commissioner's "views with respect to
accepting title to El Vado Dam and Reservoir, and as to whether fee simple title or an easement
should be taken to District works."  Trial Exh. 111 (US037) at 1.  The memorandum is entitled
"Grant of Easement conveying all District works and real property required for accomplishment
of the purposes set forth in [the 1951 Repayment Contract]."  Id.  In the memorandum the
Regional Director requests that the Project Manager compile descriptions of the properties that
had been conveyed vis a vis the 1953 Grant of Easement so that Reclamation "will be in a
position to propose to the District that we be a given a more appropriate conveyance for
recordation."  Id.

53.     In a July 28, 1955 memorandum to the Commissioner of Reclamation, the
Regional Director notes that "Reclamation regulations require a statement by the Project
Manager that title to the land upon which construction is to be initiated has been secured by the
United States before construction contracts are awarded."  Trial Exh. 112 (US038) at 1.  Because
preparing separate deeds containing adequate descriptions of all necessary properties necessary
for the Middle Rio Grande Project would take more than a year, "as an interim arrangement it
was suggested that the District provide the United States with a blanket conveyance of all its

properties wherever located in order that the Project Manager could correctly inform the Denver office that he had obtained the necessary title to all real property involved in the construction program." Id.  The instrument on which the Project Manager relied to certify title was the November 24, 1953 "Grant of Easement" that "conveys all of the District works, including El Vado Dam and Reservoir" on which Reclamation "had already performed extensive rehabilitation." Id. at 2.

## IV.   ACQUISITION OF TITLE TO ADDITIONAL EASEMENTS AND RIGHTS-OF-WAY NECESSARY FOR PROJECT PURPOSES, AND ACQUISITION AND RETIREMENT OF MRGCD'S BONDED INDEBTEDNESS

54.    In addition to the blanket conveyance that MRGCD made to the United States in the 1953 "Grant of Easement" of all of MRGCD's properties required to carry out the Middle Rio Grande Project, Reclamation needed additional rights-of-way from third parties to construct and rehabilitate the Project.   See, e.g., Trial Exh. 136 (US056) at 3 ("In the rehabilitation of District works under the Contract with the District, the Bureau has found it necessary to acquire additional right-of-way for straightening and widening various canals and laterals included in the rehabilitation program.").  Before Reclamation could initiate construction on any Project feature, MRGCD acquired and assigned to the United States title to all of these third-party property interests pursuant to Article 27 of the 1951 Repayment Contract.  See Trial Exh. 67 (US001) ¶ 27.

55.    A 1958 Bureau memo notes Bureau estimates that approximately 10,000 easements needed to be acquired by MRGCD and then transferred to the United States.  Trial Exh. 157 (Plaintiffs' Exh. 1) (1958 Memo to Brophy). The memo states that at that time, a total of 1750 easements had been acquired and conveyed to the U.S., and the Bureau was processing acquisitions at about 1500/yr.

56.     The typical process for identifying and acquiring title to these third-party interests involved several steps.  First, Reclamation identified the area needed to construct a particular Project feature. See, e.g., Trial Exh. 148 (US067) (Project Manager stating that the first step was preparation of "[e]ngineering surveys, plats and maps needed to determine and advise the District of the rights-of-way required").  Second, Reclamation would advise MRGCD of the proposed construction and the necessary additional rights-of-way that MRGCD would need to secure from third parties.  See, e.g., Trial Exh. 102 (US032) (requesting that MRGCD acquire the rights-of-way necessary for construction of the Atrisco Feeder Canal).  Appraisals would be completed, and MRGCD would then acquire the necessary property interest, typically title to an easement, and assign it to the United States.

57.     Once MRGCD assigned the title to the United States, and Reclamation verified the sufficiency of that title, MRGCD would be reimbursed for its expenses in acquiring the property interest.  See, e.g., Trial Exh. 101 (US031) (stating that MRGCD "could not be repaid until satisfactory title to the easements had been assigned to the United States").  MRGCD was an active participant in this process and was always aware of what features were necessary for the Middle Rio Grande Project, where and when Reclamation was going to be working on these features, and what additional rights-of-way were necessary for the work.[2]

---

[2] See, e.g., Trial Exh. 153 (US072) at 2 (November 21, 1957 report on the status of the "Construction and Rehabilitation Program" indicating that MRGCD "made a field inspection of all the proposed irrigation rehabilitation works shown on the summary sheets prepared by [Reclamation's] Design Section"); Trial Exh. 154 (US073) at 1 (December 12, 1957 letter from Reclamation to MRGCD indicating that MRGCD had been advised of "the remaining irrigation rehabilitation program through F.Y. 1960"); Trial Exh. 170 (US077) at 3-6 (July 22, 1958 MRGCD Board Minutes indicating that Reclamation representatives "discussed and reviewed the projects finished to date, work in progress, work scheduled, non-reimbursable channelization work finished, work in progress and future construction;" a schedule of work was presented and "explained in detail"); Trial Exh. 165 (US082) (status report as of June 30, 1958, including

58.     The record contains literally hundreds of these transactions in which title to literally thousands of property interests necessary for Project purposes were acquired by MRGCD and assigned to the United States.  See Trial Exh. 136 (US056) at 3 ("Because of the numerous small tracts through which it is necessary to obtain right-of-way and the length of the ditches and other facilities, Bureau Officials estimate it will be necessary to acquire some 5,000 to 10,000 different acquisitions for portions of these tracts, each relatively small."); see also Trial Exh. 402 (Arndt Decl., US-A) ¶ 22.[3]

59.     Because of the complexity and effort that would be required to acquire all of these rights-of-way, the Department of Justice approved an abbreviated process for the acquisition of rights-of-way appraised at less than $500.  TrialExh. 136 (US056) at 3.  As part of this process, MRGCD executed an "Indemnity Agreement" with the United States whereby MRGCD agreed that it would "warrant and defend the title to all such easements and interests in land so conveyed by it to the United States."  Trial Exh. 137 (US057) at 4 ¶ 1.

60.     On March 15, 1957, counsel for Reclamation sent counsel for MRGCD a new proposed form for MRGCD to assign newly acquired property interests to the United States. US065.  The new form stated that MRGCD "assigns to the United States . . . with full warranties

---

completion of, and amount spent on,  "El Vado Dam Rehabilitation" ($595,000), "Angostura Diversion Works" ($174,000), "San Acacia Diversion Dam" ($144,000), "Canals" ($1,587,000), and "Drain Rehabilitation" ($3,209,651)); Trial Exh. 166 (US083) (November 25, 1958 MRGCD Board Minutes recognizing that "all members of the Board were personally familiar with the problems involved in the acquisition of lands needed to carry out this portion of the Middle Rio Grande Project [i.e., construction of the San Juan Feeder Canal]").

[3] Even when MRGCD was assigning easement interests to the United States easement, the assignment instrument typically referred to "titles" being assigned.  See, e.g., Trial Exh. 214 (US121) (assignment for several easements acquired from the New Mexico State Tax Commission stating that MRGCD "assigns to the United States of America . . . with full warranties all its right, *title* and interest in and to those certain easements hereinafter described") (emphasis added).

all its right, title and interest in and to the aforesaid easement." Id. at 1.  On March 18, 1957,

counsel for MRGCD wrote back, accepting the proposed form and stating that "this short form

of Assignment and Conveyance is sufficient for the purposes of *transferring title* from the

District to the United States Government."  Trial Exh. 147 (US066) at 1 (emphasis added).  After

each assignment of title to easements was made from MRGCD to the United States, it was

reviewed by Reclamation to determine whether it met the requirements of the "Indemnity

Agreement."  See, e.g., Trial Exh. 170 (US086) (January 21, 1959 memorandum from Acting

Field Solicitor to Project Manager finding that "title to the easements described [in an

assignment] is now in the United States of America.  Because of the Indemnity Agreement and

the warranties described therein, it is unnecessary to obtain additional assurances of title.").

     61.     The United States' acquisition and retirement of MRGCD's bonded indebtedness

was considered to be a important aspect of the 1947 Plan for making the Project financially

solvent over the long term. Trial Exh. 50 (US004).  In July, 1955, MRGCD lobbied Congress for

the $5.2 million federal dollars for the United States to acquire and retire MRGCD's bonded

indebtedness.  Trial Exh. 92 (US035) at 7.[4]  In his testimony before Congress, the Chief

Engineer stated that construction of the works of the District had already begun and that "the

United States, as security for the repayment of [the reimbursable] part of the construction costs,

acquired and now holds title to all of the works of the District."  Id. at 10.  He went on to note

that "[o]ne of the main objects [of the Project] was the acquisition by the United States of the

outstanding bonded indebtedness of the District" so that "the present method of assessments . . .

could be discarded and a more equitable method of assessments adopted" and that "savings

---

[4] The estimated bonded indebtedness of MRGCD at that time was approximately $6.6 million,
but MRGCD had agreed to use $1.4 million of its own funds to help acquire these bonds.  Id.

would be made to both the contracting parties by the elimination of interest payments on the outstanding bonds."  Id. at 11

62.     On December 9, 1955, Interior informed MRGCD that Congress had approved $5.3 million for the acquisition and retirement of MRGCD's bonds.  Trial Exh. 128 (US050). After the bonds were acquired and retired, the United States and MRGCD executed a supplemental agreement to the 1951 Contract allowing MRGCD to restructure its methods of collecting assessments.  Trial Exh. 149 (US068).

63.     A 1959 Financial Audit of the Middle Rio Grande Project by the U.S. Department of the Interior Office of the Comptroller recognized the necessary link between the 1953 "Grant of Easement" and the United States' expenditure of $5,300,000 to retire MRGCD's bonds:

> Pursuant to Article 26 of the repayment contract entered into with [MRGCD], the latter agreed to transfer title to the District Works to the United States.  The instrument of conveyance was executed by the District in November 1953.  The recorded value of the works was involved in this conveyance is $5,300,000 representing the amount of Federal funds, expended to extinguish the bond holders lien thereon.

Trial Exh. [], US300 at 7.

## V.     FEBRUARY 9, 1960 GRANT OF EASEMENT FOR EL VADO DAM AND RESERVOIR

64.     On February 9, 1960, MRGCD executed a grant of easement to the United States for El Vado Dam and Reservoir.  Trial Exh. 177 (MRGCD Exh. 10; US094).  The execution of the easement was not necessary for Reclamation to carry out the operations at El Vado, because Reclamation had been operating El Vado since 1956 under Amendment No. 3 to the 1951 Repayment Contract, Trial Exh. 138 (US058), and had begun rehabilitation of that facility shortly after the United States acquired title in 1953.  See, e.g., Trial Exh. 85 (US022).

65.     The purpose of the 1960 grant of easement for El Vado Dam and Reservoir, as both Reclamation and MRGCD understood it, was not to convey a new interest to the United States.  Instead, the Parties executed the instrument (1) to provide an adequate description of the approximately 4,930 acres making up the El Vado site in a recordable instrument to put third parties on notice as to the boundaries of the federal interest in El Vado Dam and Reservoir and (2) to recognize that MRGCD had not conveyed its mineral interests in the cite when the United States acquired title through the 1953 "Grant of Easement."  For example, in a memorandum from the Regional Director to the Project Manager, Bureau of Reclamation, dated February 26, 1959, the Regional Director noted that the 1953 "Grant of Easement" "provides that the District assigns and conveys to the United States all works and real property required for accomplishing the purposes set forth in the repayment contract dated September 24, 1951, and amended. *Thus, the present objective is to describe the area and to leave minerals with the District*."  Trial Exh. 171 (US087) at 1 (emphasis added).

66.     Reclamation produced draft copies of the grant of easement for the El Vado Dam and Reservoir site by letter dated November 23, 1959, noting that the "language about reserving to the District the oil, mineral and gas rights" had been inserted into the draft.  Trial Exh.175 (US091) at 1.  When the MRGCD Board considered and approved the El Vado grant of easement at its regular scheduled meeting on February 9, 1960, the Board shared Reclamation's understanding that the purpose of the instrument was *to return* to MRGCD any mineral rights it held in the El Vado site:  "An easement between the United States of America and the [MRGCD] for retention by the District of mineral rights at El Vado Dam and Reservoir Site was presented to the Board for approval. * * * The easement as presented *returns* to the District the mineral rights."  Trial Exh. 178 (US093) at 2 (emphasis added).

