# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

| | | |
|---|---|---|
| RIO GRANDE SILVERY MINNOW, ET AL., | ) | |
| | ) | |
| PLAINTIFFS, | ) | |
| | ) | |
| | ) | |
| vs. | ) | NO. CIV 99-1320 JP/RHS |
| | ) | |
| | ) | |
| | ) | |
| JOHN W. KEYS III, ET AL., | ) | |
| | ) | |
| FEDERAL DEFENDANTS, | ) | |
| | ) | |
| | ) | |
| MIDDLE RIO GRANDE CONSERVANCY | ) | |
| DISTRICT, a political subdivision of the State | ) | |
| of New Mexico, et al. | ) | |
| | ) | |
| CROSS – CLAIMANT. | ) | |
| _____ | ) | |

## CROSS – CLAIMANT MIDDLE RIO GRANDE CONSERVANCY DISTRICT'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

In accordance with the Court's Scheduling Order of July 26, 2004 (Doc. No. 624), Cross – Claimant Middle Rio Grande Conservancy District ("MRGCD") respectfully submits the following proposed Findings of Fact and Conclusions of Law.

## PROPOSED FINDINGS OF FACT

1.      This action was commenced as a general quiet title suit by the Middle Rio Grande Conservancy District ("MRGCD"). The Cross – Claim was amended twice and limited the action to the specific parcels set out in the exhibits to the Second Amended Cross – Claim (Doc. No. 366).

2.  The MRGCD title to these individual parcels is contained in the parties' Master Exhibit List (hereinafter referenced by number as "Cons. List of Exs."). These title documents have not been challenged by the United States nor could they be challenged as the United States' interest, if any, is based upon these documents.

## I.  The Middle Rio Grande Conservancy District: An Overview

3.  The MRGCD is comprised of approximately 128,787 acres of irrigable lands, including the lands of the six Indian Pueblos of Cochiti, Santo Domingo, San Felipe, Santa Ana, Sandia and Isleta, which engage in extensive agricultural practices as they have done since prior to European presence in the area.

4.  The average total annual crop value of the alfalfa, pasture, green chile and vegetables is estimated at approximately $28,000,000.00.

5.  The MRGCD maintains approximately 1,234 miles of water conveyance structures including canals, drains and acequias aimed at delivering water to approximately 11,000 irrigators throughout the Middle Rio Grande Valley.

6.  In addition to the distribution of irrigation water, the MRGCD provides flood protection, maintains drains to protect the water table and provides extensive protection to the environmental and recreational amenities within the boundaries of the MRGCD.

## II.  History of Irrigated Agriculture in the Middle Rio Grande Valley

7.  The Middle Rio Grande Valley lies west of the 100th meridian, and its inhabitants are thus bound to the labors of water control and redistribution. Ira G. Clark, *Water in New Mexico* (1987) at 1-8 and *passim*. (Cons. List of Ex.'s No. 333).

8.  Only through hydrological engineering have conditions been created that allow

even modest numbers of people to live in the area.  The Pueblo Indians first demonstrated this centuries ago when, at least partly driven by drought, they migrated to the river and began irrigating.  *See* Linda S. Cordell, *Ancient Pueblos Peoples* 133, 136 (1994) (Cons. List of Ex.'s No. 351).

9.      When Coronado entered the lush valley of the area known as the Rio Bravo, he encountered native peoples engaged in irrigated agriculture.  The Pueblo culture that this agriculture supported was augmented and diversified by the Spanish settlers who followed Coronado.

10.     Subsequent generations of peoples have flourished in the valley we now call the valley of the Rio Grande subsisting on agriculture through the use of waters in historic ditch systems or acequias.

11.     As a result, irrigated agriculture and the allocation of waters through acequias lie at the political and spiritual heart of the Middle Valley of the Rio Grande.

12.     Since the mid 1920s, the MRGCD has been the political epicenter of this vibrant agricultural community.

13.     However, the laws of aridity did not, of course, change for the Europeans and so they too toiled to water their fields, bringing irrigated acreage in the MRGCD to a peak in 1880.  *See* Sias, H.R. Doc. No. 653, at 180 (Cons. List of Ex.'s No. 55).

14.     Soon after the turn of the century, however, conditions began to deteriorate. Massive diversions in Colorado's San Luis Valley depleted the Rio Grande of its water.  *See* Burkholder Report at 26 (Cons. List of Ex.'s No. 7).  Simultaneously, deforestation and overgrazing sent large amounts of sediment pouring into the river.  *See* H.R. Doc. No. 653, at 179 (Cons. List of Ex.'s No. 55).

15.     Less flow and more sediment resulted in aggradation of the riverbed.  *See* John H.

Bliss, *Views and Recommendations of the State of New Mexico on The Middle Rio*

*Grande Reports of the Chief of Engineers and the Secretary of the Interior in*

*Middle Rio Grande Project, Letter from the Secretary of the Interior Transmitting*

*a Report and Findings on the Middle Rio Grande Project, New Mexico*, H.R. Doc.

No. 653, at 34 (2d Sess. 1950) (Cons. List of Ex.'s No. 55).

16.     Aggradation, in turn, caused the water table to seep upward and ruin crops.  *See*

*id.*  It also brought the specter of floods. *See id.* at 34-35.

17.     The MRGCD was created in response to devastating flooding and aggradation of

the riverbed of the Rio Grande.

### III.     Formation of the Middle Rio Grande Conservancy District With Private Capital And Without Support From the United States Bureau of Reclamation

18.     By the mid 1920s, faced with the prospects of flooding and aggradation of the

riverbed, some of Albuquerque's leading citizens mobilized to establish a

conservancy district.[1]

19.     The residents of the middle valley were faced with the choice of organizing a

conservancy district or standing by as Albuquerque and middle Rio Grande

farming died.

20.     The Bureau of Reclamation (hereinafter "Bureau" or "USBOR") refused to

participate in the construction of its works or provide any financial support.  *See*

---

[1] The effort dates back considerably further, however.  In 1929, J. L. Burkholder told the Albuquerque Rotary Club that formulation of a plan to rehabilitate the middle Rio Grande "has occupied a period of many years.  It probably had its inception 20 or 25 years ago.  It is certain that in 1917, twelve years ago, many people throughout the middle Rio Grande valley were actively engaged in promoting ways and means to accomplish the conservation and reclamation

CROSS – CLAIMANT MIDDLE RIO GRANDE CONSERVANCY DISTRICT'S
PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

Mem. for the Press, Dept. of Interior (March 11, 1926) (Cons. List of Ex.'s No. 5).

21.     The USBOR rejected the middle valley's irrigation system as a candidate for a federal reclamation project. *Id.*

22.     The United States Bureau of Reclamation played no role in the development of the MRGCD.

23.     Thus, the MRGCD is not and has never been a federal project.

24.     The City of Albuquerque would have fallen prey to floods of increasing frequency and agriculture, to spreading salt and alkali flats caused by seepage. The citizens chose to raise money and organize the MRGCD.[2]

25.     Pursuant to the New Mexico Conservancy Act of 1923, the MRGCD consolidated the rights of 70 community acequias into one political subdivision and created new irrigation works.

26.     Many of the ditch alignments followed historic Pueblo Indian ditches. The ditch works operate by gravity flow in the same method used for centuries. They are energy efficient, requiring virtually no electricity and constitute the largest such system in the United States.

---

of the valley." J. L. Burkholder, *The Conservancy Program,* speech before the Albuquerque Rotary Club, 4/25/29, at I (Cons. List of Ex.'s No. 8).

[2] *See* Brian McDonald, *et al.*, *An Evolutionary History of the Middle Rio Grande Conservancy District,* New Mexico Business, April, 1980, at 3 (Cons. List of Ex.'s No. 306); *see also* D. W. Bloodgood, *The Ground Water of Middle Rio Grande Valley and its Relation to Drainage,* Bulletin No. 184, Agricultural Experiment Station of New Mexico College of Agriculture and Mechanic Arts, State College, New Mexico, at 3-5, *cited by* Middle Rio Grande Conservancy District, *Middle Rio Grande Conservancy District Water Policies Plan: Working Document* 5 (C.T. DuMars and S.C. Nunn eds., 1993) [hereinafter *MRGCD Water Policies Plan*] (Cons. List of Ex.'s No. 350) .

27.    The conservancy district was intended to achieve flood control and ensure the prosperity of the farming sector.  *See* Frank Pace, Jr., *Letter from the Secretary of the Interior to the President, April 12, 1949, in Middle Rio Grande Project, Letter from the Secretary of the Interior Transmitting a Report and Findings on the Middle Rio Grande Project, New Mexico,* H.R. Doc. No. 653, at 3, 4 (2d Sess. 1950) (Cons. List of Ex.'s No. 55).

28.    The MRGCD was thus formed in the mid 1920's with private capital, and from the beginning, the MRGCD survived by developing its own sources of funding. *See* Ira G. Clark, *Water in New Mexico: A History of its Management and Use* 387 (1987) [hereinafter Clark, *Water in New Mexico*] (Cons. List of Ex.'s No. 333).

29.    Organization of the MRGCD took place under the Conservancy Act of New Mexico.  *Se*e 1923 N.M. Laws, ch. 140, re-enacted as 1927 N.M. Laws ch. 45 (codified as N.M. Stat. Ann. §§ 73-14-1 to 73-14-88 (1999)).

30.    Petitions for its establishment under the first of these statutory regimes were offered in 1923, amended in 1924 and approved by the Second Judicial District Court of New Mexico in 1925.   *See* Joseph L. Burkholder, *Report of the Chief Engineer, Submitting a Plan for Flood Control Drainage and Irrigation of the Middle Rio Grande Conservancy Project*, The Official Plan 62 (1928) [hereinafter "Burkholder Report"] (Cons. List of Ex.'s No. 7); *see also* Pearce C. Rodey, District Status and Procedure, in Middle Rio Grande Conservancy Project, Albuquerque, New Mexico, H.R. Doc. No. 141, at 7, 8 (1st Sess. 1928).

31.    The 1923 statute was declared constitutional by the New Mexico State Supreme Court on December 12, 1925.    *See In re Proposed Middle Rio Grande Conservancy Dist.*, 31 N.M. 188, 242 P. 683 (1925).

32.    The 1927 statute was declared constitutional by the same court on September 9, 1929.    *See Gutierrez v. Middle Rio Grande Conservancy Dist*., 34 N.M. 346, 282 P. 1 (1929), reh'g denied, Sept. 24, 1929.

33.    The MRGCD first issued bonds to finance its efforts in 1929.

34.    The Great Depression then occurred prompting the need for additional funding to maintain the MRGCD's works.

## IV.    The Drought of the 1940s and 1950s and the Need For Rehabilitation

35.    In the 1940s, a series of events conspired to threaten the MRGCD's survival. There were floods in 1941 and 1942.    *See MRGCD Water Policies Plan*, at 21 (Cons. List of Ex.'s No. 350).

36.    Following hard on the heels of the floods was a prolonged drought.    Meanwhile, the riverbed once more began to aggrade.    *See* Sias, H.R. Doc. No. 653, at 203-04 (Cons. List of Ex.'s No. 55).

37.    Lacking the money to perform proper maintenance, the MRGCD could only watch as many of its works deteriorated.    *See id.* at 202-03.    "The rural valley was reverting to the conditions of the preconservancy era."    Clark, *Water in New Mexico*, at 387 (Cons. List of Ex.'s No. 333).

38.    The United States Bureau of Reclamation worried that without a rapid remedy, "agricultural production in the Middle Rio Grande Valley will be destroyed . . . ." *See* Sias, H.R. Doc. No. 653, at 156 (Cons. List of Ex.'s No. 55).

39. Because its works required rehabilitation and because it needed to refinance its existing bonded indebtedness, the MRGCD sought a loan from the United States and sought to employ the United States Bureau of Reclamation as its contractor to rehabilitate its works.

40. However, rather than loan the money to refinance the existing borrowed debt, the Bureau initially planned to purchase the MRGCD's works and have the MRGCD pay off its debt with the proceeds. *See* Sias, H.R. Doc. No. 653, at 148, 159, 163, 173, 197, 222, 251-52 (Cons. List of Ex.'s No. 55).

41. The Bureau later changed its mind, determining that the simpler path would be to refinance the debt and pay off the bonds directly. The Bureau, then, would become the lender, the MRGCD, the borrower. Straus, H.R. Doc. No. 653 at 8 (Cons. List of Ex.'s No. 55).

42. It was not until the MRGCD was seeking a contractor to undertake the rehabilitation of its works and a lender to advance money for the retirement of the MRGCD's bonds that the United States became directly involved with the MRGCD.

43. Thus, lacking the funds to perform proper maintenance, the MRGCD sought a federal rehabilitation loan. This contract was ultimately procured under the authority of the Flood Control Act of 1948.

**V.     The Unique Solution: Repair and Refinancing of the MRGCD**

44. Unlike other western irrigation projects that had the United States build a project for them, the MRGCD had a history as an established political subdivision when it borrowed money from the United States Bureau of Reclamation and had its

works repaired.

45.     It was particularly unique with respect to treatment of title.

46.     The traditional projects could not begin without title because there was no land on which to build a dam  or construct a ditch.  As a practical matter, because the MRGCD had already acquired the land in fee simple and had constructed the works, all that was needed was access to perform the work in the form of right – of – way easements.

47.     Also unique was the fact that the MRGCD already had water rights and any repayment was fully secured by provisions in the 1951 Contract discussed below that allowed the United States the right to intervene and collect assessments of the MRGCD's constituents to fully ensure repayment.  Thus, again, a complete fee title interest as collateral was not required to ensure repayment of the loan.