67.     That Reclamation understood that it held more than just easement interests that would automatically revert to MRGCD upon completion of MRGCD's repayment obligation is further evidenced in other contemporaneous documents.  See, e.g., Trial Exh. 184 (US100) at 2 (June 30, 1960 memorandum from the Regional Director to the Project Manager stating that "we would expect to return El Vado Dam and Reservoir with the other facilities upon completion of all payments under the repayment contract, as provided for in Articles 26 and 29 of the basic contract (178r-423)."); Trial Exh. 223 (US129) at 1(December 17, 1962 letter from Reclamation to New Mexico State Park Commission stating that the El Vado Reservoir area and dam site "were purchased in fee simple by [MRGCD] and assigned to the Bureau of Reclamation").

68.     On July 12, 1961, MRGCD and Reclamation executed an agreement with the New Mexico State Park Commission to allow the Commission to develop recreational facilities at El Vado Reservoir.  Trial Exh. 198 (US112).  The first recital on which this agreement relies is that "the United States *owns* and controls lands or interests in lands in the El Vado Reservoir Area located in Rio Arriba County, New Mexico."  Id. at 1 (emphasis added).  The agreement does not say that MRGCD owns the lands.

69.     On October 30, 1961, the New Mexico Department of Game and Fish granted an easement to the United States to assist in the development of recreational facilities at El Vado Dam in conjunction with the July 12, 1961 agreement with the New Mexico State Park Commission.  Trial Exh. 199 (US113).  The first recital on which this grant of easement relies is that "the United States *owns* and controls lands or interest in lands in the El Vado Reservoir Area located in Rio Arriba County, New Mexico."  Id. at 1 (emphasis added).  The agreement does not say that MRGCD owns the lands.

70.     On December 21, 1976, MRGCD executed, and Reclamation approved, an agreement with the U.S. Energy Research and Development Administration ("ERDA") allowing ERDA to store up to 5,000 acre-feet annually in El Vado Reservoir.  Trial Exh.292 (US186). This agreement recognizes that "the works of the District at El Vado have been transferred by the District to the United States Government and are now operated and maintained by the United States Bureau of Reclamation under contract with the District."  Id. at 1.

## VI.     THE 1962 COUNTY-BY-COUNTY GRANTS OF EASEMENTS

71.     A July 18, 1962 letter from Reclamation to MRGCD references an earlier grant of easement covering assignment of all of MRGCD's "old rights-of-way *in Sandoval County*," and states that "[*t]his* easement [i.e., the easement covering rights-of-way in Sandoval County] was previously transmitted to [MRGCD]" but was found by the Field Solicitor to be "not in and acceptable form and not considered legal."  Trial Exh. 215 (MRGCD Exh. 12, US122) at 1. There is no reference in the letter to the 1953 Grant of Easement.

72.     On May 18, 1961, Reclamation had transmitted to MRGCD "four copies of grant of right of way easement covering the assignment of all of the District's old rights of way in Sandoval County."  Trial Exh.192 (US107).  The May 18, 1961 transmittal letter does not indicate that the blanket grant of easement for Sandoval County was intended to replace an earlier easement.  Id.  MRGCD executed the grant of right of way easement for Sandoval County on May 23, 1961.  Trial Exh. 193 (US108).  This instrument identified properties *only* by feature and by listing their "receipt and conveyance" number on the official maps of MRGCD.  Id. at 1-4.

73.     On June 6, 1961, Reclamation transmitted to MRGCD "four copies of grant of right of way easement covering assignment of all of the District's old rights of way in Bernalillo

County." Trial Exh. 195 (US109). The June 6, 1961 transmittal letter does not indicate that the blanket grant of easement for Bernalillo County was intended to replace an earlier easement. Id. MRGCD executed the grant of right of way easement for Bernalillo County on June 13, 1961. Trial Exh. 196 (US110). This instrument identified properties *only* by feature and by listing their "receipt and conveyance" number on the official maps of MRGCD. Id. at 1-10.

74.     In a letter dated June 16, 1961 to the City of Albuquerque, MRGCD stated that MRGCD had "transferred ownership of all properties . . . to the United States Government under a blanket easement to the United States Government dated November 24, 1953, and also more specifically included in an easement which includes detailed descriptions of the rights-of-way of all [MRGCD] structures, which said document was dated June 13, 1961." Trial Exh. 197 (US111) at 1. This letter indicates MRGCD's understanding that the 1953 "Grant of Easement" was not being "replaced" by the 1961 grant of easement for Bernalillo County, but that the 1961 instrument was complementary to the earlier grant and intended to provide more specific, detailed descriptions of the properties that had been conveyed by the 1953 instrument.

75.     On April 10, 1961, a meeting was held to discuss the construction of bridges for Interstate 40 over the Rio Grande. Trial Exh. 191 (US114). At this meeting, which was attended by representatives from MRGCD, Reclamation, the Corps of Engineers, the City of Albuquerque, and New Mexico State Highway Commission, MRGCD's Chief Engineer represented that the right-of-way for Middle Rio Grande Project facilities that would be affected by the bridge construction "had been conveyed to the Bureau of Reclamation in trust and that the Conservancy District could not legally convey any right-of-way to the City." Id. at 2.

76.     Following this meeting, on November 22, 1961, the United States executed an agreement with the New Mexico State Highway Commission and acknowledged by MRGCD in

which the United States grants to the Commission the right to construct the Rio Grande Bridge for Interstate 40.  Trial Exh. 201 (US116) at 1-2.  Although this agreement was executed subsequent to the June 13, 1961 blanket grant of easement for Bernalillo County that MRGCD now asserts was intended to supplant the 1953 Grant of Easement, the first recital on which this agreement relies states that "the United States has acquired from [MRGCD], by a contract dated September 24, 1951, as amended, and by an easement dated November 24, 1953, the District's works and real property necessary for accomplishment of the Middle Rio Grande Project, which acquisition includes certain lands and works located in Bernalillo County, New Mexico, being known as the Atrisco Feeder Canal and the Albuquerque (Barr Overlap Canal) Riverside Drain." Id. at 1.

77.     In 1962, Reclamation provided to MRGCD grants of right-of-way easement for each of the four counties, but did not indicate that these were meant to substitute for the 1953 Grant of Easement.[5]

78.     In a memorandum dated March 23, 1962, Reclamation indicated that it had acquired 3,164 acres for the Middle Rio Grande Project from fiscal years 1951 through 1960, but only 75 acres in fiscal year 1961 (far less than ostensibly conveyed by the 1961 blanket grants of easements).  Trial Exh. 204 (US117) at 1.  This memorandum also states that "not included [in these figures] are Conservancy District lands conveyed by General Easement in 1953," indicating that Reclamation was still relying on the 1953 Grant of Easement as the instrument conveying MRGCD's properties to the United States.  Id.

---

[5] MRGCD ignores that similar blanket grants of easement also were executed for other areas, such as MRGCD's old rights of way on Indian Lands. E.g., Trial Exh. 220 (US125).

79.     On May 8, 1962, Reclamation transmitted to MRGCD "four copies of grant of right of way easements covering the assignment of all the District's old rights of way in Valencia and Socorro County." Trial Exh. 210 (US118).  The May 8, 1962 transmittal letter does not indicate that the blanket grants of easement for Valencia and Sandoval Counties were intended to replace an earlier easement.  Id.  MRGCD executed the grant of right of way easements for Valencia and Socorro Counties on May 22, 1962.  Trial Exh. 211 (US119) (Valencia) and Trial Exh. 212 (US120) (Socorro).  Unlike the 1961 blanket grants of easements for Sandoval and Bernalillo Counties, the blanket grants of easements for Valencia and Socorro Counties did not identify properties *only* by feature and by listing their "receipt and conveyance" numbers on the official maps of MRGCD, but included detailed legal descriptions for each property identified. See id. (excerpts of pages with legal descriptions).

80.     Easements for Project works in Socorro and Valencia Counties were approved in final form by the MRGCD Board on May 22, 1962.  Trial Exh. 213 (Plaintiffs' Exh. 4) (MRGCD Board Minutes for May 22, 1962).  Board minutes note that MRGCD had already provided a "blanket" conveyance of all its property to the United States in 1953.  Id.  The minutes do not state anything about withdrawing or replacing the 1953 Grant.  Rather, the minutes note that the new easements include all new rights of way that had been purchased by the District since 1953, and expressly list all the properties conveyed therein.  Id.  As described above, between 1953 and 1962, MRGCD acquired thousands of ditch rights of way that it then conveyed to the United States to enable the Government to carry out the Middle Rio Grande Project rehabilitation work.  The 1962 easements provided express confirmation and clarification that all those easements and rights of way acquired by MRGCD after November 1953 for the Project were in turn conveyed by MRGCD to the federal government.

-31-

81.     On July 18, 1962, as noted above, Reclamation transmitted to MRGCD "four copies of grant of right-of-way easements covering the assignments of all the District's old rights-of-way in Sandoval County."  Trial Exh. 215 (US122).  The July 18, 1962 transmittal letter, in contrast to the May 18, 1961 letter transmitting the previous blanket grant of easement for Sandoval County, *does* indicate that the blanket grant of easement for Sandoval County was intended to replace an earlier easement.  Id.  MRGCD executed the new grant of right of way easement for Sandoval County on July 24, 1962.  Trial Exh. 217 (US123).  Unlike the 1961 blanket grant of easement for Sandoval County, the 1962 blanket grant of easement for Sandoval County did not identify properties *only* by feature and by listing their "receipt and conveyance" numbers on the official maps of MRGCD, but included detailed legal descriptions for each property identified.  See id. (excerpts of pages with legal descriptions).  The two versions of the grants of easements for Sandoval County contain identical operative language and cover the same properties.

82.     On October 16, 1962, Reclamation transmitted to MRGCD "four copies of grant of right-of-way easements covering the assignments of all the District's old rights-of-way in Bernalillo County."  Trial Exh. 221 (US126).  The October 16, 1962 transmittal letter, in contrast to the May 18, 1961 letter transmitting the previous blanket grant of easement for Bernalillo County, *does* indicate that this new blanket grant of easement for Bernalillo County was intended to replace an earlier easement.  Id.  MRGCD executed the new grant of right of way easement for Bernalillo County on October 23, 1962.  Trial Exh. 222 (US128).  Unlike the 1961 blanket grant of easement for Bernalillo County, the 1962 blanket grant of easement for Bernalillo County did not identify properties *only* by feature and by listing their "receipt and conveyance" numbers on the official maps of MRGCD, but included detailed legal descriptions

for each property identified.  See id. (excerpts of pages with legal descriptions).  The two versions of the grants of easements for Bernalillo County contain identical operative language and cover the same properties.  Arndt Decl., Trial Exh. 402 (US-A) ¶¶ 15-16, 18-19.

83.     MRGCD executed each of the four county-by-county grants of easement, each of which states that it was being executed pursuant to federal reclamation law and "Article 26 of the [1951 Repayment Contract]."  Trial Exhs. 211, 212, 217, 222 (US119, US120, US123, US128).  The four 1962 easements contain attachments listing the specific tracts and rights of way that were conveyed to the United States.  Id.  They contain no termination or reverter clauses and specify no conditions under which they would be reconveyed to MRGCD.  In fact, the easements explicitly state that they are granted pursuant to Article 26 of the 1951 Contract, which provides that works must be conveyed to the United States and can be reconveyed to MRGCD only with Congressional consent.  Trial Exh. 67 (US001) ¶¶ 26, 29.  They contain no reference to the earlier 1953 Grant, and certainly do not withdraw that Grant.

84.     A second agreement for Interstate 40 executed on November 20, 1963--shortly after the execution of the 1962 blanket grants of easement--also identifies the 1953 Grant of Easement as conveying MRGCD's works and real property to the United States.  See Trial Exh. 231 (US135).

## VII.     ADMINISTRATION OF THE MIDDLE RIO GRANDE PROJECT AFTER 1962

85.     On May 14, 1963, MRGCD and the United States executed Amendment Number 4 to the 1951 Repayment Contract.  Trial Exh. 227 (US132).  Amendment Number 4 pertains to MRGCD's acquisition of a supplemental source of water through the construction of the San Juan-Chama Project.