48.     In contrast, the United States took an early and commanding presence in the planning, financing and construction of works associated with the vast majority of the West's irrigation projects.  For example, the Klamath Irrigation Project in Oregon and California was created almost entirely by the USBOR using federal funds.[3]  *See e.g.* Cons. List of Ex.'s Nos. 52, 130.

49.     The Belle Fourche Project Irrigation Project in South Dakota was also constructed and directly controlled by the USBOR from its inception.  The histories of these other western projects reveal a prolonged and detailed planning phase directly funded and controlled by the federal government.

---

[3]  In 1905, pursuant to the Reclamation Act of 1902, the USBOR appropriated water in the Klamath River and Lost River and their tributaries and began the Klamath Project by constructing its diversion works, which included the Malone Diversion Dam.

50.     The history of the MRGCD, in contrast, reveals that rehabilitation of the MRGCD was accomplished for an altogether different purpose – to aid an already existing, non-federally created irrigation project in retiring its debt.

51.     The complete extent of the involvement of the federal government in the MRGCD's operations has been the federal government's efforts to aid in the rehabilitation of the MRGCD's works, to work with the MRGCD to maintain the river channel, and to serve as a lender to pay off MRGCD bonds.

52.     While the United States now insists the MRGCD is a federal project, a proposal to make it a federal project was expressly rejected by the Bureau of Reclamation.

53.     At its inception in the 1920s, the architects of the MRGCD had hoped that it would become a federal project, constructed with federal funds.  *See* Clark, *Water in New Mexico*, at 206 (Cons. List of Ex.'s No. 333).

54.     Writing in 1924, Vernon L. Sullivan summed up his report on the rehabilitation needed for the Middle Rio Grande with the hopeful comment that "[s]uch work has generally been done by the United States Reclamation Service . . . ."  Vernon L. Sullivan, *Reports and Recommendations for the Reclamation of the Middle Rio Grande Valley of New Mexico* 30 (1924) [hereinafter "Sullivan Report"] (Cons. List of Ex.'s No. 3).

55.     The next year in 1925, James C. Smith represented the MRGCD before a Senate subcommittee "from a standpoint of agriculture."  *See National Forests and the Public Domain: Hearings Before A Subcomm. of the Comm. on Public Lands and Surveys*, 69th Cong., 1st Sess. (pursuant to S. Res. 347) 3608 (Oct. 9-10, 1925) [hereinafter National Forests and the Public Domain Hearings] (statement of

James C. Smith, representative of the MRGCD) (Cons. List of Ex.'s No. 4).  Mr.

Smith stated: "If we are able to get cooperation from the Federal Government,

which we hope to get, we will appreciate it very, very much."  *Id.* at 3609.

56.    Such hope was not to be fulfilled, however.  As Vernon L. Sullivan had earlier

recognized:

> On account of the fact that the Bureau of Reclamation has so much
> unfinished work before it, and also that it has already more projects
> in this State than [elsewhere on a per capita basis], and for the
> further fact that it is a long, tedious and very uncertain question
> whether Congress would even undertake this work, we are almost
> compelled to look for some other source to accomplish this most
> important improvement.

Sullivan Report, at 30 (Cons. List of Ex.'s No. 3).

57.    Likewise, Mr. Smith knew that his chances were not good: "But if the policies of

the Federal Government and their resources should be such that we can not get

their cooperation and assistance, we hope to be able to go ahead anyway and

develop this valley."  National Forests and the Public Domain Hearings, at 3609

(Cons. List of Ex.'s No. 4).  This self-reliance would in fact be necessary, for the

Bureau was tapped out.  In a 1926 press release, it complained that it was

> being asked to construct new Federal reclamation projects
> including divisions of old projects at a total estimated cost of
> $106,289,060 despite the fact that available receipts to the
> Reclamation Fund declined $2,952,657.04 last year, according to a
> tabulation made public at the Interior Department today. The
> average annual income of the Reclamation Fund for the last five
> years has been approximately $8,500,000.

Memorandum for the Press, Department of the Interior (March 11, 1926) (Cons.

List of Ex.'s No. 5).

58.    So it was that the MRGCD was rejected as a Bureau of Reclamation project.  Left

to its own devices, the MRGCD fell back on two methods of generating income. One was the appraisal and taxation of lands within its jurisdiction; the other was the issuance of bonds. *See* 1923 N.M. Laws, at §§ 401-15, 501-28; *see also* Clark, *Water in New Mexico*, at 208 (providing summary of both methods) (Cons. List of Ex.'s No. 333).

59.     Eventually, circumstances beyond the MRGCD's control necessitated federal assistance to pay off bonds and rehabilitate its works and continued to raise private capital.

60.     With its private capital financing, the MRGCD carried out extensive works throughout the middle valley with its own capital to re-align ditches on a more efficient gravity flow basis. *See* Clark, *Water in New Mexico*, at 212 (Cons. List of Ex.'s No. 333).

61.     The MRGCD built four diversion structures to divert water for its irrigators with its own capital at Cochiti, Angostura, Isleta Pueblo and San Acacia, completing these structures during the period 1932-1934.

## VI.     The MRGCD Takes Title to Lands And Builds El Vado Dam to Store Its Native Waters

62.     The MRGCD built El Vado Dam in 1936 to hold water for its irrigation constituents with its own capital, and acquired all of the tracts underlying the dam in fee simple. *See* Deed from Edgar B. Pound and Jesse R. Pound joined by their wives for Certain property in El Vado Dam site to Middle Rio Grande Conservancy District (August 29, 1930) and Deed from H. Le Roy Hall, Wellington W. Nossaman and Frank A. Dudrow joined by their wives for certain

property in El Vado Damsite to Middle Rio Grande Conservancy District (August 30, 1930) (Cons. List of Ex.'s Nos. 19 & 20).

63.    The United States has taken the position in the principle litigation that it does not control storage in El Vado: "Once water is stored in El Vado Reservoir, Reclamation has no authority to otherwise use or reallocate the stored water to endangered species purposes, although its actions in initially storing water are subject to consultation and the requirements of sections [sic] 7 and section 9 of the ESA."   *See* Federal Defs.' Resp. in Opp'n to Plaintiffs' May 14, 2001 Opening Case Br. at 28 (Doc. No. 247).

64.    In 1983, the United States represented to the Federal Energy Regulatory Commission ("FERC"), MRGCD, and the County of Los Alamos that the El Vado Dam was owned by MRGCD and that the facility should be licensed as a private facility. See Dep't of Interior Special Report, El Vado Dam (Aug. 1983) (Cons. List of Ex.'s No. 322); letter from Joseph Miller, Projects Superintendent, Bureau of Reclamation to Ray Shollenbarger, Jr., Attorney for MRGCD (Jan. 14, 1983) (Cons. List of Ex.'s No. 318); and letter from Eugene Hinds, Regional Director to Nelson J. Jacobs, Tudor Engineering Co., Consulting Engineers and Planners (Sept. 9, 1983) (Cons. List of Ex.'s No. 323).

65.    Such representation resulted in significant legal consequences, including having the County of Los Alamos amend its application to include MRGCD as co-applicant in the license. *See* FERC Order Issuing Major License (Cons. List of Ex.'s No. 329).

66.    Having represented to the United States FERC that the United States did not own

13

the Dam, and the United States having relied upon that representation in issuing the license, the USBOR cannot now argue that it secretly was relying on the fact it "owned" the Dam and was being untruthful with another federal agency issuing a license to generate hydro-power. *See also* MRGCD Reply Ex. 2, Ex. 3 at 9, Ex. 4 at pg. 2, Ex. 5 at E-30 [Doc. No. 575] (Cons. List of Ex.'s Nos. 329, 322, 319 and 321) ("the reservoir [El Vado] is owned by the Middle Rio Grande Conservancy District and operated by the USBR").

67.    At the MRGCD's El Vado Dam site, deeds were issued to purchasers of property. These were issued by the MRGCD to third parties without approval of Congress. The United States interposed no objection, did not join in the conveyance and did not require approval of Congress as would have been required for deeded property under the 1951 Contract.

68.    No deeds were ever issued except one relating to Heron Reservoir, a federally owned facility.  No comparable deed was issued for El Vado Dam.

69.    Because El Vado Dam was included in the project but was already in existence, it would have been unthinkable that the United States would expect to receive title to the entire Dam solely because work at that dam would have made up some portion of the $10,410,633 that the MRGCD had agreed to repay to the USBOR.

70.    Consistent with the other 1962 easements referenced below, an easement was also issued for the USBOR to complete repairs on El Vado Dam.

## VII.    The Bureau's Proposal for the Middle Rio Grande Project From Velarde to Elephant Butte

71.    In the late 1940's, because of drought along the Rio Grande and the inability to meet international treaty obligations to Mexico, the United States proposed the

Middle Rio Grande Project which ranged from Velarde, New Mexico south approximately 300 miles to Elephant Butte Reservoir.

72.     The Department of Interior was unclear as to how to approach the financing of the rehabilitation work on the Middle Rio Grande Conservancy District Works.  The initial plan was to simply purchase the works and allow the MRGCD to use the money to pay off the bonds.  However, this plan was rejected:

> In the regional director's report and in my report to you of November 21, 1947, it was proposed that, as an essential part of the plan, the United States acquire the assets of the Middle Rio Grande Conservancy District, requiring the district to use the proceeds to retire its outstanding indebtedness.  For technical reasons, *it now appears that it would be better for the Secretary of the Interior to be authorized to acquire the outstanding evidences of indebtedness of the district at such prices and on such terms and conditions as he may deem necessary and proper for the protection of the interests of the United States* and to retire those obligations on such terms and conditions as he may likewise deem necessary and proper.  I recommend, therefore, that the reports referred to above be modified to this extent.

Letter from the Commissioner of Reclamation to the Secretary of the Interior, H.R. Doc. No. 653 at 8 (2nd Sess. 1950) (April 19, 1948) (emphasis added) (Cons. List of Ex.'s No. 55).

73.     Finally, the decision was made to retire the bonds at a specified cost from the MRGCD and to likewise calculate the costs of the rehabilitation work that would benefit the MRGCD and require that the MRGCD sign a contract to repay it. 1951 Repayment Contract at Article 11.  (Cons. List of Ex.'s No. 67).

**VIII.   The Decision to Contract With the United States Bureau of Reclamation**

74.     The final calculation of the amount of the loan was determined to be $5,300,000.00 to purchase the bonds and $10,410,633 for rehabilitation.  Letter

from Leon W. Hill, Regional Director, Regional Office – Region 5, Bureau of Reclamation to Gentlemen, MRGCD at 1 (June 9, 1966) (Cons. List of Ex.'s No. 239).

75. The 1951 Repayment Contract represents the first time the United States Bureau of Reclamation had ever entered into an agreement, not to construct a new reclamation project in its entirety, but to perform repair work on an already existing project.  Memorandum Covering Meeting Held January 29, 1951, Re Proposed Contract Between Middle Rio Grande Conservancy District and Bureau of Reclamation.  (Cons. List of Ex.'s No. 61).

76. Because the 1951 Repayment Contract had to cover repairs to works that were not being newly constructed by the USBOR, as well as provisions for the repayment of the loan advanced to retire the MRGCD's bonds, its character was unfamiliar to the USBOR, and the USBOR was consequently unclear about how to draft it.

77. Not only was the contract to cover repairs and a loan, it also authorized work in the channel of the Rio Grande to protect Mexico's receipt of water under the Treaty of 1906.  Moreover, it authorized channel rectification that would protect municipalities the full stretch of around 200 miles of river, in effect providing region-wide benefits beyond the boundaries of the MRGCD, from north of Española at Velarde, New Mexico, to the Elephant Butte area.

78. Thus, there would be no need for title to any MRGCD works related to the loan, except possibly as a security interest.  Nor would there be a need for any MRGCD title related to channel rectification, since the channel of the Rio Grande extends hundreds of miles above and below the MRGCD.

79. Because El Vado Dam was included in the project but was already in existence, it would have been unthinkable that the United States would expect to receive title to the entire Dam solely because work at that Dam would have made up some portion of the $10,410,633 that the MRGCD had agreed to repay to the USBOR.

80. Neither would there have been any reason that the MRGCD would be required to convey El Vado Dam or any of its assets in fee simple to the USBOR as consideration for work done to benefit interests other than the MRGCD in the form of flood control for protection of municipalities and Indian Pueblos or to benefit Mexico or to ensure that water reaches Texas under the Rio Grande Compact.  The MRGCD was not obligated to pay for any of these benefits, and no consideration was requested under the contract for these purposes.

81. Of particular concern was whether there should be a conveyance of title in perpetuity of MRGCD works without consideration since, as regards the MRGCD, the 1951 Repayment Contract was to repair existing facilities not build new facilities.  (Cons. List of Ex.'s No. 61).

82. The Department of Interior was unclear as to how to approach the financing of the rehabilitation work on the MRGCD's works.  The initial plan was to simply purchase the works and allow the MRGCD to use the money to pay off the bonds. This plan was rejected.

83. Finally, the decision was made to retire the bonds at a specified cost to the MRGCD and to likewise calculate the costs of the rehabilitation work that would benefit the MRGCD and require that the MRGCD sign a contract to repay the cost.

84.   The final calculation of the amount of the loan was determined to be $5,300,000.00 to purchase the bonds and $10,410,633 for rehabilitation.