86.     In 1974, when consideration was being given to transferring operation and management of  Project works to MRGCD, the Middle Rio Grande Flood Control Association informed MRGCD that it was "somewhat disturbed" by the proposal.  Trial Exh. 278 (US173). Pointing to past problems with MRGCD's operation of the facilities, the Association noted that "[t]he recognized expertise of the Bureau of Reclamation in irrigation planning, construction, and water management has been the salvation of the Middle Valley."  Id. Attch. at 2.

87.     The 1951 Repayment Contract states that during construction of the Project, operation and maintenance of Project works would be transferred from MRGCD to the United States, with costs to be paid by MRGCD.  Trial Exh. 67 (US001) ¶ 13(a).  After completion of construction, the United States could, upon six months' notice, allow the District to assume operation and maintenance of those works; and similarly could, upon six months' notice, "terminate the agency of the District in the operation and maintenance" of such works and reassume their operation and maintenance.  Trial Exh. 67 (US001) ¶ 13(b).  Project works, the "operation and maintenance of which are retained in the United States," are known as "reserved works," and those works for which "operation and maintenance are turned over to the District" are known as "transferred works."  Trial Exh. 67 (US001) ¶ 8.

88.     On July 29, 1974, Reclamation transferred operation and maintenance of the Project back to MRGCD, effective February 1, 1975, with the exception of the "reserved works," which included El Vado Dam and Reservoir, San Acacia Diversion Dam, and certain channelization and flood protection works.  Trial Exh. 282 (US176) at 1.  In anticipation of the actual transfer, Reclamation completed an "Examination of Irrigation Facilities" report on January 15, 1975.  Trial Exh. 285 (US178).  This report identifies the "principal project works" as including El Vado Dam and Reservoir; Angostura, Isleta, and San Acacia Diversion Dams;

and "approximately 830 miles of canals and laterals, 400 miles of drains, and 150 miles of

channelization works." Id. at 3.[6]

89.     On January 28, 1977, Reclamation transferred operation and maintenance of San

Acacia Diversion Dam to MRGCD, effective September 1, 1977. Trial Exh. 295 (US185). The

United States agreed to pay one-half the cost of operation and maintenance of San Acacia

because the Dam serves the federally-owned Low Flow Conveyance Channel as well as

MRGCD facilities. Bureau A.R. 330, (January 5, 1977, Bureau Memo).

90.     The United States has never transferred operation and maintenance of El Vado

Dam and Reservoir and certain other "reserved works" back to MRGCD. Bureau A.R. 357, 359,

365. The United States continues to perform operation and maintenance of these works and is

reimbursed by MRGCD pursuant to Article 13 of the 1951 Contract. Bureau A.R. 365.

91.     An April 22, 1994, contract between MRGCD and Public Service Company of

New Mexico regarding storage of water at El Vado states that "the works of the District at El

Vado Dam have been transferred by the District to the United States Government and are now

operated and maintained by the United States Bureau of Reclamation under contract with the

District." Trial Exh. 352 (Plaintiffs' Exh. 5).

---

[6] As of November, 1953, MRGCD possessed no deeds for Angostura or San Acacia diversion
dams. Trial Exhs. 27-39, 305, 325-27 (Exhs. 15 and 16 to MRGCD Cross-Claim). MRGCD
possessed only rights of way for those dams. Id. In November, 1953, the only deed that
MRGCD possessed for any property which is the subject of its cross-claims in this case was a
deed for the land underlying El Vado Dam and Reservoir. Trial Exhs. 9-10, 12, 14-49, 305, 325-
27 (Exhs. 14-17 to MRGCD Cross-Claim). All of MRGCD's other documented interests in the
property addressed in its cross-claims consisted entirely of rights of way. Id. The only other
deeds obtained by MRGCD for the property subject to the cross-claims were a quitclaim deed
for the San Acacia Dam site and a warranty deed for the land just south of that site, which were
conveyed to MRGCD in 1984. Trial Exhs. 326, 327 (Exh. 16 to MRGCD Cross-Claim).

92.     Quitclaims and releases of interests in Middle Rio Grande Project properties of which Federal Defendants are aware were accompanied by a finding that the particular property was never conveyed to the United States or that the property interest was not needed for Project purposes, and thus the release was made pursuant to authority from Congress. See e.g., Trial Exh. 164 (US081); Trial Exh. 357 (US200).

93.     Where Reclamation concluded that a particular property interest--even title to an easement--was necessary for Project purposes, it rejected MRGCD's request for a release or quitclaim. See, e.g., Trial Exh. 337 (US192). When MRGCD asked Reclamation to relinquish the United States' property interests in some Project properties to allow MRGCD to get full credit for those properties in a cost-sharing project, the Regional Director for Reclamation explained: "We do not believe it is in the interest of the United States and we would be unable to return our interest to you without an act of Congress specifically authorizing such." Trial Exh. 345 (US196) at 1.

94.     In a subsequent letter dated December 22, 1992, the Commissioner of Reclamation wrote to MRGCD, Trial Exh. 349 (US198) at 1:

> The Solicitor's Office has counseled that the value of the easements and rights-of-way that already reside with the United States cannot be used as a means of credit for local cost-sharing for the Flood Control Project. Reclamation has reviewed the easements and rights-of-way of the Middle Rio Grande Project and has determined that all are needed for Middle Rio Grande Project purposes. The Solicitor's Office has determined in similar cases that the Department of the Interior has no general authority to perform easement and rights-of-way transfers. Such transfers require congressional authority.

95.     The Bureau carries on its financial books almost $40 million worth of fixed assets in structures and facilities in the Middle Rio Grande Project. Bureau A.R. 365 (Bureau MRG Financial Statement for 1997).

-36-

96.     MRGCD has repaid its basic repayment obligations under the 1951 Repayment Contract, as amended by the 1963 San Juan-Chama Project Amendatory Contract.  In its letter conveying the final payment for the reimbursable expenses of the basic contract, MRGCD recognized that some action would have to occur before title to Middle Rio Grande Project properties could be reconveyed to MRGCD.  See Trial Exh. 375 (US204) ("We hope to have a smooth transition in the transfer of titles.").

## VIII.   MRGCD'S KNOWLEDGE THAT THE UNITED STATES CLAIMED TITLE TO MIDDLE RIO GRANDE PROJECT WORKS AND REAL PROPERTY

97.     As early as the 1950s, MRGCD was aware that the United States claimed title to all Middle Rio Grande Project properties, including the properties identified in Count III of MRGCD's Second Amended Cross-Claims.  The records of MRGCD and the United States are replete with instances indicating that MRGCD knew that the United States claimed title to Middle Rio Grande Project works and properties, including the specific properties identified in MRGCD's quiet title cross-claim, Count III.  The following are just several examples of the many occasions that MRGCD was informed of the United States' claim of title in Middle Rio Grande Project Properties; that the United States relied, in part, on the 1953 "Grant of Easement" as an instrument conveying such title; and that such title would remain in the United States until Congress provided otherwise.

### A.     The 1947 Plan For The Middle Rio Grande Project

98.     As noted above, the 1947 Plan indicates that a necessary and important part of the Project Plan is the acquisition of MRGCD's existing works, including EL Vado Dam and Reservoir, San Acacia and Angostura Diversion Dams, and the canals, drains, and laterals.

### B.     The 1951 Repayment Contract

99.     At the January 29, 1951 meeting of the MRGCD Board to discuss a draft of the
1951 Repayment Contract, the central point of discussion was MRGCD's obligation to convey
title to its works and properties to the United States.  MRGCD's Board Chairman recognized that
"we have to give title to the United States to all land, ditches and all works of the Conservancy
District."  Trial Exh. 61 (US008) at 2.  The scope of this conveyance, as recognized and
expressed at this meeting by MRGCD's Chief Engineer, would include all existing works
because Reclamation "proposes to spend several million dollars on work on El Vado Dam,
enlarging the canals and rebuilding diversion dams within the district."  Id.  The Board was
informed that, pursuant to federal reclamation law, the United States would "not do any work on
any property for which they do not hold title," and that MRGCD "would have to go to Congress
to have it transferred back."  Id. at 3.  The MRGCD Board was further advised that "it was a
constitutional provision that title once in the United States could be divested only by an Act of
Congress."  Id. at 5.

100.     The 1951 Repayment Contract also informed MRGCD that it would have to
convey title to its properties to the United States, and that such conveyance would occur in at
least three complementary ways.  First, Article 26 states that MRGCD "shall convey to the
United States with title satisfactory to th Contracting Officer such of the District Works *now
owned* by the District, as shall be required to be conveyed to the United States as determined by
the Contracting Officer."  Trial Exh. 67 (US001) ¶ 26 (emphasis added).  Second, Article 27
provided that the United States would "not commence construction of any feature of the project
within the boundaries of the District until all necessary rights of way therefor *have been
secured*."  Id. ¶ 27 (emphasis added).  Third, Article 29 indicates that "[t]itle to all works
*constructed by* the United States under this contract and to all such works as are conveyed to the

United States by the provisions hereof, shall, as provided by in Article 26, be and continue to be vested in the name of the United States until otherwise provided for by Congress." Id. ¶ 29 (emphasis added). Pursuant to these three provisions, MRGCD and the United States understood that title for Project properties would be conveyed to the United States 1) by direct conveyance by MRGCD of its existing property interests; 2) by acquisition of title to additional property interests necessary for Project purposes from third parties and assignment to the United States; and 3) by operation of the contract upon construction of Project works.

101.    The 1951 Repayment contract defines "construction" broadly to include "rehabilitation and extension of the irrigation and drainage system of the District, rehabilitation and repair of El Vado Dam, repairs to diversion dams and related irrigation and drainage structures; acquisition of outstanding bonds; and rectification of the Rio Grande Channel." Trial Exh. 67 (US001) ¶ 8. Article 9 identifies the Project features that the United States would "construct" as including "the irrigation and drainage system of the District including the El Vado Dam and Reservoir." Id. ¶ 9.

102.    MRGCD recognized the 1951 Repayment Contract as an effective conveyance of works to the United States. On September 28, 1953, MRGCD's counsel rejected the notion that MRGCD should be liable for paving assessments to the City of Albuquerque, first and foremost because of United States held title based on operation of the 1951 Contract, Trial Exh. 79 (US020) at 1:

> Of immediate importance is the fact that on September 24, 1951, our District executed a contract, which, among other things, required it to convey to the United States of America, Bureau of Reclamation, all District property, rights-of-way and project works. On May 11, 1953, the Supreme Court of New Mexico affirmed this contract, and the same became immediately effective, so that at present, the United States is, to all intents and purposes, the owner of the District's project works, including its rights-of-way.

-39-

### C.      Texas v. New Mexico And Texas And New Mexico v. Colorado

103.     In Texas v. New Mexico, Original Action No. 9, MRGCD and the United States

argued on numerous occasions before the United States Supreme Court in the 1950s,

contemporaneously with transfer of the Middle Rio Grande Project properties from MRGCD to

the United States, that title to all Project works and facilities had been conveyed to the United

States.  MRGCD, a defendant in the case, not only acknowledged the claims of title to the

Project works but, as discussed below, adamantly agreed with and supported the United States'

position on title.  See FOF ¶¶ 145-53.

104.      In another United States Supreme Court case, State of Texas and State of New

Mexico v. State of Colorado, Original Action No. 29 filed in 1967, Texas and New Mexico

alleged that Colorado had violated the Rio Grande Compact by exceeding its water delivery

debit limit of 100,000 acre-feet of water and by refusing to make deliveries to eliminate its

excess debit. Trial Exh. 243 (US141) at 2.  Although the United States was not a party to this

litigation, the Supreme Court invited Solicitor General Thurgood Marshall to submit to the Court

the views of the United States on the controversy.  Id. at 1.  In an April 1967 brief, Solicitor

General Marshall stated that the United States was an indispensable party in this case for the

same reasons that the Supreme Court held it was an indispensable party in Texas v. New

Mexico:  "Any ruling touching the delivery obligations of New Mexico, here, as in Texas v.