85.   Because these works were not constructed *ab initio* by the USBOR, it was unclear how the loan contract should be drafted. There were no newly constructed works, and furthermore, the contract included repayment of a loan of money advanced to retire the bonds.

86.   In addition, the contract was to cover not only a loan of money, but also authorized work within the channel of the river to protect Mexico's interest in receipt of water under the Mexican Water Treaty of 1906, and municipalities along the full stretch of around 200 miles of river, in effect providing region wide benefits from north of Española at Velarde, New Mexico to Elephant Butte.

87.   Nor, would there have been any reason that the MRGCD would be required to convey El Vado Dam or any of its assets in fee simple to the USBOR as consideration for work done to benefit interests other than the MRGCD in the form of flood control for protection of municipalities, Indian Pueblos or to benefit the country of Mexico or to ensure that water arrives for Texas under the Rio Grande Compact.  The MRGCD was not obligated to pay for any of these benefits, and no consideration was requested under the contract for this purpose.

88.   Thus, there was a generalized confusion as to the form this novel three part rehabilitation / loan / general consent to provide access to the Rio Grande, agreement for the benefit of the region and Mexico might take.

IX.   **The MRGCD Board [Oscar Love] Objects To A Request For Title In the Initial Draft of the 1951 Contract**

18

89.    Of particular concern was whether there should be a conveyance of title in

perpetuity of MRGCD works without consideration, since this was, after all only

a loan advanced to pay off rehabilitation work and a bonded indebtedness.

According to the Memorandum Covering Meeting Held January 29, 1951, Re

Proposed Contract Between Middle Rio Grande Conservancy District and Bureau

of Reclamation, MRGCD Board Member Oscar Love stated:

> In going over this contract [i.e., a draft of the 1951 Repayment
> Contract] the other day, we spent a full half day with the Bureau
> representatives and came to an item on page 13 that floored us and
> it is paragraph 4 on page 13 [eventually to become Paragraph 29],
> which reads as follows:
>
> <u>TITLE TO REMAIN IN UNITED STATES</u>
>
> Title to all works constructed by the United States
> under this contract and to all such works as are
> conveyed to the United States by the provisions
> hereof, shall be and continue to be vested in the
> name of the United States until otherwise provided
> for by Congress, notwithstanding the transfer
> hereafter of any such works to the District for
> operation and maintenance.
>
> I told them I would have to have more advice and counsel than I
> had in order to do this.  They will not do any work for us until we
> sign this or some similar contract. . . .

(Cons. List of Ex.'s No. 61).

90.    Legal Counsel for the MRGCD were misinformed as to the proper kind of

contract and whether there needed to be an outright conveyance of title to all of

the works or whether it could be limited to certain parcels. According to the

Memorandum Covering Meeting Held January 29, 1951, Re Proposed Contract

Between Middle Rio Grande Conservancy District and Bureau of Reclamation,

MRGCD Board Member Hugh Woodward asked, "Is there a law that we have to convey title to the United States?"

(Cons. List of Ex.'s No. 61).

91.     According to the Memorandum Covering Meeting Held January 29, 1951, Re Proposed Contract Between Middle Rio Grande Conservancy District and Bureau of Reclamation, "Reclamation Law, Section 7 was read by MRGCD attorney Mr. Macpherson, stated that the Secretary has no authority to perform work on projects to which title is not vested in the United States."

(Cons. List of Ex.'s No. 61).

92.     He was clearly wrong in this assertion. Section 7 of the Reclamation Act, as it stood in 1951 (and, with no pertinent changes, as it stands today), states:

> That where, in carrying out the provisions of this Act, it becomes necessary to acquire any rights or property, the Secretary of the Interior is authorized to acquire the same for the United States by purchase or by condemnation under judicial process, and to pay from the reclamation fund the sums which may be needed for that purpose, and it shall be the duty of the Attorney General of the United States upon every application of the Secretary of the Interior, under this Act, to cause proceedings to be commenced for condemnation within thirty days from the receipt of the application at the Department of Justice.

35 Cong. Rec. 6677 (Cons. List of Ex.'s No. 2).

93.     First, construction did start before there was any agreement for transfer of title (Cons. List of Ex.'s No. 109).  Furthermore, Section 7 of the Reclamation Act in fact has never contained any statements concerning whether the Bureau could or could not work on property it did not own and indicates affirmatively that title is required only when necessary.  This provision, ultimately became the basis for the compromise in the contract that required title be transferred only if considered

"necessary" by the Secretary.  *See* Contract No. 178r-423 Between United States and the Middle Rio Grande Conservancy District for Rehabilitation and Construction of Project Works, and Repayment of Reimbursable Construction Costs Thereof, Articles 26 and 29 (September 24, 1951) (Cons. List of Ex.'s No. 61).

## X.   The Honorable Sam Bratton Objects to Conveyance of the MRGCD's Title to the United States

94.   According to the Memorandum Covering Meeting Held January 29, 1951, Re Proposed Contract Between Middle Rio Grande Conservancy District and Bureau of Reclamation, Distinguished legal scholar and Judge Sam Bratton suggested the contract between the MRGCD and the Bureau might contain the following provision in lieu of absolute vested title in the United States. He suggested that legal title remain in the MRGCD, with equitable title being assigned to the United States during the term of the contract, with an absolute right of reversion upon payment in full of the contract.  He suggested that it add as a proviso:

> but that conveyance is upon the express understanding and condition that upon repayment or reimbursement [sic] to the United States, all equitable right and interest in the property conveyed to the United States under or pursuant to this contract shall be extinguished and shall revert to the District or its assignees

(Cons. List of Ex.'s No. 61).

## XI.   The Love / Bratton Compromise – A Contract to Select Parcels For Conveyance At a Future Date

95.   The final version of Article 29 of the 1951 Repayment Contract incorporates the conditional nature of section 7 of the Reclamation Act requiring title only when "necessary" as well as Judge Bratton's suggestion that whatever parcels were

CROSS – CLAIMANT MIDDLE RIO GRANDE CONSERVANCY DISTRICT'S
PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

conveyed would be committed to be returned to the MRGCD upon payment in full of the contract.  It states in relevant part:

### TITLE TO REMAIN IN UNITED STATES

Title to all works constructed by the United States under this contract and to all such works as are conveyed to the United States by the provisions hereof, shall, *as provided in Article 26*, be and continue to be vested in the name of the United States until otherwise provided for by Congress, notwithstanding the transfer hereafter of any such works to the District for operation and maintenance.

1951 Repayment Contract at Article 29. [4]  Thus, instead of requiring an outright title as originally drafted, and set out in Finding 89 above, acquisition of title was made conditional on the terms of Article 26.

96.     Article 26 tracks the language of Section 7 in requiring only the title necessary for the Secretary to carry out the obligations under the contract. It states in pertinent part:

The District shall convey to the United States with title satisfactory to the Contracting Officer *such of the District works* now owned by the District, *as <u>shall</u> be required to be conveyed to the United States as determined by the Contracting Officer.  But this contract is executed upon the express understanding and condition that* while the legal title to the District works conveyed to the United States under the terms of this contract or by any separate instruments executed pursuant to its terms may continue thereafter in the United States, *upon full compliance by the District* with all covenants required to be performed by it under the terms hereof, *including the repayment in full* to the United States of all sums of money at times, and on conditions as herein provided, *and on consent of Congress, the United States will reconvey to the District all District works transferred to the United States*, under the provisions of this contract, and additions thereto; . . . ;

1951 Repayment Contract, Art. 26 (Cons. List of Ex.'s No. 67) (emphasis added).

---

[4] *cf.* Proposed Finding No. 70, *supra* ("*as provided in Article 26*" has been added to final version").

CROSS – CLAIMANT MIDDLE RIO GRANDE CONSERVANCY DISTRICT'S
PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

97.     Thus, the concern that "floored" board member Oscar Love that the MRGCD might have to vest title to the United States in every piece of realty owned by them and Judge Bratton that whatever was conveyed would have to come back upon final payment were both addressed in the final version.

98.     There is no outright conveyance of title to anything unless and until there has been a determination by the Contracting officer (Secretary of Interior) that a transfer is required. And, any transfer that is made in the future would be only as a security interest to be re-conveyed upon repayment in full of the contract.

99.     On its face, the 1951 Repayment Contract contains no determination by the Contracting Officer of such of the MRGCD's works then owned by the MRGCD, that were to be required to be conveyed to the United States thus it conveyed nothing.

100.    Furthermore, the United States is unable to identify a single document from the Contracting Officer or his agents that identified the parcels to which the United States wished to acquire fee title.

101.    The Contracting Officer never designated any "works" to be transferred and none were transferred by deed.

102.    It is now too late for the Contracting Officer to make such a designation. The MRGCD has achieved full compliance with all covenants required to be performed by it under the terms of the 1951 Repayment Contract, including the repayment in full to the United States of all sums of money and at times, and on conditions as provided in the 1951 Repayment Contracts.  Pub. L. No. 107 – 20, § 2402, 115 Stat. 155 (Doc. No. 572, pg. 7, n. 2).  Letter from Subhas K. Shah,

Chief Executive Officer, Middle Rio Grande Conservancy District, to Charles Calhoun, Regional Director, Bureau of Reclamation, United States Dep't of the Interior re: Final Payment Check on Rio Grande Project (December 13, 1999) (Doc. No. 366, Ex. 4).

103.  The MRGCD has no further obligations under the contract.  The bonds have been retired, the rehabilitation work was completed and has been paid for.  *See* Letter from Subhas K. Shah, Chief Executive Officer, Middle Rio Grande Conservancy District to Charles Calhoun, Regional Director, Bureau of Reclamation, United States Dep't of the Interior re: Final Payment Check on rehabilitation loan (December 13, 1999) (Cons. List of Ex.'s No. 375).  The MRGCD has no further duties with respect to the work to be performed by the USBOR for the benefit of society at large or the entire Middle Rio Grande Project and Mexico.

104.  Indeed, the MRGCD has entered into a separate Memorandum of Agreement with the USBOR to cooperate to ensure that channel rectification work can continue, that is supported by access easements to allow this work to take place.

105.  The USBOR does continue to work for the MRGCD under the voluntary portion of the contract as operating agent for the MRGCD in operating El Vado Dam. However, the USBOR has not performed any work on for MRGCD on the remainder of the MRGCD works since 1974.

106.  Consistent with the contract, there is no evidence in the record that the USBOR has done any work on MRGCD works without full compensation by the MRGCD under the 1951 Contract.  The only additional work was on the outlet works of El Vado Dam as part of the San Juan - Chama Contract.

107.    The United States has offered no evidence that the alleged assets on the books of the USBOR or any payments made on the Middle Rio Grande Project in excess of the contract amount in the 1951 Contract were requested by the MRGCD or that any title was ever requested as a quid pro quo for the performance of this work.

108.    The USBOR never requested or received any amendment to the 1951 Contract to require conveyance of title to MRGCD works as a quid pro quo for any non-reimbursable worked performed by the United States Government that benefited society at large, or supported by deliveries to Mexico under international treaties.

109.    Because the United States accepted the compromises offered by Judge Bratton and MRGCD Board member Love, eliminating the requirement of vested title to all works and committing to the obligation to re-convey the properties upon full re-payment of the contract as set out in Article 26 of the 1951 Repayment Contract, the United States could never have had any reasonable expectation of holding properties selected for conveyance in fee simple and in perpetuity after the MRGCD paid off the 1951 Repayment Contract.

**XII.    The 1953 Conditional Grant of Easement**

110.    Consistent with the Love / Bratton compromise, in lieu of vested title and as a purely interim measure, without specifying which parcels would be conveyed, on November 24, 1953, the MRGCD Board gave the United States a Grant of Easement:

> Grant of Easement
>
> The Middle Rio Grande Conservancy District, a municipal corporation organized and existing under the laws of the State of New Mexico, for consideration paid and benefits received, assigns and conveys to the United States of America all District works and

real property *required for accomplishment of the purposes set forth in that contract between the District and the United States dated September 24, 1951* as amended by contract dated June 19, 1953 and approved by the Supreme Court June 29, 1953, together with the right, privilege and easement to construct, replace, operate and maintain any structure the United States of America may deem necessary or desirable for the construction, operation and maintenance of the Middle Rio Grande Project and the right, privilege and easement to remove from or place on earth or rock, with the right of ingress and egress for men, materials and equipment for the purposes of carrying out the provisions of that certain contract of September 24, 1951 as amended, in and upon the real estate described in the official maps of the Middle Rio Grande Conservancy District, together with all structures on said real estate necessary to the operation of the irrigation and drainage system.

Doc. No. 366, Ex. 5.

111.    The 1953 Conditional Grant of Easement echoed the Love / Bratton compromise both as to the conditional and general language of the 1951 Repayment Contract by not presently assigning or conveying to the United States any particular MRGCD works or real property, but rather, awaiting the actual assignment until a designation is made by the Secretary.

112.    The 1953 Conditional Grant of Easement assigned and conveyed only those works and real property of the MRGCD which would be determined to be "required." in the future.

113.    The 1953 Conditional Grant of Easement contains all of the language that would be conveyed in an easement rather than in a deed.  A deed to real property, whether quitclaim or warranty, does not have to recite the entitlements that go along with that title. This "easement" proceeds to describe the rights associated with an easement, not a transfer of title. Were it intended to be a permanent transfer of title by deed, it would have contained the material contained in the

standard deed form for New Mexico (*see, e.g.* NMSA 1978, § 47-1-37 (1941)) and would have discussed whether it contained warranty covenants, special warranty covenants and the other accoutrements of a deed. It contains none of these requirements.  It is clear that United States was well capable of drafting a deed, it did so for Heron Reservoir, when it acquired that site from the MRGCD. Warranty Deed to Heron Reservoir (March 14, 1967) (Cons. List Ex.'s No. 242). In short, the 1953 Grant of Easement, is a conditional easement not tied to any determinable tract of land.