New Mexico, would both entail control of the operations of the Middle Rio Grande Conservancy

District, *all of whose dams and other works are owned and operated by the United States*, and

affect the water rights of the Pueblo Indians, of whom the United States is the representative."
Id. at 4 (emphasis added).[7]

105.    In its joint response with Texas to the United States' 1967 memorandum, New
Mexico recognized the United States' claim that it acquired title to the works of MRGCD after
the onset of the Texas v. New Mexico case.  See, e.g., Trial Exh. 248 (US145) at 9 ("The United
States argued in its final memorandum at that time (1956), it had *taken title to all of the works of
the Middle Rio Grande Conservancy District,* and that any manner of relief sought by Texas
which included control over the gates of El Vado Dam would now be ineffective in the absence
of the United States as owner of the works.") (emphasis in original). Texas also conceded that in
Texas v. New Mexico it "admitted the United States was indispensable because of its ownership
of the works sought to be controlled."  Id.

**D.     The Granting Of Licenses Over Middle Rio Grande Project Properties**

106.    In a memorandum dated June 16, 1955 copied to Reclamation, MRGCD's
counsel advised the MRGCD Board that he had been informed by counsel for Reclamation that
MRGCD should not be issuing "any easements, rights-of-way, leases, etc., over and on what was
formerly the District property since title has been transferred to the United States of America."
Trial Exh. 100 (US030) at 1.  MRGCD's counsel concurred with this view stating that "this
proposition has merit for the reason that we are standing on the proposition that the title to all the
works, including the ditches and rights-of-way and El Vado Reservoir is now vested in the
United States of America."  Id.  "It is my opinion and suggestion, since the District has

---

[7] The United States was granted intervention in 1968, the matter was stayed, and Original Action
29 was dismissed with prejudice in 1985 based on a stipulated motion of dismissal.  See 474
U.S. 1017 (1985) (Justice Marshall taking no part).

transferred title to all works of the District to the United States, that the United States, or some department thereof with authority, execute all transfers that effect the property transferred by the District; or, in the alternative, that the United States issue a directive to the District appointing it as its agent to handle such transfers to the end that no question may be raised as to the status with the title of the property that has been transferred by the District to the United States." Id. at 2.

107.    At the MRGCD Board meeting on June 28, 1955, the Board addressed the issues raised by its counsel's June 16, 1955 memorandum, noting that "attorneys for the Bureau of Reclamation stated that, since title to [MRGCD] works has been transferred to the United States of America[,] the granting of any lease, easement, or transfer of any interest, whatsoever, in and over the property transferred by [MRGCD] to the United States of America, should be made by the United States instead of the Board of Directors of [MRGCD]." Trial Exh. 103 (US033) at 2. MRGCD's attorney stated that "title to all the works, including the ditches, rights-of-way, and El Vado Reservoir is now vested in the United States," and the Board then passed a resolution stating that "it is the consensus of the Board that such request and demand of the attorneys for the Bureau of Reclamation should be complied with in view of the fact that title to all the works of [MRGCD] has now vested in the United States of America." Id.  The Board thus resolved that "hereafter all easements, rights-of-way, leases and transfers of any interest in and to the properties which have been conveyed by [MRGCD] to the United States of America will be submitted, passed upon, and granted at the discretion of the United States of America and not by the Board of Directors of [MRGCD]." Id.

108.    MRGCD apparently acted on this resolution in short order, terminating a parking lease of a Mr. Louis J. Generis by letter dated July 18, 1955, and informing him that "[t]his is not

a discriminating action as all leases are being cancelled in that the United States Government, Bureau of Reclamation, is now the owner of this property." Trial Exh. 108 (US036) at 1; see also, Trial Exh. 152 (US071) at 1 (November 13, 1957 letter from MRGCD to Mr. Henry Summerford refusing request to build a bridge because the Project property at issue "is property owned at the present time by the United States Government and held in trust for [MRGCD]"); US079 (August 27, 1958 letter from MRGCD to State Highway Department referring Department to Reclamation for proposed crossing of San Francisco lateral "since the government is now the owner of these rights-of-ways").

109.    At that same June 28, 1955 Board meeting, the Board passed a second resolution to request that the United States record the 1953 "Grant of Easement" that "convey[ed] title to all works of [MRGCD] to the United States of America." Trial Exh. 103 (US033) at 3. The purpose of such recording was to protect MRGCD by "serving notice on the general public that title to all works of [MRGCD] is now vested in the United States of America." Id. In accordance with this resolution, MRGCD's Secretary-Treasurer wrote Reclamation a letter dated July 1, 1955 asking "if the Grant of Easement dated November 24, 1953, transferring title to all District works and real property to the United States of America has been made of record in all of the counties within the confines of the Middle Rio Grande Conservancy District." Trial Exh. 105 (US034) at 1.

110.    In August 1955, Reclamation requested that MRGCD join Reclamation in issuing a licence to Bernalillo County to allow the County to install a drainage system to drain flood waters "into the ditches and canals that formerly belong to [MRGCD]." Trial Exh.114 (US040) at 3. On August 9, 1955, the Board passed a resolution denying this request, stating that "on the 24th day of November, 1953, the Board of Directors of [MRGCD] transferred all title to the

works of the District to the United States of America" and that it therefore did not have

jurisdiction to join such a license. Id. The resolution further states "that it is the considered

opinion of the Board of Directors of [MRGCD] that all title to the works of the District,

including all rights-of-way, canals and ditches and El Vado Reservoir, is now vested in the

United States of America." Id.

     111.    Reclamation executed the license with Bernalillo County on August 11, 1955.

Trial Exh. 115 (US041). The first recital states that MRGCD "has, pursuant to lawful authority

and contract, transferred to the United States certain of its works, including the right of way for

and the Alameda Drain." Id. ¶ 1. The license further states that it will "terminate upon reversion

of the right of way and Drain to [MRGCD]." Id. ¶ 11. On September 1, 1955, however, the

Regional Director for Reclamation wrote to MRGCD to clarify that "[a]lthough title to Bureau

constructed or rehabilitated facilities rests in the United States, it has been and continues to be a

policy of the Bureau of Reclamation to clear licenses, permits and easements drawn to grant

such crossings or uses with the Irrigation or Conservancy District involved, so that the interests

of the United States and the District are fully protected." Trial Exh. 119 (US044) at 1.

### E.    The Sandia Conservancy District

     112.    On October 11 1955, MRGCD approved comments on the proposed Master Plan

Report for the Sandia Conservancy District that stated: "Title to all structures and attached

facilities necessary for the operation of the irrigation, drainage and flood control works owned

by [MRGCD] has been transferred to the United States Government and are now being operated

and maintained by the Bureau of Reclamation." Trial Exh. 122 (US046) at 1. Reclamation's

comments on the same proposed Report were copied to MRGCD, stating: "Title to the drains

and appurtenant works of [MRGCD] have [sic] been transferred to the United States

Government, and are now being operated and maintained by the Bureau of Reclamation, in conformance with the contract dated September 24, 1951, and amendments thereto."  Trial Exh. 121 (US045) at 1.

F.    **New Belen Acequia Case**

113.    By letter dated April 6, 1956, counsel for Reclamation wrote to MRGCD concerning a dispute that had arisen with the "ditch commissioners" of the New Belen Ditch, which Reclamation intended to rehabilitate, operate, and maintain. Trial Exh. 135 (US055) at 2-3.  In that letter, counsel for Reclamation indicated that the United States position was that the New Belen Ditch "was intended to be conveyed to the United States through the grant of easement executed by the district in 1954 [sic]."  Id. at 2.  "However, in order that any doubts as to the intent of the District may be eliminated, it is necessary that the District furnish us with a resolution which sets forth that the District is of the opinion that the New Belen Ditch was and is a part of its works and facilities and was conveyed to the United States by virtue of the aforesaid grant of easement for operation and maintenance by the Bureau of Reclamation pursuant to the contract between said Bureau and the District."  Id. at 2-3.[8]

114.    On April 10, 1956, MRGCD complied with this request, and passed a resolution affirming that MRGCD originally had acquired the New Belen Ditch as part of the official plan for the District, and "in the conveyance of title by the district to the United States of America it

---

[8] See also Trial Exh. 174 (US090) (November 6, 1959 Reclamation memorandum stating that "[t]he blanket easement assignment from the District to the United States of November 24, 1953 did not specifically name the ditches and structures of the District.  For this reason the Solicitor's Office requested that the District set forth its opinion as to whether the New Belen Ditch was and is part of the works and facilities conveyed to the United States by the aforesaid grant of easement.").

was the intention of the district and the district did convey to the United States of America all the right, title and interest of the district to operate and maintain the New Belen Ditch." Id. at 4.

115.    By the end of 1959, tension over the New Belen Ditch was still hampering Reclamation efforts to rehabilitate, operate, and maintain it. See Trial Exh. 176 (US092). Because of the importance of the Ditch to the Project, the United States decided to bring a condemnation action in federal court. Trial Exh. 179 (US095). Based on representations from MRGCD that it had acquired the ditch and conveyed the ditch to the United States as part of the 1953 Grant of Easement, the May 20, 1960 Complaint and Declaration of Taking filed by the United States in United States v. 56.091 acres of land, Civ. No. 4454 (D.N.M.), did not include the 50-foot right-of way for the ditch itself. See Trial Exh. 183 (US099) at 2 ¶ 5 (stating that the United States "owns the unencumbered perpetual and assignable right, privilege and easement [to the New Belen Acequia]"). However, due to concerns that MRGCD may not have acquired the ditch and thus may not have held it to convey to the United States through the 1953 Grant of Easement, the United States amended the Complaint on July 13, 1960 to provide for the taking of the ditch right-of-way were the Court to find that the United States did not already own it. Trial Exh. 185 (US101) at 3 ¶ 5.

116.    Shortly after the onset of this action, counsel for Reclamation wrote to counsel for MRGCD identifying the issue concerning the 50-foot right-of-way and stating the United States' position that the "acequia was part of the District works transferred to the United States and covered by a 'grant of easement' from [MRGCD] to the United States dated November 24, 1953." Trial Exh. 186 (US102). Because the United States was relying on the 1953 Grant of Easement and the warranty that MRGCD made therein concerning the conveyance of the

District's works,[9] Reclamation requested MRGCD's assistance in "defense of the title to the New Belen Acequia transferred by [MRGCD] to the United States." Id. In response, MRGCD acknowledged the warranty contained in the 1953 Grant of Easement, and indicated that it would assist in the litigation "in compiling material in defense of this title." Trial Exh. 188 (US104).

117.    In early 1963, after additional research and with the condemnation action still pending, the Department of Justice "ascertained that [MRGCD], the Government's predecessor in title, acquired title to the old canal right of way more than 30 years ago and that its title was upheld by decree in the state court of New Mexico." Trial Exh. 224 (US130) at 1.  Therefore, MRGCD "was in possession of the canal between [1929] and the conveyance to the United States on November 24, 1953 [meaning] that the Government has an unquestionable title to that right of way." Id.  Although the 1962 county-by-county grants of easement that MRGCD now contends "replaced" the 1953 Grant of Easement were executed only months before, the United States relied on the 1953 Grant of Easement to narrow the litigation on February 25, 1963 by dismissing the part of the Amended Complaint raising any issue over the United States' title to the ditch right-of-way itself, in the hopes of facilitating settlement.  Trial Exh. 225 (US131).[10]

**G.    "Indemnity Agreement" and "Certification of Channel Right-Of-Way"**

---

[9] On at least three occasions during the pendency of this litigation, the Commissioner of Reclamation informed members of Congress that MRGCD had conveyed the New Belen Ditch to the United States through the November 1953 Grant of Easement. See Trial Exh. 182 (US098) (U.S. Senator Chavez), Trial Exh. 190 (US106) (U.S. Representative Morris), and Trial Exh. 233 (US136) (U.S. Senator Mechem).

[10] Although this partial dismissal did apparently encourage some landowners to settle, the litigation was not finally resolved until 1968, when the Court issued two orders based on settlement stipulations confirming "the title vesting" in the United States.  Trial Exh. 249 (US146) and Trial Exh. 250 (US147).