114.   Even though the document on its face was not intended by the United States to be a deed, but rather an easement, the MRGCD Board was incorrectly informed by their legal counsel this was in the nature of a deed.  Because it conveyed nothing the United States did not record the easement.   Internal discussions reflecting the United States' knowledge that it had not yet obtained title to any MRGCD works or properties soon began to circulate.

## XIII.   The United States Refuses to Accept Or Record the 1953 Conditional Grant of Easement

115.   The MRGCD Board was truly perplexed.  The proper procedure for informing the entire world, including the MRGCD itself that the United States believed the conveyance they had requested was valid was to record it.  To find out the bona fides of the document, on July 1, 1955, MRGCD Secretary – Treasurer sent the following to John C. Thompson, Project Manager, Bureau of Reclamation – Albuquerque Project (accompanied by an explanatory excerpt from June 28, 1955 Minutes of MRGCD Board of Directors Meeting):

CROSS – CLAIMANT MIDDLE RIO GRANDE CONSERVANCY DISTRICT'S
PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

Pursuant to the action of the board [sic] of Directors of the Middle Rio Grande Conservancy District, at a regular meeting held June 28, 1955, please advise if the Grant of Easement date November 24, 1953, transferring title of all District works and real property to the United States of America has been made of record in all of the counties within the confines of the Middle Rio Grande Conservancy [sic] Ciatrict [sic].

In the event this grant of easement has not been recorded, we request that you proceed forthwith to have this document made of record in all of the counties within the confines of the Middle Rio Grande Conservancy District and to notify us of your filing and subsequently of its completion.  This request is made in the interest of all parties concerned including the general public and as another step in our joint coordinated efforts.

(Doc. No. 555, Ex. US034).

116.	The MRGCD pressed the matter, demanding that the United States either acknowledge this was a valid document by recording it or explain why not. On July 15, 1955, John C. Thompson, Middle Rio Grande Project Manager wrote the following to the USBOR Regional Director:

Attached is a copy of a letter, dated July 1, 1955, from the Middle Rio Grande Conservancy District requesting this office to record the subject easement.  We are also enclosing an excerpt of the minutes of the regular semi-monthly meeting of the Board of Directors of the District, dated June 28, 1955, which sets forth the Board's request that the easement be made of record.

It is our opinion that the request of the Middle Rio Grande Conservancy District in regard to the recording of this instrument should be complied with immediately.  This matter has been discussed with the local Field Solicitor's office and they concur.  Please advise as to your opinion of this matter.

Memo from John C. Thompson, Project Manager, to Regional Director (July 15, 1955) (Determined Non-Privileged, 24994) (Doc. No. 511, Ex. 21).

**XIV.   The USBOR Regional Director Again Refuses to Record the 1953 Conditional Grant of Easement**

117.   The Regional Director immediately realized that the document contained no legal description, contained no warranties as required by a deed and appeared to any person concerned to be only an easement.   He attempted to have the Commissioner take the responsibility of treating this as sufficient to meet the conditional conveyance requirement of the 1951 contract.   On July 28, 1955, the USBOR Regional Director wrote the following to the USBOR Commissioner.   He explained that in 1953 it was impossible to complete a valid conveyance, but they wanted to get started with the project.   And, thus had come up with this "interim" document, he clearly does not know what to do with it.   He acknowledges that in the future they will need deeds to complete conveyances, but is simply unclear what to do with this easement.   He writes:

> Article 26 of the Repayment Contract between the United States and Middle Rio Grande Conservancy District, dated September 24th, 1951, provides in part the following:
>
> "The District shall convey to the United States, with title satisfactory to the Contracting Officer, such of the District works now owned by the District as shall be required to be conveyed to the United States as determined by the Contracting Officer."
>
> As you know, *Reclamation regulations* require a statement by the Project Manager that title to the land upon which construction is to be initiated has been secured by the United States before construction contracts are recorded.
>
> Late in 1953, when construction work was about to be undertaken on a portion of the District works, it was decided at that time that it would be impossible to make the determination and properly describe the District works to be conveyed in accordance with the above quoted portion of the [1951] Repayment Contract.

It was estimated at that time that more than a year would be required to prepare deeds containing appropriate descriptions of the property to be conveyed to the United States.  Therefore, *as an interim arrangement* it was suggested that the District provide the United States with a blanket conveyance of all its properties *wherever located* in order that the Project Manager could correctly inform the Denver office that he had obtained the necessary title to all real property involved in the construction program.   Such instrument was to be held *until a proper form could be substituted* therefor.  The instrument referred to, entitled "Grant of Easement," is enclosed.

*On several occasions attorneys for the District have asked that the Grant of Easement be recorded.*  By letter of July 1, 1955 to John Thompson, Project Manager, the District transmits an excerpt from Minutes of the 145th Meeting of the Board of Directors of the Middle Rio Grande Conservancy District held June 28, 1955, which requests that the Bureau proceed forthwith to have said Grant of Easement made of record in all counties within the confines of the Middle Rio Grande Conservancy District.  Copies of the letter and excerpts of the meeting are enclosed.

 You will note that *in the event the United States does not intend to record the instrument, transferring title to all the works of the Middle Rio Grande Conservancy District to the United States,* then the District will take the necessary action to see that said instrument is duly recorded in all the counties within the District.  Some of the *objections to recording of said Grant of Easement* are outlined in the Field Solicitor's memorandum to me of July 19, 1955, a copy of which is enclosed.
Largely because of the Texas v. New Mexico litigation, the Bureau and Department decided against assuming the care, operation and maintenance of El Vado Dam and Reservoir, and by Amendatory Contract, dated February 14, 1955, assumed operation of all of the District works except El Vado Dam and Reservoir.   In this connection, you will note the Grant of Easement under consideration conveys all of the District works, including El Vado Dam and Reservoir.   We have already performed extensive rehabilitation work on El Vado Dam, and additional work will be accomplished during the current fiscal year....

The plan under consideration here is to propose to the District that in lieu of the "Grant of Easement" now in existence, a new instrument be drawn which will appropriately describe the District works to be conveyed to the United States in accordance with the Repayment Contract, and that this new instrument be properly

CROSS – CLAIMANT MIDDLE RIO GRANDE CONSERVANCY DISTRICT'S
PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

recorded.  Although we are not in a position to provide detailed descriptions to all of the District works required for project purposes, it is contemplated that the drains can, for the most part, be so described, and that the canal and lateral system can at least be described by name and general location on District maps.  In any event, the District works to be conveyed could be far better described now than is the case in the enclosed Grant of Easement....

*Secondarily, current Bureau policy is to take only easements for canals, laterals and drain rights-of-way in the acquisition of lands therewith.  In the acquisition of an interest in an existing system, as provided for in the repayment contract, it appears that fee simple title was intended.  Your views on this point are also desired.*

Since the District may at any time, as per their regulation, have the existing Grant of Easement recorded, *it is requested that you advise on the above two points by teletype promptly*.  In your deliberations you should bear in mind that the District may proceed with the recording of the existing instrument regardless of what position the Bureau my take on this matter.

Memo from Regional Director to Commissioner (July 28, 1955) (emphasis added)

(Determined Non-Privileged, 660-62/24991-3) (Doc. No. 511, Ex. 8).

118.   This letter makes clear that it was "Reclamation regulations," not Reclamation law, that required the USBOR to secure title to land on which it was to initiate construction and thus it was perfectly consistent with Reclamation law for the USBOR to accept the Love / Bratton conditional conveyance compromise.

119.   The 1953 Grant of Easement was not intended to be a conveyance, but rather, was an "interim" instrument that accomplished no actual conveyance and was designed to give the appearance in the Project Manager report, of technical correctness, insofar as title was concerned.

120.   The USBOR was aware that the 1953 Grant of Easement was not a "proper form."

121.    The USBOR was aware in 1955 that it had still not recorded the 1953 Grant of Easement because of their concerns that it was only an interim measure that contained no legal description.

122.    The Regional Director was contemplating the real possibility that the United States would choose not "to record the instrument, transferring title to all the works of the Middle Rio Grande Conservancy District to the United States."

123.    Other language in the memorandum reflects that the MRGCD, likely because it knew it was not a deed, but was only a grant of easement, wanted to get it recorded, the United States believed this was to give the MRGCD and the United States leverage in the *Texas v. New Mexico* litigation.

124.    The USBOR did not want to record the easement because it was aware the 1953 Grant of Easement did not "appropriately describe the District works to be conveyed to the United States."

125.    At the same time that the USBOR knew it had no deed, the Department of Justice was arguing there was such a deed to gain leverage for itself, the State of New Mexico and the MRGCD in the Supreme Court litigation.

126.    The current letter reflects an understanding of Bureau policy" which was "to take only easements for canals, lateral and drain rights-of-way in the acquisition of lands therewith" (an important fact in a situation where the USBOR was not actually constructing a project, but merely repairing its canals, laterals, and drains).

127.    The Project Manager was clearly caught in the middle between the *Texas v. New Mexico* litigation and the reality there had been no current conveyance. He

decided to request the USBOR Commissioner's "views" on whether "fee simple title" really was "intended" in the "acquisition of an interest of an existing system," such as the MRGCD.

128.　　The Project Manager was sufficiently pressured by the issue to ask the USBOR to advise him "by teletype promptly."

## VX.　The USBOR Regional Director Abandons the 1953 Conditional Grant of Easement And Requests Advice As to Title

129.　　The Regional Director decided to go forward with the task of acquiring some kind of title containing a usable legal description, thus opting at that juncture to note record the easement. On July 28, 1955, the Regional Director he wrote the following to the Middle Rio Grande Project Manager:

> Subject:　　Grant of Easement conveying all District works and real property required for accomplishment of the purposes set forth in contract between the District and the United States, dated September 24, 1951, as amended – Middle Rio Grande Project, New Mexico
>
> Reference is made to your letter of July 14, 1955, and our telephone conversation of this date relating to the above subject.
>
> *There is enclosed for your information a copy of my letter of this date to the Commissioner outlining the situation and requesting his views with respect to accepting title to El Vado Dam and Reservoir, and as to whether fee simple title or an easement should be taken to District works.* You will be advised promptly when I have heard from the Commissioner with respect to this matter. In the meantime, however, you should proceed in accordance with our telephone communication of this morning and prepare the best description to District works required for project purposes which can be prepared in a relatively short time. It is believed that you now have adequate descriptions to District drains on which work has been completed, in progress, or on which work is to be initiated in the near future. With respect to the canal and lateral system, it is believed they should be reasonably well described by name and reference to such maps as the District may have of same.

This office fully recognizes that neither you nor the District may be able to furnish descriptions of all works required for project purposes.  However, *such works as cannot be described now could be conveyed at later dates when descriptions covering said properties are available.*

In further pursuance of our conversation, it is contemplated that upon advice from the Commissioner's office, and results of your efforts to describe property to be conveyed [unreadable*], we will be in a position to propose to the District that we be given a more appropriate conveyance for recordation.*

If you have any comments with respect to this matter as outlined herein or in my letter to the Commissioner, please submit them promptly.

Memorandum from Regional Director to Project Manager (July 28, 1955) (Determined Non-Privileged, 657-8/24998-9) (emphasis added) (Doc. No. 511, Ex. 9).

130.   The Regional Director at this juncture had not received advice in response to his letter, but he made it clear that whatever the 1953 Conditional Grant of Easement did, it was not a recordable document that conveyed title and that such document would be created in the future.

131.   Thus, even up to the Commissioner level, the USBOR was aware that the issue of whether the USBOR would take fee simple title to MRGCD property or whether there had been a conveyance was still unclear. But at a minimum the Regional Director was not accepting the 1953 easement as sufficient in any respect.

132.   On September 2, 1955 the Regional Director wrote the following to the USBOR Commissioner:

Subject:       Conveyance of District Works to the United States – Middle Rio Grande Project

. . .

> *We have not as yet received letter you stated would follow with reference to the second question in our letter of July 28, above subject.* We would appreciate your advising when we might receive this letter. **[the second question was whether any future conveyance should be as an easement or fee title].**

Letter to Commissioner, from Regional Director (September 2, 1955) (Cons. List of Ex.'s No. 120) (emphasis added).

133.    The record shows no documentary sign of any sort that the USBOR Commissioner responded in writing to the Regional Director's question of whether the USBOR should take fee simple title or merely an easement to MRGCD property.

## XVI.   The Field Solicitor Rules the 1953 Conditional Grant of Easement Invalid And That It Conveys No Title And Directs New Documents Be Prepared

134.    However, the matter was referred to the Field Solicitor's Office to obtain his opinion as to the validity of the 1953 easement and whether the 1951 contract effectuated a transfer of properties to the USBOR or whether it was conditional in nature.  Obviously if it did not convey anything it should not be recorded.  On August 19, 1955, acting Field Solicitor for the USBOR A. V. Rascoe sent the following Inter-Office Memorandum to the BOR Regional Director in Amarillo, Texas, to the Project Manager in Albuquerque, New Mexico and to the Regional Solicitor in Denver, Colorado.  He concluded that neither the 1951 Contract nor the 1953 Conditional Grant of Easement conveyed anything, but rather were conditional commitments to convey in the future.  For this reason the 1951 Contract and the 1953 Conditional Grant of Easement could not be recorded and

must be replaced with a conveyance document that the Secretary deems is required by the 1951 contract.