118.    On April 24, 1956, MRGCD and the United States executed an "Indemnity Agreement," pursuant to which MRGCD was afforded a streamlined and less expensive process to convey to the United States title to easements and other property interests acquired from third parties needed for Project purposes. Trial Exh. 137 (US057). The Indemnity Agreement with MRGCD expressly recognizes the United States' claim of a title interest in what had become Middle Rio Grande Project properties: "In the event that at some future unknown date the possession and ownership of the project works and facilities are returned to the District, the District agrees to accept from the United States the conveyance or transfer of such easements or interests in lands so acquired [pursuant to the Indemnity Agreement] without reference or demand as to the title held by the United States." Id. at 7 ¶ 6.

119.    At the MRGCD Board meeting on December 9, 1958, Reclamation presented the Board with a proposed "Certification of Channelization Right-Of-Way." Trial Exh. 168 (US084). Reclamation was concerned with work to be performed on a particular stretch of river "without the benefitted area of the District, but within the exterior boundaries," and desired further assurance that MRGCD had conveyed the necessary property interests to the United States before Reclamation could begin the channelization work. Id. at 1. The Certification prepared by Reclamation and unanimously approved by the Board, states that "the District, by that certain instrument labeled 'Grant of Easement' dated November 24, 1953, did convey to the United States such of its works and facilities, including rights-of-way, as were needed by the United States in the execution of the work contemplated under the [1951 Repayment Contract]." Trial Exh. 169 (US085) at 1. MRGCD certified that it had "assigned such rights-of-way to the United States with full covenants and warranties, by [the 1953 Grant of Easement], subject to the terms and conditions of Repayment Contract No. 178r-423, as amended." Id.

###### H.    Other Licenses, Agreements, and Contracts

120.    Through the execution of literally dozens of agreements and licenses by the

United States concerning Middle Rio Grande Project properties, MRGCD was made aware of

the United States' continued reliance on the 1953 "Grant of Easement" and the United States'

claim of title to various properties formerly owned by MRGCD.  For example, on May 21, 1958,

the United States granted the State of New Mexico permission to realign a portion of U.S.

Highway 85 over the "easement of the United States known as the Feeder No. 4, Belen Highline

Canal [that had been] assigned to the United States from [MRGCD] on November 24, 1953."

Trial Exh. 158 (US075) at 2 ¶ 1.  MRGCD acknowledged the agreement by signing it along with

the United States.  Id. at 5.  Also on May 21, 1958--and again with the acknowledgment of

MRGCD--the United States and the State of New Mexico executed a contract for the relocation

of the San Acacia Drain.  Trial Exh. 159 (US076).  This contract was similarly based on the

premise that "[MRGCD] has, pursuant to lawful authority and contract, transferred to the United

States certain of its works and facilities including the rights-of-way and water-conveying

facilities known as the San Acacia Drain."  Id. at 1.

121.    On September 30, 1958, Reclamation, the Bureau of Land Management, *and*

MRGCD executed an agreement allowing joint use of a building housing radio equipment on

Sandia Crest that Reclamation used in operating and maintaining the Project.  Trial Exh. 163

(US080).  One recital on which this agreement is based recognizes that "pursuant to [the 1951

Repayment Contract], the works and facilities of the District have been conveyed to the United

States, subject to the provisions of Article 26 of the contract which reads in part as follows:

[quoting language from Article 26 that title to Project works would be reconveyed to MRGCD

after repayment and 'on consent of Congress']").  Id. at 1.

122.    On March 19, 1959, Reclamation executed a "Release of Liability" agreement with Charlie and Ruth Teas of Albuquerque, New Mexico.  Trial Exh. 172 (US088).  Pursuant to the agreement, the Teas consented to Reclamation widening a maintenance road adjacent to the Albuquerque Riverside Drain, and agreed to hold the United States harmless for any damage that might result to the Teas' nearby recreational facilities.  Id. at 2 ¶¶ 6, 7.  In executing this agreement, the United States relied upon the premise that "[MRGCD] has, pursuant to lawful authority and contract, transferred to the United States certain of its works and facilities including the rights of way and water-conveying facility known as the Albuquerque Riverside Drain."  Id. at 1 ¶ 2.

123.    MRGCD and the United States continued to rely on the 1953 Grant of Easement as an instrument conveying to the United States title to Middle Rio Grande Project works and properties after the execution and recording of the 1962 county-by-county grants of easements that MRGCD now argues "replaced" the 1953 "Grant of Easement."  For instance, on November 20, 1963, the United States executed an agreement with the New Mexico State Highway Commission and acknowledged by MRGCD for construction of Interstate 40 over several Project facilities in Bernalillo County that states that "the United States has acquired from [MRGCD], by a contract dated September 24, 1951, as amended, *and by an easement dated November 24, 1953*, the District's works and real property necessary for accomplishment of the Middle Rio Grande Project, which acquisition includes certain lands and works located in Bernalillo County, New Mexico, being known as the Duranes Lateral, Zearing Lateral, Alameda Interior Drain and Albuquerque Acequia."  Trial Exh. 231 (US135) at 1 (emphasis added).

124.    Similarly, on February 8, 1965, the United States signed an agreement with the State of New Mexico and acknowledged by MRGCD to allow the State to replace a bridge over

the Albuquerque Main Canal.  Trial Exh.235 (US138).  This agreement states that "the United

States has acquired from [MRGCD], by a contract dated September 24, 1951, as amended, and

by an easement dated November 24, 1953, the District's works and real property necessary for

accomplishment of the Middle Rio Grande Project, which acquisition includes certain lands and

works located in Bernalillo County, New Mexico, being known as Albuquerque Main Canal."

Id. at 1.

125.    On November 19, 1964, the United States and MRGCD executed a license and

agreement with the Albuquerque Metropolitan Arroyo Flood Control Authority.  Trial Exh. 234

(US137).  This agreement also identifies the United States' interests in Middle Rio Grande

Project properties as more than just an easement interest: "[T]he District, has, pursuant to lawful

authority and contract, transferred to the United States certain of its works, including certain

rights of way *and* the drains, canals, laterals and acequias located thereon, as hereinafter

described, located within the County of Bernalillo."  Id. at 1.

126.    On March 7, 1977, Reclamation, MRGCD and the City of Albuquerque executed

an agreement to allow the City to continue to discharge storm waters into the San Jose Drain.

Trial Exh. 296 (US187) at 1-2.  This agreement recognizes that "the District has, pursuant to

lawful authority and contract, transferred to the United States certain of its works, including

rights of way, as hereinafter described, located within the City of Albuquerque and the County of

Bernalillo."  Id. at 1.  This agreement also provides that "the parties hereto recognize that at

some future time, in accordance with applicable law, *the works and facilities of the United States*

may be operated and maintained by the District and/or *the title thereto may be reconveyed to the*

*District*."  Id. at 4 ¶ 12 (emphasis added).

127.    On November 8, 1977, MRGCD, Reclamation, and the New Mexico State Park & Recreation Commission executed an "Agreement concerning the Construction and Maintenance of Park Facilities on Conservancy District Lands."  Trial Exh. 299 (US189).  The first recital on which this agreement is based states that "the District is operating and maintaining certain rights-of-way for ditches, canals, [and] drains, and legal title to the same being vested in the United States of America."  Id. at 1.

128.    In October 1981, the Department of the Interior through Reclamation, the Bureau of Indian Affairs, and the Secretary of the Interior's Designated Engineer, executed an agreement with the Six Middle Rio Grande Pueblos Irrigation Committee concerning the procedures for storage and release of Indian water entitlements in the Middle Rio Grande Valley. Trial Exh. 310 (US191).  "Additionally, through the March 17, 1980 Agreement [with MRGCD providing for a quantity of water to be stored in El Vado Reservoir to meet the needs of the Middle Rio Grande Pueblos] *and by virtue of the U.S. Government's ownership of certain dams, reservoirs, and conveyance channels*, [Reclamation] has the responsibility to monitor District programs of operations and maintenance of the works constructed pursuant to the official plan without in any way showing partiality to District lands as distinguished from Pueblo Indian lands."  Id. (emphasis added).

**I.    Fencing of Middle Rio Grande Project Properties**

129.    In the late 1960s and early 1970s, MRGCD used the United States' title interest in the Project properties to deflect public pressure for additional fencing to prevent the accidents, such as drownings.  On September 8, 1967, MRGCD wrote to United States Senator Joseph M. Montoya and attributed some of the responsibility for fencing issue to the United States and its ownership of Project properties.  See generally Trial Exh.246 (US143).  In an attached statement

from MRGCD's Board, MRGCD advised Senator Montoya that "[a]ll the ditches, canals, and drains to which the District had acquired title have, in turn, been conveyed to the United States Government by virtue of a Rehabilitation Contract under which the Federal Government was authorized to expend some [$18 million].  The title will remain in the United States until the sum due for rehabilitation has been repaid."  Id. Attch. at 1.  At its Board meeting on September 12, 1967 on this issue, MRGCD repeated that "all the ditches, canals, and drains to which the District have acquired title have been conveyed to the United States Government."  Trial Exh. 247 (US144) at 2.

130.    When the issue of fencing arose again 1972, MRGCD reaffirmed its 1967 statement that the United States owned the Project properties, and also passed a resolution on April 25, 1972 indicating that because "the United States owns title to most of the works of the District" and MRGCD could not afford the fencing program itself, that MRGCD would only "encourage" funding for a project for fencing and piping through other agencies of the government.  Trial Exh. 255 (US151) at 6.

131.    The following month, the Congressional Subcommittee on Water and Power Resources of the Senate Interior and Insular Affairs Committee held hearings on Senate Bill S.3472, a bill to authorize federal cost sharing for a fencing program for the Middle Rio Grande Project.  In its testimony before the Subcommittee, MRGCD repeatedly emphasized the federal responsibility for any remedial measures because the United States owned the Project facilities.  See Trial Exh. 256 (US152) at 1-2, 4, 6-7 (emphasis in original):

> Under a rehabilitation contract between the United States and [MRGCD] dated the 21st [sic] day of September, 1951, all works within the District to which [MRGCD] had title, was conveyed to the United States (see Section 29 of that Contract, on page 14).  Title to all of the works of [MRGCD] remains vested in the United States until otherwise provided for by Congress.

> * * *
>
> Fencing of canals and ditches in the [District] presents several serious problems
> [including that] the title to the works of the District is in the United States
> Government and the property owners would be assessed for the purpose of
> placing improvements on lands that their representative does not own.
>
> * * *
>
> In addition, title to the major portion of the works of [MRGCD] is in the United
> States and will remain there for many years.  It would, thus, appear that funding
> for the protection of people who may be subject to accident on United States
> property should be the responsibility of the United States.

132.    In his testimony on S.3472, Governor Bruce King of New Mexico also urged the

Subcommittee  to conclude that because the United States owned the Middle Rio Grande Project

properties that the federal government should bear a greater share of the financial burden of

implementing a fencing program for the Middle Rio Grande Project.  See Trial Exh. 257

(US153) at 3, 4:

> I am advised that the question is further complicated by the fact that under the
> 1951 contract between the Bureau of Reclamation and the District for the
> repayment of reimbursable construction costs, the United States holds title to all
> of the works of the District and title must continue to be vested in the United
> States until otherwise provided by Congress.
>
> * * *
>
> I urge this Committee's favorable consideration of an amendment to S.3472 to
> provide, with respect to projects constructed, owned or operated by the United
> States, that the Secretary of the Interior may, under appropriate contract, advance
> all of the funds required for the needed safety measures with one or more political
> subdivisions in the benefitted area required to repay, without interest, 50% of the
> construction costs or that amount which the Secretary finds that the political
> subdivisions are able to pay, whichever is the lesser.