> In Regional Counsel's Memorandum No. 53-146 of August 14, 1953, Marvin R. Whittington, Attorney, discusses the question of the validity of deed to lands in State of New Mexico which describe the subject matter as "all" of the grantor's property, or "all" of his property in a certain locality, expressing the opinion that "[unreadable] of the weight of authority, including the State of New Mexico, such a deed as between the parties is not defective or void for want of a description."

> . . .

> From the language of the Grant of Easement and the contract of September 24, 1951, *it is evident that the parties thereto did not intend to consummate a present conveyance of specific properties, and if an attempt is made to construe such present intent to convey, then the conveyance fails because of lack of certainty or ascertainability of specific properties intended to be conveyed.*

> In the instant case there is no agreement between the parties as to what is intended to be conveyed.  Instead, there is an agreement that the Contracting Officer shall determine the extent of the conveyance:  "such of the . . . works . . . as shall be determined by the Contracting Officer."  Inasmuch as a determination had not been made by the Contracting Officer at the time of the Grant of Easement, November 24, 1953, it must necessarily follow that the parties could not have contemplated specific properties to be conveyed in that instrument.  Also:  " . . . if a deed contains an indefinite and uncertain description, and the parties, either before the execution of the instruments of afterwards, by agreement, go upon the ground and mark out the boundaries of the land intended to be conveyed, the deed is valid, and the same result would undoubtedly follow if the grantee should go upon the lands of the grantor and mark out the boundaries and go into possession of the land claimed under the conveyance and so remain in possession with the acquiescence of the grantor."  (Simpson v. Blaisdell, 85 Mo. 199; 27 Atl. 101)  If the only thing that is needed to make certain the boundaries, then there seems little doubt but that a going upon the land and marking out of boundaries" by grantee as suggested in the Simpson case, supra, would suffice and that conveyance would then be effective.  However*, the language "such as the . . . works . . . as shall be required . . . as determined by the Contracting Officer" does not merely leave uncertain the*

> *matter of boundaries.  There is something yet to be determined, something left to human judgment.*
>
> *Inasmuch as the Grant of Easement executed by the Middle Rio Grande Conservancy District on November 24, 1953, cannot possibly be effective as to third parties, and a great deal of confusion might result unnecessarily from a recording of the instrument, since there is no way to trace into the mind of the Contracting Officer the extent of the properties of the District "as* shall be required to be *conveyed to the United States," I suggest that the instrument not be recorded.*  In lieu thereof, as determination are made by the Contracting Officer of the need for conveyance of individual properties of the district to the United States, the instruments so conveying such individual works and tracts should be recorded.

Inter-Office Memorandum by A.V. Rascoe to Office Files, Bureau of Reclamation, Amarillo Office; copies to Regional Director, Bureau of Reclamation, Amarillo, Texas; Project Manager, Albuquerque, New Mexico; Regional Solicitor, Denver, Colorado (Aug. 19, 1955) (Cons. List of Ex.'s No. 116).

135.   Because its Field Solicitor advised it conveyed nothing, the United States did not record the November 24, 1953 Grant of Easement, contradicting the arguments made by the United States in their briefs in Texas v. New Mexico. And, even though the United States relies on that document as its sole source of title to MRGCD properties, the United States has not recorded it as of the date of trial in this case.  *See* Mem. and Order at 3, *Albuquerque v. Dep't of the Interior*, CIV No. 89 – 1198 JP (Feb. 8, 1991) (Cons. List of Ex.'s No. 348).

## XVII.  The USBOR Acknowledges Blanket Conveyance Water Not A Deed And Directs New Conveyance Documents Be Prepared

136.   In 1958, a Bureau of Reclamation Internal Memorandum to William Brophy raised the issue again, indicating that the "blanket conveyance" was not a deed,

CROSS – CLAIMANT MIDDLE RIO GRANDE CONSERVANCY DISTRICT'S
PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

but rather was designed to allow access and certification of "rights of ways" so they could get the construction contracts moving.  He openly acknowledges that if there is to be any actual conveyance it will have to specify the parcels conveyed, concurring with Solicitor Rascoe.

> The transfer of old District rights of way is required by the [1951] repayment contract.  A blanket conveyance of all rights of way was made in November 1953.  This blanket conveyance was prepared only so that the Project could certify rights of way insofar as construction contracts were concerned.   The assignment and conveyance of old District rights of way will, of course, have to be prepared in acceptable, recordable form.  This means a listing and geographic description of all drains, irrigation ditches, levees, etc. with their respective locations and rights of way widths.   The Project now has this voluminous assignment and conveyance listing prepared in draft form.

Bureau of Reclamation Internal Memorandum to William Brophy ("Report of Status of Rights of Way") (1958) Exhibits in Support of Plaintiffs' Memorandum in Opposition to MRGCD Motion For Summary Judgment on Second Amended Cross – Claims (Cons. List of Ex.'s No. 157).

137.   This memorandum further reflects that the USBOR did not require fee title to all MRGCD works to start construction, to the contrary, it required only rights of way to do the work.

138.   This memorandum also confirms that it had as its only purpose providing the minimum color of title to allow construction to begin.

139.   It was not considered a sufficiently valid conveyance to be in recordable form.

140.   Future action was required to identify all rights of way the United States might determine it requires.

141.    An agreement executed November 22, 1961 in which the New Mexico State Highway Commission, the MRGCD and United States were parties states: "[t]he United States makes no warranty, expressed or implied, as to the extent of the validity of the grant [1953 Grant of Easement] contained herein." *See* Agreement between the United States and the New Mexico Highway Commission granting the Commission the right to construct the Rio Grande Bridge for Interstate 40 over Middle Rio Grande Project facilities (Cons. List of Ex.'s No. 201).

## XVIII.    The United States Realizes Advantages to Using State Sovereignty By Making the MRGCD, As Owner, the Real Party In Interest in Tort Litigation

142.    By 1958, the United States realized that there may be some additional legal advantages to having the MRGCD, not the United States become the real party in interest and title holder of the MRGCD works.  The 1958 Middle Rio Grande Project History states clearly that the United States concluded it could use the State's sovereign immunity to seek dismissal of law suits involving MRGCD works by arguing that the MRGCD was the owner of the property and the United States was only their agent. Since the State was immune from suit, the case would have to be dismissed. This is the exact opposite of the argument made in *Texas v. New Mexico*.  It states,

> There are several civil actions pending, descriptions of which appear later under this section, in which *the U.S. Attorney is submitting motions seeking to have the cases dismissed on the grounds the United States in the maintenance of the works of the District under the contract of September 24, 1951 is an agent of the State of New Mexico*, and as the State is immune from suit, the United States as an agent is immune from suit.  Another point in the motion is that the Conservancy District has agreed to repay the United States for all costs of maintaining and reconstructing the works and that, therefore, the State of New Mexico, i.e., the Conservancy District, is the real party of interest and inasmuch as

the State is immune from the suit, the United States is also
immune. . . .

1958 Project History at 13/4 (Doc. No. 511, Ex. 27). *See also* Complaint, Answer
of Defendant United States, and Judgment, *Ringer v. United States*, No. 3997
Civil (Cons. List of Ex.'s No. 348).

**XIX.   The United States Determines It Does Not Need Fee Title, Refuses to Record the
1953 Conditional Grant of Easement and Withdraws the Unrecorded Document
And Replaces It With Specific Easements Containing Valid Legal Descriptions of
Particular Parcels**

143.   The matter finally came to a head when valid legal descriptions were prepared for

virtually the entire district.  Rather than insist on fee simple title they determined

they required only a right of way easement interest.  The Field Solicitor had

determined the 1953 easement was legal and these were being provided in their

place.   These right of way easements were utilized in all four counties

encompassing the MRGCD.  On February 26, 1962, the Project Superintendent

sent the following memo to the Regional Director:

> Subject:   Legal Sufficiency of Grant of Right of Way
> Easement – Middle Rio Grande Project, New Mexico
>
> *Enclosed in a Grant of Easement covering all Middle Rio
> Grande Conservancy District properties within Valencia
> County.*   This document has been reviewed by the
> Albuquerque Field Solicitor and approved with one
> exception as noted on the enclosed easement. *The detailed
> instruments have been completed in accordance with oral
> instructions issued by the field Solicitor.   There are
> approximately 348 pages similar to this covering all
> District property in Valencia County.*
>
> Please review the enclosed document for satisfactory title
> and legal sufficiency in accordance with Paragraph 26 of
> Contract Symbol [sic] 178r-423.  The local Field Solicitor
> feels that the enclosed exception should be added to clarify
> Article 1 of the easement.

Memorandum from Project Superintendent to Regional Director (February 26, 1962) (Cons. List of Ex.'s No. 202) (emphasis added).

144.    On May 22, 1962, the MRGCD Board approved a Grant of Right of Way Easement by Middle Rio Grande Conservancy District to the United States for properties in Valencia County.  *See* Grant of Right of Way Easement by Middle Rio Grande Conservancy District to United States of America (May 22, 1962) for properties in Valencia County (Cons. List of Ex.'s No. 211).

145.    On May 22, 1962, the MRGCD Board approved a Grant of Right of Way Easement by Middle Rio Grande Conservancy District to the United States for properties in Socorro County.  *See* Grant of Right of Way Easement by Middle Rio Grande Conservancy District to United States of America (May 22, 1962) for properties in Socorro County (Cons. List of Ex.'s No. 212).

146.    On July 18, 1962, the Project Superintendent sent the Chief Engineer of the MRGCD the following:

> We are enclosing four copies of grant of right-of-way easements covering the assignments of all the District's old rights-of-way in Sandoval County.  This easement was previously transmitted to you and had been assigned by the District to the Government. However, *review by our Field Solicitor revealed that the previous assignment was not in an acceptable form and not considered legal*.

Letter from Project Superintendent, Bureau of Reclamation, United States Dep't of the Interior, to Hubert Ball, Chief Engineer, Middle Rio Grande Conservancy District, In re: Grant of Right-of-Way Easement for properties in Sandoval County (July 18, 1962) (Cons. List of Ex.'s No. 215).

147.   On October 16, 1962, the Project Superintendent sent the Chief Engineer of the MRGCD the following:

> We are enclosing four copies of grant of right-of-way easements covering the assignments of all the District's old rights-of-way in Bernalillo County. This easement was previously transmitted to you and had been assigned by the District to the Government. However, *review by our Field Solicitor revealed that the previous assignment was not in an acceptable form and not considered legal.* The present form has been reviewed and found to be entirely acceptable and legal.
>
> Please review the enclosed easements and if it is satisfactory have signed and acknowledged pursuant to an enabling resolution of the Board of Directors. Return all copies of the signed easement and upon recordation in the county records, a copy will be returned to you with all recording information.

Letter from Project Superintendent, Bureau of Reclamation, United States Dep't of the Interior, to Hubert Ball, Chief Engineer, Middle Rio Grande Conservancy District, In re: Grant of Right-of-Way Easement for properties in Bernalillo County (October 16, 1962) (Cons. List of Ex.'s No. 221).

148.   After signing and recording of the easements in the form requested by the USBOR as a complete replacement of the withdrawn 1953 Conditional Grant of Easement, the obligations of the MRGCD with respect to title under the 1951 Contract were completed. Since the contract has been fully performed, no further requests for conveyance of title by the MRGCD can be imposed by the USBOR.

149.   Thus, even though at the outset, the MRGCD and initially some personnel at the USBOR believed fee title was required under the 1951 Contract this turned out to not be true. Easements were accepted as sufficient. To the degree those easements are needed to carry out channel rectification work they remain valid today.

**XX.    The United States Determines It Does Not Need Title to the MRGCD's Diversionary Water Rights**

150.    Other obligations set out in the 1951 contract were also determined to not be required.  Article 28 of the 1951 Repayment Contract states:

> The District has made certain water filings including filings for storage and use of water in the El Vado Reservoir and it shall cause any and all such filings made in the name of the District to be assigned to the United State *for beneficial use* in the project . . .

1951 Repayment Contract at Article 28 (Cons. List of Ex.'s No. 67) (emphasis added).

151.    The MRGCD holds State Engineer permit 0620 for diversion and beneficial use of all the unappropriated water within the MRGCD as of the date of the filing. This permit was not assigned to the United States.  Indeed, it was not until 1963 that any right associated with water was assigned to the United States. This was not permit 0620, but rather, a storage right 1690, which allows storage exclusively for beneficial use by the MRGCD. Thus, the United States holds no rights to divert or use water within the MRGCD.  State Water Rights Permit No. 1690 (Cons. List of Ex.'s No. 11).

**XXI.  The MRGCD Assigns Permit No. 1690 As Security Pursuant to New Mexico Supreme Court Precedent**

152.    On May 28, 1963, the MRGCD assigned State water permit 1690 to the United States pursuant to Article 26 of the 1951 Contract.  *See* Transfer and Assignment of Water Rights Between Middle Rio Grande Conservancy District and the United States of America (May 28, 1963) (Cons. List of Ex.'s No. 226).