**J.    Other Interactions Involving Local Governments and Third Parties**

133.    In dealings contemporaneous with the 1953 Grant of Easement and the 1961 and

1962 county-by-county grants of easement, both Reclamation and MRGCD indicated to local

governments and third parties that the United States held title to all Middle Rio Grande Project

properties.  For example, by letter dated August 10, 1959, MRGCD informed the Village of Los

Lunas that MRGCD was not responsible for street paving affecting project properties in Los Lunas because "[a]ll of the rights of way of the Conservancy District have been transferred to the United States Government in care of the Bureau of Reclamation." Trial Exh.173 (US089). On September 6, 1960, MRGCD informed the City of Albuquerque that MRGCD was not responsible for paving assessments for Project property because "[w]e have transferred this property to the United States Government and they have been the owner for the passed four or five years." Trial Exh. 187 (US103). Similarly, in a letter dated March 29, 1961, Reclamation and MRGCD wrote the New Mexico State Tax Commission to acquire easements adjacent to Project ditches "on each side of the existing 50-feet which [MRGCD] and the Bureau of Reclamation *already own*." Trial Exh. 181 (US097) (emphasis added).[11]

134.    On March 28, 1960, Reclamation wrote to a Mr. Joseph E. Roehl, who had made inquiry as to "the width of the right of way for the Lane Lateral, Middle Rio Grande Project." Trial Exh. 180 (US096) at 1. In its letter, Reclamation indicated that by operation of New Mexico conservancy law, MRGCD had acquired rights of way in all laterals of 50 feet, and that "[i]n connection with the rehabilitation of the project by the Bureau of Reclamation, the District has conveyed the project works, including all laterals and rights of way to the United States." Id. On October 4, 1960, Reclamation and MRGCD wrote a joint letter to a Mr. M.H. Felts, informing him that a building he was constructing encroached upon the rights of way for the Old Belen Acequia, which "is described on [MRGCD] Property Map 100 and is owned, operated and

_____

[11] See also, e.g., Trial Exh.244 (US142) at 1 (May 2, 1967 letter from MRGCD to City of Belen concerning proposed annexation plan and informing the City that "[a]s to the works of the District, generally speaking, those have been conveyed to the United States Government").

maintained by the Bureau of Reclamation under [the 1951 Repayment Contract]."  Trial Exh. 189 (US105) at 1.[12]

135.    By letter dated February 26, 1970, Reclamation responded to an inquiry from MRGCD about water rights in the District and a request from MRGCD for the United States to take legal action to protect those rights.  Trial Exh. 253 (US149).  Although Reclamation declined to pursue such legal action, it advised MRGCD that "[s]hould you conclude that it is necessary to include the United States of America as a party to [MRGCD's own] action in view of [the United States'] legal title to the property and its interest in the economic stability of the District with relation to its capability to meet its debt payments under the repayment contract, then we will understand your decision and purpose."  Id. at 2.

136.    In May 1970, MRGCD compiled and issued its "Policies, Rules and Regulations," many of which rely on the United States' ownership and control of the Middle Rio Grande Project properties.  Trial Exh. 254 (US150).  For example, MRGCD adopted a resolution, with the consent of Reclamation, to close several roads along Project structures to the public, including along the Albuquerque Riverside Drain.  Id. at 9.  Part of the premise for this closure was that "it has been brought to the attention of the Board of Directors of [MRGCD] that

---

[12]  See also, e.g., Trial Exh. 200 (US115) at 1 (November 21, 1961 letter from Reclamation to Mr. Alfredo Baca regarding rehabilitation of Angostura Dam and the "land now owned by the Bureau of Reclamation"); Trial Exh. 219 (US124) at 1 (August 21, 1962 letter from Reclamation to MRGCD concerning exchange of lands with City of Albuquerque adjacent to Alameda Interior Drain "title of which is held by the United States"); Trial Exh. 241 (US140) at 1 (January 11, 1967 letter from MRGCD to Mr. John J. Duhigg concerning construction of bridge over "the works of the District which have been transferred to the U.S. Government"); Trial Exh. 252 (US148) at 3 (January 27, 1970 MRGCD Board meeting at which MRGCD informed engineer for proposed redesign of Coors Road affecting Corrales Ditch, Corrales Acequia and Corrales Main Canal that "the District right-of-way has been conveyed to the U.S. Government and [he] should negotiate with the Bureau of Reclamation").

the general public is using the roads along the canals and ditches, title to which is now vested in the United States of America, for vehicular travel," and that public use was interfering with Reclamation's activities.  Id.  Another resolution, concerning the fencing of ditches, similarly states that "the United States owns title to most of the District."  Id. at 23.

137.    On April 19, 1977, MRGCD's counsel submitted to the Board a memorandum addressing whether MRGCD had authority to expend funds on the construction of a fence along the Albuquerque Riverside Drain near the Albuquerque Zoo.  Trial Exh. 297 (US188).  One of the considerations for this determination was stated as follows: "As the Board knows, the title to the Albuquerque Riverside Drain is in the United States Government and no fence could be installed on that property without its consent."  Id. at 2.

138.    In public discussions concerning the "Bosque Conservation Initiative" in 1990, Reclamation took the position that MRGCD had conveyed Middle Rio Grande Project properties to the United States through the 1953 Grant of Easement.  "On November 24, 1953, the District conveyed to the United States much of its works and facilities, including the rights-of-way required to execute the work under the contract.  On December 9, 1958, the District certified to the United States that it possessed and warranted all rights-of-way necessary for channelization and flood control work with the project."  Trial Exh. 169 (US085) at 3.

139.    MRGCD's April 1993 "Water Policies Plan" acknowledges that title to all MRGCD works vested in the United States until repayment was complete and Congress consented to reconveyance. "In return for the United States' work [pursuant to the 1951 Contract], the Conservancy turned over ownership of all 'its works' in trust to the United States for the benefit of the ratepayers of the district.").  Trial Exh. 350 (US199) at 48-49.  "Under [the 1951Contract] and subsequent contracts, the Bureau acquired all existing debt, in return for

which it received the districts property rights in the works, as a security interest, [and] undertook a rehabilitation program which included El Vado dam and the Isleta, Angostura, San Acacia and Cochiti diversion dams, extensive work on lateral canals, and the channelization of 127 miles of river." Id. at 22.

140.    In a November 1994 paper published by the New Mexico Water Resources Research Institute, counsel for MRGCD wrote: "In addition to agreeing to repay improvement, operation and maintenance costs, the Conservancy conveyed an interest in ownership of all of its works and water in trust to the United States for the benefit of the rate payers in the Conservancy."  Trial Exh. 358 (US201) at 382; see also id. at 386 n.8 (stating that "[a]rguably, the ownership interest is a security interest only").

141.    In 1998 testimony before the New Mexico State Legislature, the Chief Engineer of MRGCD stated that title to all MRGCD works had been transferred to the United States and could not be reconveyed until MRGCD paid off the 1951 Contract and Congress consented to the reconveyance.  "Under the 1951 contract, title to many District works was assigned or conveyed to the Bureau of Reclamation . . . .  Once [MRGCD's debt under the 1951 Contract] is paid, we will, as specified in Article 26 of the contract, petition the U.S. Congress to consent to reconveyance of title to all Project works, including El Vado Dam and the three diversion dams on the Rio Grande (Angostura, Isleta, and San Acacia) to [MRGCD].  The District is working closely with the Bureau of Reclamation and the New Mexico Congressional delegation to ensure that the eventual hand-over of complete responsibility for all District functions and property will be smooth."  Trial Exh. 369 (US202) at 2-3.

142.   Following up on that position, in 1999 when he made MRGCD's final payment to the Bureau for its share of the Middle Rio Grande Project, Mr. Shah asked that the Bureau immediately begin work on the "transfer of titles" back to MRGCD.  Trial Exh. 375 (US204).

143.   During discussions with the Department of the Interior's Office of the Solicitor in 1999 on issues relating to the transfer of projects works and storage rights between MRGCD and Reclamation, MRGCD's counsel conceded that "on November 24, 1953, the Conservancy granted an easement to the United States for Conservancy works and real property . . . cover[ing] all real estate described in the official maps of the Conservancy and all structures on the real estate necessary to operate the irrigation and drainage system."  Trial Exh. 373 (US203) at 4. MRGCD's counsel also recognized the 1958 Certification of Channelization Right-of-Way based on the 1953 Grant of Easement, and acknowledged that the 1962 county-by-county grants of easement were "*additional* right-of-way easements."  Id. (emphasis added).  With regard to the "transfer of title" back to MRGCD following repayment of the 1951 Contract, MRGCD's counsel further recognized that the 1951 Contract "required an act of Congress before the Secretary could re-convey the project works to the Conservancy," but suggested that this contract term could be amended to delete the requirement.  Id. at 5.[13]

_____

[13]The August 23, 1999 MRGCD letter to Reclamation specifically states:

> The [1951] MRGP Contract is explicit that an interest in Conservancy project works must be conveyed to the United States, with title satisfactory to the Secretary of the Interior, if so required by the Secretary of the Interior, and that the works may be reconveyed to the Conservancy, with the consent of Congress, upon repayment of the debt.  Id. art. 26.  *It appears the Secretary of the Interior actually required the Conservancy to convey the Conservancy works to the federal government at the time of contracting or afterward.  The contract provides that title will remain in the United States to all of the works constructed by the United States or conveyed to the United States until the Conservancy fulfills all of its contract obligations, including repayment, at which time, "on*

## IX.  MRGCD'S USE IN JUDICIAL PROCEEDINGS OF THE UNITED STATES' TITLE TO MIDDLE RIO GRANDE PROJECT WORKS AND REAL PROPERTY

144.    MRGCD's April 1993 "Water Policies Plan" admits that MRGCD has on numerous occasion used the United States' title interests in the Middle Rio Grande Project to its advantage in judicial proceedings.  For example, the Plan states:

> The United States' interest in [MRGCD] property shelters [MRGCD] from some kinds of legal and political challenges.  Several lawsuits have been dismissed on the grounds that the United States is an indispensable party, especially <u>Texas v. New Mexico</u>, filed in 1952, which alleged that the MRGCD had been operating in violation of the Rio Grande Compact [and a] 1972 class action suit asking for injunctive relief to abate the nuisance caused by [MRGCD] unfenced irrigation ditches was also dismissed on these grounds.

---

> *consent of Congress," the United States may reconvey the works to the Conservancy.*  <u>Id</u>. arts. 26 and 29.  Article 29 specifically states that the works constructed by or conveyed to the United States will "continue to be vested" in the United States "until otherwise provided for by Congress, notwithstanding the transfer hereafter of any such works to the Conservancy for operation and maintenance."
>
> *                    *                    *
>
> The Conservancy has assigned project works and water rights to the United States over the course of the projects.  It appears the Conservancy has conveyed to the United States, through easements, Conservancy rights to project works with no reversion clauses.  First, on November 24, 1953, the Conservancy granted an easement to the United States for Conservancy works and real property.  Grant of Easement, Nov. 24, 1953.  The easement covers all real estate described in the official maps of the Conservancy and all structures on the real estate necessary to operate the irrigation and drainage system.  The easement does not contain a reversion clause.  The Conservancy certified that this easement included the river bed of the Rio Grande for channelization purposes.  Certification of Channelization Right-of-Way, Dec. 9, 1958.
>
> Second, on May 22, 1962, the Conservancy granted additional Right-of-Way easements to the United States.  For $1.00 per county, the Conservancy conveyed by easement to the United States all of the Conservancy works in Valencia, Socorro, Bernalillo, and Sandoval Counties.

Trial Exh. 373 (US203) at 3, 4 (emphasis added).

Trial Exh. 350 (US199) at 23.  The following are examples of cases in which MRGCD used, or attempted to use, the United States' title to Middle Rio Grande Project properties to its advantage in judicial proceedings.

### A.    Texas v. New Mexico

145.    In Texas v. New Mexico, Original Action No. 9, both MRGCD and the United States argued on numerous occasions before the United States Supreme Court in the 1950s, contemporaneously with transfer of the Middle Rio Grande Project from MRGCD to the United States, that title to all Project works and facilities had been conveyed to the United States.  As MRGCD's counsel stated in a memorandum to MRGCD's Board dated June 16, 1955, "[w]e have advanced in our several briefs and motions before the United States Supreme Court in the suit Texas has instituted against the State of New Mexico and the District that the United States now is the owner of all of the works of the District and is an indispensable party to the suit."  Trial Exh. 100 (US030) at 2-3.[14]

146.    Texas v. New Mexico was an original action before the Supreme Court in which Texas alleged that the Middle Rio Grande Project facilities were not being managed in a manner consistent with New Mexico's Rio Grande Compact obligations.  From its opening brief in this case filed in December 1951, MRGCD, as a co-defendant with the State of New Mexico, sought to get the case dismissed without a resolution of the merits of Texas' claims:[15]  "The Middle Rio

---

[14] In this memorandum, MRGCD's counsel advocated to the Board that it could gain further advantage in pursuing dismissal of the Texas v. New Mexico lawsuit if it could persuade the United States to record the November 24, 1953 "Grant of Easement" conveying title of MRGCD's properties to the United States.  Trial Exh. 100 (US030) at 2 and 3.