153.    That the MRGCD's conveyance of Permit 1690 was a security interest was decided by the New Mexico Supreme Court in 1953.  *Middle Rio Grande Water*

*Users Ass'n v. Middle Rio Grande Conservancy District*, 57 N.M. 287, 258 P.2d 391 (1953). In that case, the New Mexico Supreme Court held that New Mexico law granted the MRGCD authority to convey the permit, *but only as security. Id.* at 300, 258 P.2d at 399 ("It is true this municipal corporation [MRGCD] holds these properties in the final analysis for its members, but in the conveyance to the United States it is only conveying the legal title as security for the money to be spent for the benefit of the District for which charge is made").

154.    Therefore, ten years before the actual assignment took place in 1963, a judicial determination had been made that the MRGCD could not convey the storage right except as a security interest.

155.    The New Mexico Supreme Court having ruled in 1953 that the MRGCD had no legal authority to convey more than a security interest, the United States, therefore, held no more than a security interest prior to the time the 1951 Contract was paid off.

156.    The May 28, 1963 Transfer and Assignment of Water Rights explicitly relies on the New Mexico statute interpreted by the New Mexico Supreme Court in *Middle Rio Grande Water Users Ass'n* – ch. 148, Laws of 1939, referred to in the Transfer as "Section 75-32-2, New Mexico Statutes, Annot.," currently NMSA 1978, § 73-18-2 (1978).

157.    And, this opinion was required by the USBOR as a condition of entry into the 1951 Contract. *See* art. 40, 1951 Contract.

## XXII.  This Court Confirms the MRGCD's Diversionary Rights Never Conveyed

158.    On April 19, 2002, this Court recognized that

> Unlike most federal Reclamation projects, BOR did not appropriate water rights for the Middle Rio Grande Project. Under a 1951 contract, MRGCD was to assign its water rights to the United States, but ultimately MRGCD in 1963 transferred to BOR *only the right to store water* in El Vado Reservoir.

Mem. Op. and Order at 28, *Rio Grande Silvery Minnow v. Keys*, No. CV 99-1320 JP/RLP-ACE (April 19, 2002) (emphasis added) (Doc. No. 371).

## XXIII.   The 1963 Amendatory Contract Regarding San – Juan Chama Created No Further Security Interest in Permit 1690.  The Permit Was Assigned Prior to the 1963 Amendatory Contract

159.   The 1951 Contract was referenced in six amendatory contracts for the San Juan – Chama contract of June 25, 1963.

160.   The payment schedules and cost reimbursement arrangements demonstrate the subsequent contracts are completely separate from any obligations or exchanges of consideration under the 1951 Contract.

161.   The 1963 Contract did not serve to extend the 1951 Contract beyond its original terms and the MRGCD was provided no new consideration to extend its obligations.

162.   The 1963 Contract has its own subject matter, payment terms and provisions and far exceeds the scope of the 1951 Contract.

163.   It was not the intent of the parties that the contracts merge.

164.   If the United States had intended to merge the contracts into one, then any and all obligations under the 1951 Contract would have been extinguished upon execution of the 1963 Contract, and there would have been one payment schedule instead of two payment schedules.

165.   The 1963 Contract did not merge into the 1951 Contract.

166.    The MRGCD has paid off its obligations on both contracts.

## XXIV.   The USBOR Continues to Refer to the 1962 Replacement Easements As The Only Operative Conveyance

167.    All further references were to easements and rights of way as needed.  None

contains a request for a deed.  For example:

A.      On November 9, 1979, the Project Superintendent sent the Secretary –

Treasurer of the MRGCD the following:

In reference to your letter of October 25, 1979, concerning Tract 8-1, Map 132, and Tract 1-A-2-a, Map 133, these tracts are not mentioned in *the Master Easement* of 5-22-62.  The San Francisco lateral is shown in *the Master Easement* and we believe it was the intent of the district to assign this entire ditch to the United States.

Since *the subject whole tracts are not shown in our right-of-way records as having been transferred to the United States*, we see no reason for the District not to dispose of them without further action on our part.  We do recommend, however, that any purchaser be made aware that right-of-way for the adjoining San Francisco Lateral proper has been assigned to the United States.

Letter from Projects Superintendent to Raoul Cordova, Secretary – Treasurer,

MRGCD (Nov. 9, 1979) (Cons. List of Ex.'s No. 304).

168.    On June 2, 1981, the Acting Projects [sic] Superintendent sent the General

Manager of the MRGCD the following:

The Bureau is actively engaged in the channelization of the river bed of the Rio Grande under authority of the Flood Control Acts of 1948 (62 Stat. 1171) and 1950 (64 Stat. 163).

Under a certain contract between the United States and the Middle Rio Grande Conservancy District dated September 24, 1951, the District agreed to furnish all necessary rights-of-way for river channel rectification within the Project limits.

169.    On January 10, 1985, the fact the United States held only an easement interested

was reflected in the issuance of licenses to cross MRGCD lands.  The Projects

Superintendent sent Ray Shollenberger, Jr., attorney for the MRGCD, the

following:

> the Bureau's preference for our involvement in the licensing
> program is that of reviewing and approving licensees [sic] and/or
> permits, granted by the Middle Rio Grande Conservancy District
> for installations on federally benefited facilities of the Middle Rio
> Grande Project. Such an *involvement would reflect the limited*
> *interest in real property that was assigned the Bureau by the*
> District under the repayment contract.

Letter from Charles A. Calhoun, Projects Superintendent, Upper Rio Grande

Basin Projects Office, Bureau of Reclamation to Ray Shollenbarger, Jr., Attorney

for MRGCD (Jan. 10, 1985) (Cons. List of Ex.'s No. 330).

## XXV.   The Issue of the Scope of the 1953 Conditional Grant of Easement Is Raised Before This Court

170.    On October 26, 1990, the Federal District Court of New Mexico issued the

following findings relating to the nature of the un-recorded easement as it might

be applied to the Rio Grande Bosque, not within the MRGCD:

> 3.      UNCONTROVERTED FACTS: The following facts are
> established by admissions in the pleadings or by
> stipulations of counsel at the pre-trial conference:
>
> . . .
>
> 5.      *On November 24, 1953, the Middle Rio Grande*
> *Conservancy District conveyed an easement over the*
> *subject property to the United States Bureau of*
> *Reclamation. This easement was never recorded with the*
> *Bernalillo County Clerk's Office.*

Pre-Trial Order in *Albuquerque v. Interior*, CIV No. 89-1198 JP at 5-6 (Oct. 26,

1990) (Cons. List of Ex.'s No. 338) (emphasis added).

171.    In the hearing on that matter, United States Attorney John Zavitz represented to the court that this un-recorded document was not a deed but rather a specific easement aimed at fulfilling a purpose of providing equipment access into the Bosque: "And I think that that gives it [1953 Conditional Grant of Easement] definition as to what kind of uses were intended, that it was intended to cover whatever engineering devices might be needed."  (Cons. Ex. No. 344). He also argued unsuccessfully persons should be bound by it because they should be forced to search USBOR records to try to find the unrecorded document and had they found it they would have been bound by it: "Why weren't the Taylor Defendants at least interested in searching for the recorded or unrecorded [1953 Conditional Grant of Easement] [?]"  (Cons. Ex. No. 346).

172.    In *Albuquerque v. Interior*, this Court determined in a final order and binding decision involving, *inter alia*, the United States' and the MRGCD, "in 1953, the MRGCD conveyed an easement to the United States that extended over some of the Taylor property and included all of the accretion land . . .  The easement was never recorded." (Cons. Ex. No. 348).

## XXVI.  Easement Status Continues From 1968 - 1999

173.    For a period from 1968 to 1999, the United States asserted only an easement interest in MRGCD properties and acted accordingly.  It was not until there was need for water for the RGSM that the opinion of all of the previous solicitors was changed.  Testimony by Affidavit of Garry Rowe [Doc. No. 568].

174.    During the period from 1985 to 1999, this view was affirmed repeatedly.  On June 3, 1994, the Acting Regional Director sent the USBOR Regional Solicitor,

Intermountain Region, a letter stating that the 1962 easements "encompass the entire irrigation and drainage portion of the Middle Rio Grande Project. In most cases, the district owns the lands underlying these easements in fee title." Memorandum from Charles A. Calhoun, Acting Regional Director, Bureau of Reclamation, United States Dep't of the Interior, In re: Request for Legal Opinion Regarding the Extent of Reclamation's Authority to Control Proposed New Uses of its Exclusive Easements, Middle Rio Grande Project, New Mexico at 1 (Cons. List of Ex.'s No. 354).

175. On July 28, 1995, Field Solicitor Lynn R. Collins sent the Area Manager a memo containing the following: "It is our understanding that, in most cases, title to the lands in the Middle Rio Grande is held by MRGCD, and the United States holds only an exclusive easement." Memorandum from Field Solicitor, Salt Lake City Field Office to Area Manager, Bureau of Reclamation, Upper Colorado Region, Albuquerque Projects Office, Attn: ALB – 421 re: Comments on Proposed Standardized License Agreement Form to be Used by the Middle Rio Grande Conservancy District, Middle Rio Grande Project, New Mexico (July 28, 1995) (Cons. List of Ex.'s No. 360).

176. On August 9, 1995, Area Manager Garry M. Rowe, who is a witness in this case, wrote the following to the Chief Engineer of the MRGCD that the Field Solicitor's July 28, 1995 memorandum

> was in response to a request from our office for comments on the standardized license agreement (agreement) form proposed by MRGCD. The Solicitors' [sic] comments give direction to this office's signature concurrence for agreements to which Reclamation holds an Exclusive Easement [sic] interest in MRGCD land. We have reviewed the comments and believe they

can be easily accommodated to the satisfaction of our respective agencies.

Letter from Garry M. Rowe, Area Manager, Albuquerque Projects Office, Bureau of Reclamation to Subhas K. Shah, Chief Engineer, MRGCD re: License / Joint – Use Agreement Procedure Change Between the Middle Rio Grande Conservancy District and the Bureau of Reclamation, Middle Rio Grande Project, New Mexico (Cons. List of Ex.'s No. 363).

177.   In October, 1999, the USBOR and the United States Army Corps of Engineers issued a Programmatic Biological Assessment that stated:

> Under the contracts between Reclamation and MRGCD and under the Middle Rio Grande Project authorizing statute and general Reclamation law principles, MRGCD was supposed to convey to Reclamation title to MRGCD works, including the diversion dams. The United States' current research indicates that *this title transfer did not occur. Rather, Reclamation received from MRGCD a series of easements* to "all the works and structures of the [MRGCD] . . . for the operation and maintenance of the Middle Rio Grande Conservancy District."

Albuquerque Area Office, Bureau of Reclamation, Dep't of the Interior & Albuquerque District, Army Corps of Engineers, Dep't of Army, Programmatic Biological Assessment of Federal Discretionary Actions Related to Water Management on the Middle Rio Grande, New Mexico at 24 (Cons. List of Ex.'s No. 374) (emphasis added).

## XXVII.  The United States Changes Its Position On Title In Response to Environmental Plaintiffs' Litigation

178.   It was not until commencement of the Environmental Plaintiffs' administrative appeal that the USBOR changed the legal position it had taken since 1955.

179. Solicitor Leshy, on June 19, 2000, citing no legal authority and reversing the three opinions issued earlier, concluded the United States held fee title to all of the MRGCD's works.

180. Emboldened by Solicitor Leshy's opinion, on July 6, 2000, then Secretary of Interior Babbitt issued notice that the United States intended to seize San Acacia Dam, lock the headgates, by-pass 300 cfs of water that was being diverted under State Engineer Permit 0620 that was never conveyed to the United States.

## XXVIII.   All Parties in the Middle Rio Grande Valley Have Relied On the MRGCD's Title Since 1962

181. Since the beginning of the 1951 Contract when the Love / Bratton compromise was accepted by the USBOR agreeing to not require vested title to all of the works of the MRGCD, there has never been any period of more than 10 years when the United States claimed it held title to the MRGCD.

182. By 1955, the USBOR made it clear through memoranda and correspondence that it did not claim title to MRGCD properties in a manner hostile to the title of the MRGCD.

183. The USBOR has never been in possession of any MRGCD lands or property other than by consent of the MRGCD pursuant to the 1951 Contract performing work for and on behalf of the MRGCD.

184. Since at least 1967, although the 1951 contract requires congressional approval before property deeded to the United States can be conveyed to third parties, based upon their personal knowledge witnesses have testified that the United States has never required of the MRGCD that it seek congressional approval for a conveyance of any property held by the MRGCD.

185.  The United States has issued hundreds of quitclaim deeds releasing their easement interest without congressional approval.

186.  Ditches owned by the MRGCD at the time of the 1951 Contract have been abandoned and released from MRGCD ownership.  Since 1967, there is no instance where congressional approval was required to release the easement interest of the United States.

187.  Not only did the United States not object to issuance of quitclaim deeds to MRGCD property without congressional approval, it billed the MRGCD for preparation of those deeds as part of their operation and management costs.

188.  From 1967 to present, the United States never refused to issue any license to encroach upon their easement interest and ultimately insisted that this be done by the MRGCD because they were the title holder of the property.

189.  In May 2001, the City of Albuquerque put together a pilot project for development of a method for diverting San Juan - Chama water.  The United States insisted that the MRGCD be the responsible party for issuance of the license as the owner of the fee land and they signed as holder of an easement.  (Cons. List of Ex.'s Nos. 391, 392).

190.  On May 22, 2001, in a letter to Subhas K. Shah, Chief Executive Officer of the MRGCD, Rick L. Gold, Regional Director of the Bureau of Reclamation, intending to explain the United States' theory as to why the 1951 Contract remains in force after being repaid, wrote: "[O]ver the years, the District has occasionally requested Reclamation to release its 'easement interest' in project lands that were no longer serving project needs."  (Cons. List of Ex.'s No. 387).