[15] The importance of getting the Texas v. New Mexico litigation dismissed was a key point in MRGCD's 1954 annual report: "[T]his suit is more important than is generally recognized and should New Mexico lose the results could amount to a major disaster to this area and most of the entire state."  Trial Exh. 87 (US023) at 6; see also id. at 10 (discussing developments in case).

Grande Conservancy District has contracted to convey its works and water rights, which include El Vado Dam and Reservoir, to the United States. * * * The United States is now the real party in interest and is entitled to be heard."  Trial Exh. 58 (US013) at 24-25.  In its subsequent Answer to Texas' Complaint, MRGCD formally asserted the defense that the United States was an indispensable party because, *inter alia*, the United States has contracted with [MRGCD] for the acquisition of certain properties of the District including El Vado Dam and Reservoir."  Trial Exh. 70 (US014) at 15.

147.    In its first brief on the indispensability of the United States, filed in June 1953, MRGCD reviewed Articles 26 and 29 of the 1951 Repayment Contract, and concluded that "[u]nder the September 24, 1951, contract El Vado Dam and Reservoir is the property of the United States" and thus the United States was an indispensable party.  Trial Exh. 75 (US017) at 59.  In its August 1953 reply to Texas' assertion that title to El Vado Dam and Reservoir had not yet passed to the United States, MRGCD suggested that the 1951 Contract itself passed at least a present equitable interest to the United States in El Vado Dam and Reservoir.  Trial Exh. 77 (US127) at 17-18.

148.    The Special Master, in a report entered on February 28, 1954, agreed with MRGCD that the United States had an interest in El Vado Dam and Reservoir.  "Title to certain of the District works is to be conveyed to the United States (Art. 26, R.778), and is to remain in the United States notwithstanding transfer of any of the works to the District for purposes of operation and maintenance, *until otherwise determined by Congress*."  Trial Exh. 84 (US021) at 26 (emphasis added).  The Special Master concluded, however, that the United States was not an indispensable party by virtue of its title interests in the Middle Rio Grande Project, because the 1948 Act required the Project to be operated in conformity with the Rio Grande Compact, which

was precisely the relief sought by Texas.  Id. at 29-30.  The Special Master did conclude that the United States was indispensable because of the rights of the Six Middle Rio Grande Pueblos.  Id. at 47.

149.    Following the Special Master's February 24, 1954 Report, Texas moved to amend its prayer for relief and the Special Master issued a second report recommending that the motion be granted.  MRGCD objected to this second report, and to the fact that the Special Master refused to consider "All Defendants' Exhibits 48 and 49"--the 1953 Grant of Easement and the November 24, 1953 MRGCD Board minutes that directed the execution of that instrument--that MRGCD had offered to show that "pursuant to the Contract of Sept. 24, 1951, title to certain of the works of the District, including El Vado Reservoir, have been conveyed to the United States and that the United States has title to and is now in control of the operation and maintenance of El Vado Reservoir."  Trial Exh. 117 (US042) at 3-4 (All Defendants' Exhibits 48 and 49 attached thereto).

150.    In its brief in support of these exceptions, MRGCD cited the 1953 Grant of Easement for the statement that "title to all of the works of the Defendant, Middle Rio Grande Conservancy District, hav[e] vested in the United States," rendering it an indispensable party. Trial Exh. 118 (US043) at 25 (citing R.1293, All Defendants Exhibit 49).  "[T]he United States is now the owner of all the works of the Defendant, Middle Rio Grande Conservancy District, including El Vado Dam and Reservoir, and a decree entered pursuant to [Texas'] tendered amended statement of relief, which seeks to control the operation of El Vado Dam and Reservoir, would necessarily affect the property rights of the United States."  Id. at 25-26; see also id. at 24, 26, 30 and 31 (additional statements that the United States held title to all of MRGCD's works).

-63-

151.    On October 17, 1955, the Supreme Court invited the United States to provide its view on the question of indispensability.  In a brief filed in February 1956, the United States requested until November 1956 to file a brief setting forth its views, but the United States did indicate that pursuant to the 1951 Repayment Contract that MRGCD "undertook to convey to the United States legal title to all its works, to be reconveyed, upon consent of Congress, after performance by the District of all its obligations under the contract."  Trial Exh. 134 (US054) at 3.  The United States stated that MRGCD "has conveyed to the United States the legal title to all its works," and in an appendix to the brief the Solicitor of the Department of Interior also stated that MRGCD "has conveyed to the United States title to its works."  Id. at 3-4 and Appx. at 7.

152.    In its November1956 brief, the United States argued that it was an indispensable party because Texas sought to control the Project features to which the United States held title: "Under the agreement of September 24, 1951, the United States has now taken over title to and operation of all the dams and other works of the Middle Rio Grande Conservancy District. * * * And since the facilities are now owned and operated by the United States, a decree putting them under the control of a Special Master would amount to an interference with the property and activities of the Government."  Trial Exh. 143 (US063) at 8-9; see also id. 4, 10, 11.[16]  In its response to the United States' memorandum asserting ownership to all of MRGCD's works and facilities, MRGCD (a named co-defendant in the case with the State of New Mexico) not only acknowledged the United State's claim of ownership, but embraced it: "The defendants concur, *without reservation*, in the argument presented by the United States in support of the proposition

---

[16] The United States also argued that it was an indispensable party by virtue of the Indian interests in distribution of the waters of the Rio Grande, even though the Special Master in a second report had concluded the recommended that a proposed amended prayer by Texas had cured this problem.  See id. at 12-16.

that *since the United States now owns and operates all the dams, reservoirs and other facilities of [MRGCD]*, which the proposed amended prayer of the plaintiff seeks to control, the United States of America is an indispensable party to this lawsuit." Trial Exh. 145 (US064) at 3 (emphasis added); see also id. at 2 ("The claim of the United States that it now owns and operates all the dams and facilities sought to be controlled by the decree is fully supported by the facts."); id. at 4.

153.    Shortly after the filing of these briefs, on February 5, 1957, the Supreme Court dismissed the Texas v. New Mexico litigation in a *per curiam* decision. The entirety of the Supreme Court's decision reads "The motions to amend the bill of complaint are denied. The motion to dismiss is granted and the bill of complaint is dismissed because of the absence of the United States as an indispensable party." 352 U.S. 991 (1957).

### B.    The **State of New Mexico ex rel. Norvell** and **Escamilla** Fencing Cases

154.    In State of New Mexico ex rel Norvell v. Middle Rio Grande Conservancy District, Civ. No. 3-72-2666 (N.M. State Dist. Ct., Bern. Cty. 1972) and State of New Mexico ex rel Albino Escamilla v. Middle Rio Grande Conservancy District, Civ. No. 3-72-03901 (N.M. State Dist. Ct., Bern. Cty. 1972), Plaintiffs brought nuisance claims against MRGCD[17] because of a number of drownings in Middle Rio Grande Project ditches and canals. See Trial Exh. 259 (US155) and Trial Exh. 277 (US172). Plaintiffs sought injunctive relief ordering MRGCD to fence or otherwise enclose these facilities to abate the alleged hazardous conditions.

_____

[17] The City of Albuquerque, the County of Bernalillo, and the Commissioner of the Bureau of Reclamation were also named defendants in the Escamilla case. Lead counsel for Plaintiffs in the Escamilla case and, for a time, in the Norvell case, was Charles T. DuMars, lead counsel for MRGCD in the present case.

155.    In these two cases, which were eventually consolidated, MRGCD repeatedly argued--and argued successfully--before both the District Court of Bernalillo County and the Supreme Court of New Mexico that the United States was an indispensable party because MRGCD had conveyed title to all of its Middle Rio Grande Project properties to the United States, and that such title would remain with the United States until an act of Congress.  For example, in its motion to dismiss in both cases, MRGCD stated that "the United States is an indispensable party for the reason that it owns fee simple title to all ditches and canals formerly owned by [MRGCD]."  Trial Exh. 261 (US156). In its memorandum brief in support of its motion to dismiss, MRGCD argued:

> [MRGCD] has entered into a Rehabilitation Contract with the United States . . . . Under this Contract, upwards of $18,000,000.00 was expended by the United States for the rehabilitation of District works.  This indebtedness is repaid to the United States semi-annually and under the Contract, title to all works of the District were conveyed to the United States.  This includes all drains, irrigation ditches and canals which were owned by the District.  Title to these works remain in the United States until there is an Act of Congress which authorizes reconveyance to the title to [MRGCD].

Trial Exh. 276 (US171) at 5-6; see also Trial Exh. 280 (US174) (MRGCD's Reply Brief).[18]

156.    In its written letter opinion dated July 10, 1974, the District Court found that "[t]itle to all works formerly owned by [MRGCD] is in the United States, which includes  the canals, ditches and drains."  Trial Exh. 279 (US175) at 7.  Based on this finding, the District Court held the United States' interests in the Middle Rio Grande Project rendered the United

---

[18] On September 13, 1974, the District Court held a hearing on Plaintiffs' motions to "set aside" his decision on the indispensability of the United States.  See Trial Exh. 284 (US205).  At this hearing, MRGCD strenuously reargued its position that the United States was the real party in interest, even after the return of operation and maintenance of the facilities at issue to MRGCD. See, e.g., id. at 352 ("Our position is that here you have not only got a security interest, but the legal title holder of the property is involved.").  The court denied Plaintiffs' motions from the bench.  Id. at 363.

States an indispensable party that could not be joined, and the Court dismissed both lawsuits on this basis.  Id. at 8; see also Trial Exh. 283 (US177) (Order of dismissal on ground that United States was an indispensable party that could not be joined).

157.    On appeal to the New Mexico Supreme Court, MRGCD repeated its argument that the United States was an indispensable party because MRGCD had conveyed all Middle Rio Grande Project properties to the United States.  For example, MRGCD stated:

> The Plaintiffs in the Escamilla case had not denied in Federal Court nor did they deny in State Court that the title to the ditches, canals and drains of the District, i.e., the District works, had been conveyed to the United States nor did they or could they deny that the contract with the United States provided that title to the District works would remain in the United States until otherwise provided by Congress even though operation and maintenance might be taken over by [MRGCD] [citing Paragraph 29 of the 1951 Repayment Contract].  Also, it is noted on Paragraph 13(b) of the same contract . . . that even though the United States allows the District to operate and maintain certain works, the District is operating as an agency of the United States and its agency can be terminated on six month's notice by the United States.

Trial Exh. 286 (US179) at 5.  The New Mexico Supreme Court affirmed the District Court's dismissal of both cases on the basis that the United States was an indispensable party. Trial Exh. 289 (US182).

158.    As the previous quotation indicates, the Escamilla case was temporarily removed to the United States District Court for the District of New Mexico because the Escamilla plaintiffs had included the Commissioner of the U.S. Bureau of Reclamation as a defendant. While in federal District Court, Civ. No. 9610 (D.N.M.), MRGCD argued that it had conveyed all of its Project properties to the United States, and that these properties would not be reconveyed to MRGCD absent an act of Congress.  Referring again to the 1951 Repayment Contract, MRGCD stated that:

under the Contract, title to all works of the District were conveyed to the United
States.  This includes all drains, irrigation ditches and canals which were owned
by the District.  Title to these works remain in the United States until there is an
act of Congress which authorizes reconveyance of the title to [MRGCD].

Trial Exh. 262 (US157) at 2-3.

159.    Relying on MRGCD's statement, Judge Mechem dismissed the United States

from the case, finding that the United States held legal title to the Project works and that there

had been no waiver of sovereign immunity against the United States' interests:

A contract has been entered into between the government and the Conservancy
District.  Under this contract legal title was conveyed to the United States and
approximately $18,000,000 was expended by the United States for rehabilitation
of the District works.  The indebtedness is repaid to the United States semi-
annually.  Under these circumstances it appears that any order requiring
additional expenditures (for fencing the ditches or otherwise abating the nuisance)
would have a definite effect on the public treasury and upon the public domain.