191.    Since 1967, the MRGCD was a defendant in hundreds of quiet title suits.  Since
        the United States had not recorded its 1953 easement, which it now claims is a
        deed, it was named as "unknown claimants of interest."  It has never intervened in
        a single quiet title suit as an alleged owner or sought to have a case removed to
        federal court under the federal Quiet Title Act.  All of those decrees would be
        invalid if the United States were to now be determined to have been the owner
        since 1951, and likewise to have been determined to have been immune from suit.

192.    Since 1967, in no case involving any title derived from the MRGCD has there
        ever been a title insurance policy that lists the United States as holding more than
        an easement interest.

193.    The Tingley Beach property was sold in November 1997 to the City of
        Albuquerque at market price and a title company provided the City of
        Albuquerque a title insurance policy. That policy lists the United States by
        reference only to the 1962 easement. The United States did not object to the sale
        or claim an ownership interest prior to the sale.  *See* Special Warranty Deed
        (Tingley Beach) and Commitment (Cons. List of Ex.'s No. 368).

194.    In 1983, the Rio Grande State Park shown on the map attached to the MRGCD's
        Response to the Federal Defendants' Motion In Limine and introduced at trial was
        established. That Park, measuring more than twenty - five river miles of the
        Bosque, was created based upon a specific legislative finding the MRGCD owned
        the Bosque land on which it was to be located. The United States has never
        challenged that finding.

195.     The MRGCD and the City of Albuquerque and the MRGCD and the Village of Corrales have entered into joint powers agreements for management and control of the Bosque, within the city limits of these municipalities.  In each case the MRGCD is listed as owner. The United States has never contested these political agreements or otherwise asserted its alleged ownership interest.

196.     The record contains no mortgage, lien hold documents, or other identification of any interest perfected under New Mexico law solely because the United States did work on any property owned by the MRGCD.

197.     Because of the Love / Bratton compromise, that provision of the 1951 Contract was rendered meaningless because all interests to be acquired in the works of the MRGCD were required to be identified by the Secretary.

198.     The Secretary created no list of any properties or works it claimed to own simply because the work was performed for which the United States Bureau of Reclamation received full compensation.

199.     Any interest that could have been created as a lien for work performed could have had as its only function ensuring payment by the MRGCD.  The underlying obligation having been fully paid, there is no basis for creation of a lien today or a list for which the United States now claims title.

200.     The fact that the MRGCD retained the United States to perform work on its behalf creates no title or other property interest in the United States.

201.     Paragraph 13(a) of the 1951 Contract states that the United States Bureau of Reclamation performs Operation & Maintenance only while construction is ongoing.  *Id.* at 46 (Cons. List of Ex.'s No. 5).   Construction is complete.

Therefore, the MRGCD is allowing the USBOR to continue in this role in the MRGCD's absolute discretion.

## PROPOSED CONCLUSIONS OF LAW

1. This Court has jurisdiction over the parties and the subject matter of this action.

2. The United States has requested no affirmative relief with respect to either its title or a construction of the 1951 repayment contract No.178r 423, and therefore, no relief can be awarded to the United States.

3. The United States chose to not counter cross claim against the MRGCD under the federal Quiet Title Act.  Any such claims which could have been brought were compulsory counterclaims and have been waived.  Fed. R. Civ. P. 13(a).

4. The Court has the authority to quiet title in the MRGCD and against the United States pursuant to 28 U.S.C. §2409a, which waives sovereign immunity for that purpose and likewise has the authority to construe the 1951 Contract and award declaratory relief to the MRGCD as to its intent and meaning vis-à-vis the nature of the security interest created in State Engineer water rights storage permit 1690, pursuant to 43 U.S.C. §390uu.

5. This action has been narrowed to include only the properties described in Exhibits 14, 15, 16 and 17 to the MRGCD's Second Amended Cross Claim (Doc. No. 366).  The sources of title to those properties in the MRGCD are set out in Consolidate List of Trial Exhibits to be Introduced at Trial, Nos. 1, 6, 9, 10, 12 – 40, 42 – 49, 325 – 327 (Doc. No. 634).  The United States has not challenged the underlying title to these properties, but alleges they were subsequently acquired by the United States after 1951.

6.     This is an action involving real property within the State of New Mexico. The United States, solely because it is a sovereign, has no legal right to refuse to comply with the rules for acquisition of real property in New Mexico. The United States has the obligation to acquire and hold property pursuant to deeds that meet the statutory requirements of deeds as set out in New Mexico statutes. If they do not have a deed to real property that contains an ascertainable legal description for a specific parcel, they cannot be the titleholder to that property. *See* NMSA 1978, § 47-1-1 through 47-1-56 (1989); *see also Maestas v. Martinez*, 107 N.M. 91, 752 P.2d 1107 (Ct. App. 1988).

7.     This is a civil action involving real property. Whether or not it would be useful to the environmental plaintiffs in their administrative appeal relating to the exercise of federal discretion under the Endangered Species Act of 1973, § 7(a)(2), 16 U.S.C. §1536(a)(2), if the United States were to hold title to MRGCD works is not relevant to this quiet title action. The environmental plaintiffs have not alleged or proven they have real property within the MRGCD, therefore, the environmental plaintiffs have no standing to appear in this case as a party and the court will not consider any evidence offered by the environmental plaintiffs.

8.     Allowing the intervention in quiet title actions by parties who have no real property interest in actions under the federal Quiet Title Act, 28 U.S.C. §2409a, would open the doors of courts to interventions in quiet title cases throughout the United States by parties seeking to affect the outcome of real property cases, based upon the individual political agendas of the proposed intervenors, when

they have no direct stake in the outcome of the real property dispute before the court.

9.    A party that has no contractual or property interest cannot intervene in a suit involving a contract between two parties or in a quiet title action, therefore, environmental plaintiffs cannot be a party  to the MRGCD's Second Amended Cross – Claims.

10.    The environmental plaintiffs' allegations in the administrative appeal portion of this litigation that their claims under the Endangered Species Act, 16 U.S.C. §§ 1531 – 1544 and the MRGCD's Second Amended Cross – Claims are "closely intertwined" and that the outcome of the Second Amended Cross – Claims could affect the scope of consultation required under the ESA and/or are contrary to environmental plaintiffs' claims do not state title claims, nor do they allege any interest that would cloud the title of the MRGCD's works and properties.

11.    The environmental plaintiffs lack standing to participate as a real party in interest. *See generally* Fed. R. Civ. P. 17(a).

12.    The environmental plaintiffs cannot assert a claim as a third party beneficiary of a contract relating to real property between the MRGCD and the United States because the Tenth Circuit has required that such a beneficiary's right must "be apparent from the express provisions of the contract and that the benefit cannot be incidental but must be a direct benefit intended by the contracting parties to accrue in favor of the third party."  *Gallagher v. Continental Ins. Co.*, 502 F.2d 827, 831 (10th Cir. 1974).

13.      A party may not be granted affirmative relief outside the relief sought in her pleading. Fed. R. Civ. P. 8.

14.      There are no express provisions of the 1951 Contract signed September 24, 1951 that recognize or acknowledge any rights of environmental plaintiffs.

15.      The parties to Contract No. 178r-143 did not intend any direct benefit to accrue in favor of environmental plaintiffs.

16.      The United States has not alleged that it holds title to any property with the MRGCD by adverse possession as defined under New Mexico law.

17.      There is no legal basis in New Mexico property law for a person to acquire an ownership interest in property because they may have performed work on the property of another. New Mexico law provides for mechanics liens, contractors liens, mortgages, and creation of security interests through New Mexico's adaptation of the Uniform Commercial Code. There is no evidence that the United States as ever sought to comply with New Mexico State law that would convey ownership of any real property to the United States solely because it performed repair work on the MRGCD's property.

18.      A valid deed requires at a minimum, an intent to make a present, not future or conditional, conveyance of property, a description of the property conveyed that can be ascertained on the face of the deed, or, at a minimum, the particular tract conveyed must be identifiable as distinguished from other tracts.

19.      Failure to state the intent to make a conveyance as of the date of the deed, as opposed to intent to make a conveyance at some future date, converts the

document from a deed to a commitment to make a conveyance of a specific tract in the future.

20.     The MRGCD has prepared and executed deeds in proper form when requested by the USBOR, including deeds to MRGCD offices located within the MRGCD boundaries and a deed to Heron Reservoir.  There are no comparable documents in the record that constitute deeds from the MRGCD to the United States that convey any property interest in the properties at issue in this case, including the diversion structures at Angostura and San Acacia and the El Vado Dam and Reservoir.  Nor is there any evidence the United States ever requested or accepted a deed to any of these properties.

21.     The 1951 Contract on its face created no claim to any properties of the MRGCD. It was conditional upon a selection of the properties needed as a security interest by the United States and actual performance under the contract creating mutual obligations.  No performance under the contract that could create any obligation occurred until after 1953.

22.     The unrecorded 1953 Grant of Easement, dated November 29, 1953, from the MRGCD to the United States, did not convey any property interests to the United States.  It was drafted as an interim document to meet USBOR regulations to allow the USBOR to commence construction.

23.     The 1953 Conditional Grant of Easement by the MRGCD to the United States was deficient in that it did not contain any legal description of the properties to be conveyed, was conditional upon future identification of the property to be conveyed and was never accepted or recorded by the United States.

24.     The only interests in the MRGCD properties at issue in this case are easement interests created in 1962 by the execution and recording of the easements in the record at Cons. List of Ex.'s Nos. 211, 212, 216 and 222 and the easement interest in El Vado Dam in the record at Cons. List of Ex.'s No. 177.

25.     By 1955 and up to and including 1962, the United States did not claim it held title to the MRGCD properties at issue in the case.  To the contrary, it refused to assert such an interest in direct contravention of the requests of numerous parties.

26.     Because the United States affirmatively disclaimed its interests in the MRGCD's properties under the 1953 Conditional Grant of Easement from 1955 to 1962, the statute of limitations under the federal Quiet Title Act could not begin to run. From 1962 to 1999, the United States asserted only an easement interest. Therefore, this action is not barred by the Federal Quiet Title Act statute of limitations.

27.     The MRGCD has fulfilled all its repayment obligations pursuant to the 1951 Contract and the 1963 San Juan - Chama Contract. The only remaining obligations under those contracts are for operation and maintenance performed at the request of the MRGCD. The existence of an Operation and Maintenance contract does not create title in the United States.

28.     The MRGCD has fulfilled all its repayment obligations arising from United States' retirement of MRGCD bonds.

29.     The MRGCD has fulfilled all its repayment obligations arising from any construction work performed by the United States on any lands or works owned by the MRGCD.

30.     The MRGCD has no repayment obligation for work for channel rectification from Velarde, New Mexico to Elephant Butte Dam.  It has entered into a separate Memorandum of Agreement to allow channel rectification to continue and does not contest the continued viability of any easements issued for that purpose.

31.     The United States has produced no evidence as to why the existing easements are not sufficient to carry out the functions of channel rectification or to engage in operation and maintenance contracts at the request of the MRGCD.  In short, it has produced no evidence why a fee title as opposed to an easement is necessary.

32.     With the exception of El Vado Dam, the United States has performed no maintenance or operation services for the MRGCD since July 29, 1974.  The work performed at El Vado Dam, as a contractor for MRGCD, does not create title in that facility. All repairs to El Vado Dam under the operation and maintenance contracts have been paid in full by MRGCD.

33.     Because the MRGCD has title to all of the properties at issue in this case and because the United States has provided no evidence of title meeting the requirements of New Mexico real property law, the MRGCD has made out a prima facie case of the validity of its title.  The United States has made no case at all.

34.     Even if the United States held title to unspecified properties within the MRGCD rather than an easement interest, it had notice of this quiet title suit at the time of the filing of the Cross – Claims before the Court.  The United States has failed to record the only document on which it relies as a source of title and offers no explanation for not doing so.  The failure to record the only document on which it

claims to base its title, estops the United States from relying on that document in this case.

35.     The 1951 Contract uses the word "constructed" in the 2nd "Whereas" clause to mean works already completed in the entirety, not "repaired".  It notes that the MRGCD already owns works it has "constructed".

36.     In paragraph 29, the 1951 Contract states that title to all works "constructed" by the United States "shall, as provided in Article 26, be and continue to be vested in the name of the United States."

37.     The definitions section of the Contract defines "district works" as "Those structures, reservoirs, ditches and canals, now constructed and operated by the District and those to be constructed or rehabilitated…."

38.     Thus, the contract contemplates two kinds of work – the construction of new works and the rehabilitation of already constructed works.

39.     There is no merit to the United States' argument that the word "constructed" should be construed to mean "repaired".  This would mean that if the United States puts in one bolt in a head gate, the United States would automatically hold title to that fixture.

40.     The definition of "construction" is included to describe what will be paid for under the 1951 Contract.  It is not designed to pervert the standard meaning of "constructed" as it is clearly used in this agreement.

41.     This is a "construction" repayment contract under USBOR law.  It was unique because more than one/third of the contract had nothing to do with construction at all.  Rather, it was a loan to ensure the retirement of bonds. Para. 9 (a).  It is clear

62

that one cannot say the United States "constructed" a bond in the mechanical sense. Yet, the definition of "construction" includes, acquisition of existing bonds. Nor, can one say they that by engaging in "rectification of the Rio Grande Channel" the United States constructed it *ab initio*.  It is clear that the definition of "construction" is included to define the scope of work paid for, not to yield absurd constructions that the acquisition of bonds is to construct the bonds, that rectification of a river channel is to construct it, or that adding a bolt to the face of El Vado Dam is the same as constructing it.