Trial Exh. 267 (US162) at 3.  Having dismissed the United States as a party, which had been the

predicate for removing the litigation to federal court, Judge Mechem did not reach the question

of whether the case against MRGCD should be dismissed on the basis of the United States

indispensability, and remanded the case back to state court (where, of course, that issue was

decided in MRGCD's favor).  Id. at 6[19]

**C.    The Escamilla "One Person/One Vote" Case**

160.    In another case filed in federal district court, Escamilla v. Middle Rio Grande

Conservancy District, Civ. No. 9547 (D.N.M. 1972), the plaintiffs argued that the method for

selection of the MRGCD Board was unconstitutional.  Trial Exh. 258 (US154).  In support of a

---

[19] During the remand to state court, MRGCD used Judge Mechem's finding that the United
States held title to Middle Rio Grande Project properties to buttress its arguments that the United
States was an indispensable party in both the District Court and the New Mexico Supreme Court.
See Trial Exh. 280 (US174) at 6.

motion for a protective order relating to discovery that was heard and granted in part, MRGCD stated "[i]t must be remembered that title to all works of [MRGCD], including El Vado Dam has been conveyed to the United States Government under contracts." Trial Exh. 268 (US163) at 5. During this litigation, each of the MRGCD Board members certified under oath and filed with the Court answers to interrogatories stating that "[t]itle to the District works has been conveyed to the United States, including El Vado Dam." See Trial Exh. 269 (US164), Trial Exh. 270 (US165), Trial Exh. 271 (US166), Trial Exh. 272 (US167), Trial Exh. 273 (US168), Trial Exh. 274 (US169), Trial Exh. 275 (US170). On May 23, 1975, this case was dismissed as moot because the New Mexico State Legislature enacted a law to regulate the election of the MRGCD Board of Directors. Trial Exh. 287 (US180).

### D.    Standifer v. The Middle Rio Grande Conservancy District

161.    In Standifer v. The Middle Rio Grande Conservancy District, Civ. No. 8-76-03640 (N.M. State Dist. Ct., Bern. Cty.), Plaintiffs alleged that MRGCD, in its operation of the Project works, canals, and laterals, caused portions of Plaintiffs' real estate and improvements "to be flooded, covered, seeped, subject to overflow or washing or otherwise injured by the flow and presence of waters introduced by [MRGCD]. Trial Exh. 290 (US183) at 2. Plaintiffs sought $125,000.00 in damages. Id. In an order granting MRGCD's motion to dismiss, the Court held that "the United States of America was title owner of the Corrales Main Canal at the time damages in question are alleged to have occurred and the United States is an indispensable party to this action whose joinder is not feasible pursuant to Rule 19 of the New Mexico Rules of Civil Procedure." Exh. Trial Exh. 293 (US184) at 1-2.

### E.    City of Albuquerque v. U.S. Dept. of the Interior

162.     In City of Albuquerque v. U.S. Dept. of the Interior, Civ. No. 89-1198 JP (D.N.M. 1989), the City sought to quiet title to a riverside property owned by a third party that the City was seeking to condemn in a separate state proceeding.  Both the United States and MRGCD were named as defendants in the case because the United States asserted an interest in the property by virtue of the 1953 Grant of Easement and having constructed jetty jacks on the property.

163.     On October 29, 1990, before this very Court in which MRGCD now asserts the 1953 Grant of Easement conveyed *nothing*, MRGCD filed proposed findings of fact that included the following:

1. Articles 14, 26 and 27 of the [1951 Contract] between the United States and [MRGCD] . . . require MRGCD to convey all of its property and works to the United States and to provide the United States with all rights of way necessary for the river channel rectification described in Article 9(c) of the contract.

2. On November 24, 1953, [MRGCD] provided the United States Bureau of Reclamation with a Grant of Easement.

3. *The November 24, 1953 Grant of Easement conveyed to the United States all [MRGCD] works and real property required for accomplishment of the purposes set forth in [the 1951 Contract]* together with the right, privilege and easement to construct, replace, operate and maintain any structure the United States of America may deem necessary or desirable for the purposes of carrying out the provisions of [the 1951 Contract] in and upon the real estate described in the official maps of [MRGCD].

Trial Exh. 341 (US193) at 1-2 (emphasis added).

164.     In its proposed findings of fact, the United States also relied on the 1953 Grant of Easement as the basis for the claim to its property interest in the disputed lands, noting that it had entered the property in good faith reliance on the 1953 Grant of Easement and that the 1953

Grant granted more than just easement interests.  Trial Exh. 343 (US194) at 2, 3, 6.[20]  Although

MRGCD later acknowledged in that case that the 1953 Grant of Easement did not convey the

particular property at issue in that litigation because MRGCD did not own that property in 1953,

MRGCD did not rescind its statement that the 1953 Grant of Easement conveyed other

properties to the United States.

F.     **Tracey v. Board of Directors and Officers of the Middle Rio Grande Conservancy District**

165.     In Tracey v. Board of Directors and Officers of the Middle Rio Grande

Conservancy District, Civ. No. 17219 (N.M. State Dist. Ct., Val. Cty. 1972), Plaintiff, whose

husband drowned in the New Belen Wasteway trying to save the Plaintiff's two children, both of

whom also drowned, brought a negligence action against MRGCD for alleged failure to properly

secure the facility.  Trial Exh. 263 (US158) at 1-3.  Plaintiff sought damages in the amount of

$653,000.  Id. at 4.  MRGCD filed a motion to dismiss this case, asserting that "the ditch or

wasteway in which the decedent, Burnell W. Tracey, is alleged to have drowned, is owned by the

United States Government and is operated and maintained by the United States, and, therefore,

the United States is an indispensable party to this action."  Trial Exh.265 (US160) at 1.  In

support of its motion to dismiss, MRGCD filed the affidavit of its Secretary-Treasurer, who

swore under oath that "said title to the ditch to which allegations are directed in Plaintiff's

Complaint is in the United States Government and not in the Conservancy District."  Trial Exh.

---

[20] Even Plaintiff City of Albuquerque concurred with the position of the United States and
MRGCD concerning the 1953 Grant of Easement, requesting the Court to find that "[o]n
November 24, 1953, [MRGCD] granted an easement . . . over the Accretion Land to the United
States."  Trial Exh. 343 (US195) at 2.

264 (US159) at 1.  Plaintiff subsequently filed a notice of voluntary dismissal, ending the litigation.  Trial Exh. 266 (US161).

### G.    Other Cases

166.    In addition to the numerous cases discussed above, there are other cases in which MRGCD used or attempted to use the United States' title interest in Middle Rio Grande Project works to its advantage in judicial proceedings.  See, e.g., Trial Exh.113 (US039) (answer of MRGCD in Torres v. Olguin de Torres, Civ. No. 13-310 (N.M. State Dist. Ct., Soc. Cty. 1955), in which MRGCD states that "if any ditches and canals traverse the land described in Plaintiffs' Complaint, that such ditches and canals, together with the rights-of-way thereof, belong to the United States of America and if it be the purpose of Plaintiffs' Complaint to quiet their title to the rights-of-way, and easements for such ditches and canals . . . that Plaintiffs' title may not be quieted without the presence of the United States and for that purpose the United States of America is a necessary and indispensable part of this suit"); Trial Exh. 125 (US048) (answer of MRGCD in Bamert v. Adelmann, Civ. No. 13-315 (N.M. State Dist. Ct., Soc. Cty. 1955), stating that "the lands described in Plaintiffs' Complaint include the Joral Ditch, which has been operated and maintained by the Defendant for years past, and is now the property of the United States of America").

### CONCLUSION

167.    The record amply demonstrates that MRGCD and the United States understood and intended for the United States to hold title to all Middle Rio Grande Project properties.  In accordance with those understandings and intentions, the United States acquired title to all Project works and other properties, including those identified in MRGCD's cross claims.  In accordance with federal Reclamation Law, the U.S. Constitution, the 1947 Plan, the 1948 and

1950 Acts of Congress establishing the Project, and the 1951 Repayment Contract, MRGCD and the United States understood and intended that title to the Project properties would remain with the United States until Congress authorized otherwise.

168.    In reliance on this title, the United States invested millions of federal taxpayer dollars in the Project, and took stands to protect this title interest before the United States Supreme Court and in numerous other forums.  MRGCD not only knew of the United States' claim to title, but endorsed it and expanded on it in numerous additional judicial and legislative proceedings to gain advantages it otherwise would not have enjoyed had the United States not held title.

169.    Both MRGCD and the United States understood that title to all Middle Rio Grande Project properties rested with the United States, including El Vado Dam and Reservoir, Angostura and San Acacia Diversion Dams, and the Albuquerque Main Canal and Riverside Drain.  MRGCD's arguments otherwise now are not supported by the facts.


Dated this 7th day of October, 2004.              Respectfully submitted,

                                                  **FOR FEDERAL DEFENDANTS:**

                                                  DAVID C. IGLESIAS
                                                  United States Attorney
                                                  JAN ELIZABETH MITCHELL
                                                  Assistant United States Attorney
                                                  District of New Mexico
                                                  P. O. Box 607
                                                  Albuquerque, New Mexico 87103
                                                  (505) 224-1472

                                                  THOMAS L. SANSONETTI
                                                  Assistant Attorney General
                                                  U.S. Department of Justice
                                                  Environment & Natural Resources Section

<u>   electronically filed              </u>
ANDREW A. SMITH, Trial Attorney
General Litigation Section
C/O United States Attorney's Office
P. O. Box 607
Albuquerque, New Mexico 87103
(505) 224-1468

Of Counsel:

MEGAN J. WALLINE
MICHAEL SCHOESSLER
Office of the Solicitor
U.S. Department of the Interior

**FOR PLAINTIFFS:**

ADVOCATES FOR THE WEST

<u>   telephonically approved          </u>
Alletta Belin
Steven C. Sugarman
Belin & Sugarman
618 Paseo de Peralta
Santa Fe, New Mexico 87501
(505) 983-8936/983-1700

Laurence ("Laird") J. Lucas
PO Box 1612
Boise ID 83701
(208) 342-7024

## CERTIFICATE OF SERVICE

I hereby certify that on October 7, 2004, copies of "FEDERAL DEFENDANTS' AND PLAINTIFFS' PROPOSED FINDINGS OF FACT REGARDING MRGCD'S SECOND AMENDED CROSS CLAIMS" were served by U.S. mail on the following counsel of record:

Alletta Belin
Steven Sugarman
Belin & Sugarman
618 Paseo de Peralta
Santa Fe, New Mexico 87501

Laurence ("Laird") J. Lucas
Advocates for the West
P.O. Box 1612
Boise, Idaho 83701

Christina Bruff DuMars
Charles T. DuMars
Law & Resource Planning Associates
201 3rd Street NW, Ste. 1750
Albuquerque, New Mexico 87102

John E. Stroud/Karen Fisher
New Mexico State Engineer &
Interstate Stream Commission
P.O. Box 25102
Santa Fe, New Mexico 87504-5102

Stephen R. Farris
Marc J. Rosen
New Mexico Attorney General's Office
P.O. Drawer 1508
Santa Fe, New Mexico 87504-1508

Fred Abramowitz
115 Gold Ave, SW #205
Albuquerque, New Mexico 87102

Thomas A. Simons, IV
Frank M. Bond
Faith Kalman Reyes
The Simons Firm, LLP
P.O. Box 5333
Santa Fe, New Mexico 87502-5333

Peggy E. Montano
Trout, Witwer & Freeman
1120 Lincoln Street, Suite 1600
Denver, Colorado 80203

Jay Stein
Stein & Brockmann, P.A.
P.O. Box 5250
Santa Fe, New Mexico 87502-5250

Charles W. Kolberg
Assistant City Attorney
City of Albuquerque
P.O. Box 2248
Albuquerque, New Mexico 87103

Maria O'Brien
Modrall, Sperling, Roehl, Harris & Sisk, P.A.
P.O. Box 2168
Albuquerque, New Mexico 87103-2168

Fred J. Waltz
P.O. Box 6390
Taos, New Mexico 87571-6390

Reid Peyton Chambers/Anne D. Noto
Sonosky, Chambers, Sachse, Endreson & Mielke
500 Marquette Avenue NW, Suite 700
Albuquerque, New Mexico 87102


_____electronically filed_____

Andrew A. Smith