42.    Paragraph 29 is also conditional.  The alleged "constructed works", as opposed to repaired works to which the United States believes it should have acquired title, are not made clear until the Secretary determines for which "constructed" works it seeks title.  Since there is no way of determining which those are, and no such designation has been made, there could be no present conveyance.  And, since the Contract has been fully repaid it is too late to make such a designation.

43.    The assignment of permit 1690 was determined by the New Mexico Supreme Court to be solely as a security interest.  *Middle Rio Grande Water Users Ass'n v. Middle Rio Grande Conservancy District,* 57 N.M. 287, 300, 258 P.2d. 391, 399 (1953) ("…in the conveyance to the United States, it is only conveying the legal title as security for the money to be spent for the benefit of the District for which charge is made…").  The United States required this construction as a condition of entering into the contract.

44.    The 1951 Contract and the San Juan – Chama contract have both been fully re-paid.

CROSS – CLAIMANT MIDDLE RIO GRANDE CONSERVANCY DISTRICT'S
PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

45.     When the underlying note or obligation secured by an assignment of collateral is satisfied, the security interest dissolves as a matter of law.

46.     43 U.S.C. § 489 is not a bar to the dissolution of this interest. That requires congressional approval of re-conveyance of "structures, reservoirs, ditches and canals." Water Right Storage Permit 1690 is none of these. Therefore, it reverted to the MRGCD by operation of law upon completion of payment under the contracts in this case. Nor is paragraph 28 of the 1951 Contract a bar to the dissolution of the United States' security interest in permit 1690.

47.     At a minimum, because the MRGCD has fulfilled all its obligations under the 1951 Contract, Permit 1690 should be directed to be held in trust for the benefit of the MRGCD until title can be re-conveyed to the MRGCD.

48.     The San Juan - Chama contract between the MRGCD and the United States is not an extension of the 1951 Contract, but contains new obligations, supported by new consideration, and is unrelated to the 1951 Contract.

49.     The San Juan - Chama contract between the MRGCD and the United States was not merged into the 1951 Contract, but is a new contract, supported by new consideration, and is unrelated to the 1951 Contract.

50.     In any event, all construction repayment obligations of the MRGCD under the San Juan - Chama contract have been fulfilled and the San Juan - Chama Contract does not require a security interest in El Vado Dam.

51.     There is substantial evidence, indeed clear and convincing evidence, that the MRGCD built El Vado Reservoir and is the owner in fee simple of El Vado Dam and Reservoir. The United States holds only an easement interest. There is also

substantial evidence, indeed clear and convincing evidence, that the Untied States holds only an easement.

52.  Title in fee simple to the lands and works at issue in this case should be quieted in the MRGCD because none of the affirmative defenses asserted by the United States has merit.

53.  No principle of property law creates title in another party by estoppel.

54.  None of the evidence advanced by the United States on its judicial estoppel theory or generalized estoppel theory creates title in the United States.

55.  If estoppel did apply in this case, the United States would be bound by the statements of its attorney, John Zavitz, that the United States' interest in the works of the MRGCD is a limited interest, for the purpose of engaging in flood control and channelization pursuant to the Middle Rio Grande Project Act. His assertions to the Court stipulate the 1953 Conditional Grant of Easement conveyed no title.

56.  The accrual of a claim under the Quiet Title Act in favor of the MRGCD is governed by 28 U.S.C. §2409a(k), in that the MRGCD is a political subdivision of the State of New Mexico.  As discussed above in Conclusion 16, no specific claim to title was made on any consistent basis until the year 2000, so the statute never commenced to run and no right or reason for filing suit occurred.

57.  The United States did not, by public communications, make consistent claims with respect to MRGCD lands that were sufficiently specific as to be reasonably calculated to put the MRGCD on notice of the United States' claim until July 2000.  To the contrary, the United States consistently reversed its public positions

and, in direct communications with the MRGCD and among its own staff, denied it held title from 1955 to 1999.  And, between 1962 and July 2000, the United States has never asserted anything other than an easement interest in the lands and works of the MRGCD.

58.     The United States' request for and acceptance of the 1962 easements is inconsistent with its claim of ownership of the lands and works of the MRGCD in fee simple.

59.     Under the doctrine of merger of title, the United States cannot have both an easement interest in the lands and works of the MRGCD, and be the owner of the land and works in fee simple.  Had any title passed by operation of law under that contract or as a result of construction, without need of any documents of conveyance, forty years of legal activity creating easements, access and licenses for use of MRGCD works would have been unnecessary.  Thus, there is no rational legal basis for claiming the United States acquired title by operation of law or simply by having repaired MRGCD facilities.

60.     The defenses of collateral estoppel, judicial estoppel and equitable estoppel have no application to this case because, with the exception of the hundreds of quiet title suits in which MRGCD has been a party, and in which the United States refused to intervene, the MRGCD has not previously litigated the issue of the ownership of the MRGCD's lands and works with the United States or any other party.

61.     The issue of the ownership of the MRGCD's lands and works has never been fully adjudicated on the merits as between it and the United States or any other

party, with the exception of the hundreds of quiet title suits in which the MRGCD has been a party and in which the United States has refused to intervene. The record contains no example of any case where an adverse ruling has been entered against the MRGCD on the title issue.

62.    The issues in this case regarding ownership of the MRGCD's land and works are not identical to any other case cited by the United States in its exhibits.  Thus, the United States has failed to meet the most basic pre-requisite for application of the doctrine of collateral estoppel.

63.    If issues of ownership of the lands and works of the MRGCD have been previously litigated, the MRGCD did not have a full and fair opportunity to litigate them and collateral estoppel does not apply.

64.    Any previous litigation concerning ownership of the MRGCD's lands and works concerned issues that were substantially different than the current litigation, thus the MRGCD did not have a full and fair opportunity to litigate the issues presented in this case.  For this reason, the doctrine of collateral estoppel does not apply.

65.    The relationship of the parties in any previous litigation involving issues of ownership of the lands and works of the MRGCD prevented the issues raised in this case from being fully and fairly litigated; thus collateral estoppel does not apply.   Furthermore, the issues relating to the 1953 Conditional Grant of Easement, the 1962 easements, and the entire fifty-year history of the relationship between the USBOR and the MRGCD was neither litigated nor necessary to the final judgment in any of the cases raised by the United States.

67

CROSS – CLAIMANT MIDDLE RIO GRANDE CONSERVANCY DISTRICT'S
PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

66.     Any previous decision in any previous litigation concerning the ownership of the MRGCD's lands and works, was not necessary to the final judgment; thus collateral estoppel does not apply.

*67.*     Collateral estoppel is not applicable in this case because there have been significant changes in the facts since any previous litigation regarding ownership of the MRGCD's lands and works was concluded.  Significantly, any positions in *Texas v. New Mexico* were made moot when the 1953 Conditional Grant of Easement around which the title issue was raised was specifically withdrawn and replaced by the 1962 easements.  Thus, *Texas v. New Mexico* has no relevance whatsoever on the issue of collateral estoppel.

68.     Recognizing the application of the doctrine of collateral estoppel to the facts presented in this action would not further the interests of judicial economy.

69.     The United States has not sustained its burden of demonstrating collateral estoppel applies in this case and there is no basis for dismissing this action based upon that defense.

70.     The United States Court of Appeals for the Tenth Circuit does not recognize the doctrine of judicial estoppel.

71.     The MRGCD has not assumed contradictory positions in this or related litigation with respect to the detailed issues of the Conditional Grant of Easement, thus the doctrine of judicial estoppel does not apply.  Specifically, the 1953 Conditional Grant of Easement which was alleged to form the basis of title by the United States and the MRGCD was withdrawn in 1962. Thus, the positions taken by the United States and MRGCD in *Texas v. New Mexico* have no bearing on the nature

and scope of the United States' interest under the 1962 easements which are the only remaining conveyance documents in this case.

72. The MRGCD has never fully and fairly litigated the issue of its title in a quiet title suit or succeeded in convincing any court to accept a contrary position regarding its ownership of lands and works in any other litigation where this was the issue for determination in this case.

73. Even if this Court were to reject the Tenth Circuit Court of Appeal's position, and adopt judicial estoppel for the first time at the District Court level rather than allowing the Tenth Circuit to rule on this issue, the doctrine is not applicable to the MRGCD as a political subdivision of the State of New Mexico.

74. There is no evidence that the United States ever relied upon its position as a titleholder rather than an easement holder to its detriment such that it would have suffered any injury as a result of it holding an easement rather than title to the MRGCD's properties.

75. The fact the United States expended money on projects which helped the public at large be free of flooding, aided in the delivery of water to Elephant Butte Reservoir by channelizing the river, and provided other non-reimbursable benefits to the public at large, does not provide a legal basis for wresting title from a party that never conveyed it.

76. Once the construction costs in the two re-payment contracts were fully paid, the United States had no basis for arguing that it should have made the MRGCD pay for more costs than those agreed to in the contracts because there was more benefit.

77. The allocation of costs among reimbursable and non-reimbursable costs is a choice for the Congress in the appropriation process. If they decide the overall public benefit of a project does not have to be reimbursed by a particular beneficiary, this Court has no discretion or right to second guess that judgment or wrest title from a party the United States now says should have paid more.

78. The doctrines of separation of powers and impairment of contracts prevent the federal court from re-writing the contract between the MRGCD and the United States to require that the MRGCD should be forced to provide title to its works to the United States after it has paid in full, when the United States chose to not require conveyance of title, and chose not to seek reimbursement for general public benefits.

79. By withdrawing the interim 1953 Conditional Grant of Easement and replacing it with the 1962 easements, which all agree are still in effect, and by accepting those easements for a period of forty years, the United States has waived any right to claim either reliance on title or damages if it now is unable to reinstate the title it should have requested fifty years ago.

80. All of the reliance by the property owners within the MRGCD, including the City of Albuquerque, and the Legislature in the creation of the Rio Grande State Park, require that the United States not prevail on its estoppel related defenses.

81. The MRGCD has met its burden of establishing prima facie title to the properties in its Second Amended Cross – Claims.

82. Title to the properties contained in the record at Doc. No. 366, including El Vado Dam and Reservoir, should be quieted in the MRGCD, free of any encumbrances

other than the duly recorded access easements which all agree remain in full force and effect. A Declaratory Judgment should be entered that the water right storage permit 1690, being no more than collateral for the repayment contracts in this case, reverted by operation of law to the MRGCD, upon payment in full of those repayment contracts.

Dated: October 7, 2004.

Respectfully submitted,

LAW & RESOURCE PLANNING ASSOCIATES,
*A Professional Corporation*

By:_____

        Charles T. DuMars
        Christina J. Bruff
        David Seeley
        Attorneys for Cross – Claimant MRGCD
        Albuquerque Plaza, 201 3rd Street NW, Ste. 1750
        Albuquerque, NM 87102
        (505) 346-0998 / FAX: (505) 346-0997

71

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of the foregoing Cross - Claimant Middle Rio Grande Conservancy District's Proposed Findings of Fact and Conclusions of Law were served upon counsel on this 7th day of October, 2004 as follows:

Alletta Belin, Esq.
Advocates For the West
618 Paseo de Peralta
Santa Fe, NM  87501
(505) 983-8936 / FAX: (505) 983-0036

Laird Lucas, Esq.
Advocates for the West
Post Office Box 1612
Boise, ID  83701

Patricia A. Madrid, Attorney General
Stephen Farris, Asst. AG
Frances Bassett, Asst. AG
Karen L. Fisher, Asst. AG
Post Office Drawer 1508
Santa Fe, NM  87504
(505) 827-6010 / FAX: (505) 827-4440

Robert M. White, City Attorney
Michael I. Garcia, Asst. City Attorney
Post Office Box 2248
Albuquerque, NM  87103
(505) 768-4500 / FAX (505) 768-4525

Tom Simons, Esq.
Frank Bond, Esq.
Faith Kalman Reyes, Esq.
Post Office Box 5333
Santa Fe, NM  87502
(505) 988-5600 / FAX (505) 982-0185

Peggy Montano, Esq.
Trout, Witwer & Freeman
1120  Lincoln Street Ste. 1600
 Denver, CO  80203

Maria O'Brien, Esq.
Modrall Sperling
Post Office Box 2168
Albuquerque, NM  87103-2168
(505) 827-1963 / FAX (505) 758-0407

Reid Peyton Chamber, Esq.
Anne D. Noto, Esq.
Sonosky, Chambers, Sachse, Endreson & Mielke
500 Marquette Ave. NW, Suite 700
Albuquerque, NM  87102

Bradley Bridgewater, Esq.
999 18th Street, Suite 945
Denver, CO  80202
(303) 312-7324 / FAX (303) 312-7379

Fred J. Waltz, Esq.
Post Office Box 6390
Taos, NM  87571-4014
(505) 758-0407 / FAX (505) 758-0407

Andrew A. Smith, Esq.
U.S. Dept. of Justice
Environment & Natural Resources Div.
c/o U.S. Attorney's Office
P.O. Box 607
Albuquerque, NM  87103
(505) 244-1468 / FAX (505) 346-7205

_____
Charles T. DuMars

72

CROSS – CLAIMANT MIDDLE RIO GRANDE CONSERVANCY DISTRICT'S
PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW