**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO**


RIO GRANDE SILVERY MINNOW, et al.,

     Plaintiffs,

vs.                                                    No. CV 99-1320 JP/RHS-ACE

JOHN W. KEYS III, et al., ,

     Federal Defendants,

MIDDLE RIO GRANDE CONSERVANCY
DISTRICT, et al.,

     Defendant-Intervenors.


**MEMORANDUM OPINION AND ORDER
and
FINDINGS OF FACT AND CONCLUSIONS OF LAW**

     In this opinion, the Court addresses the Second Amended Cross-Claims filed on March

25, 2002 by Defendant-Intervenor Middle Rio Grande Conservancy District ("MRGCD") (Doc.

No. 366).  The Cross-Claims are asserted against the "Federal Defendants," which include the

United States of America, two federal agencies, the Bureau of Reclamation ("BOR") and the

Army Corps of Engineers ("Corps"), and officials of the agencies.[1]  The parties filed cross-

motions for summary judgment (MRGCD's Motion is Doc. No. 508 and Federal Defendants'

Motion is Doc. No. 553), however the parties did not agree that there were no disputed material

facts.  On October 19, 2004 the Court heard testimony at a non-jury trial to resolve any material

factual disputes.

---

[1]  Federal Defendant John W. Keys, III is the Commissioner of the BOR.

## I.  Introduction.

The central dispute presented by MRGCD's Cross-Claims is contained in Count III, a quiet title action brought under the Quiet Title Act ("QTA"), 28 U.S.C. § 2409a, concerning ownership of certain properties and irrigation works located in the middle Rio Grande valley. Those properties are El Vado Dam and Reservoir, San Acacia Dam (a diversion dam), Angostura Dam (a diversion dam), and certain specific tracts (identified in Ex. 17 to Cr-Cls) that include portions of the Rio Grande Bosque and drainage and irrigation ditches.  2d Am. Cr-Cls ¶¶ 71-75 at 16-17.

The remaining counts are derivative claims under which MRGCD requests declaratory judgments regarding the interpretation of various documents in the record.  In Count I MRGCD seeks a declaratory judgment interpreting the September 24, 1951 Contract between the United States and the MRGCD for "Rehabilitation and Construction of Project Works, and Repayment of Reimbursable Construction Costs Thereof" (hereafter "1951 Contract"), Ex. 67.[2]  In Count II MRGCD seeks a declaratory judgment interpreting the November 24, 1953 Grant of Easement, Ex. 582, and a series of four county-by-county Grants of Right-of-Way Easements executed and recorded in 1962, Exs. 211, 212, 216, 222.  In Count IV MRGCD seeks a declaratory judgment interpreting a June 25, 1963 amendment to the 1951 Contract for the San Juan-Chama Diversion Project, Ex. 227.  Finally, in Count V MRGCD seeks a declaratory judgment interpreting the effect of MRGCD's transfer and assignment of State Water Rights Permit No. 1690 to the United States, Ex. 11, in connection with the San Juan-Chama Project amendment to the 1951 Contract.

---

[2] Unless otherwise noted, references to exhibits are to the Consolidated Trial Exhibits filed on October 19, 2004.

Interpretation of all these documents is included in the Court's analysis of the quiet title issues presented in Count III.

MRGCD contends that it is now, and has always been, owner of the parcels and irrigation works in the middle Rio Grande, and that the United States acquired, at most, an easement interest or security interest in the contested properties and works.  MRGCD acknowledges that BOR and MRGCD began the process of the federal takeover of a pre-existing state reclamation project with the plan that the United States would acquire title to MRGCD's water rights as well as title to its real property.  This plan was memorialized in the 1951 Contract.  MRGCD asserts, however, that the plan and contract were not followed at all with respect to water rights, and that the United States, ultimately, requested only a comprehensive set of easements, not title, to allow it to carry out its work under the contract.  MRGCD further asserts that all the easements automatically reverted to MRGCD in 1999 when it completed its repayment obligation under the 1951 Contract.

The United States contends that it acquired title to these tracts and works from MRGCD, and that under the 1951 Contract, title cannot revert to MRGCD absent Congressional action. However, the United States asserts that the Court need not reach the merits of this controversy because all of MRGCD's claims are barred by the applicable statute of limitations, and also because MRGCD should be judicially estopped from asserting its claims.

The Court has carefully considered the testimony of the witnesses at the trial, the affidavits and declarations of the witnesses, the exhibits of record, the parties' proposed findings and conclusions, the arguments of counsel at the trial and in their briefs, and the relevant case law. Based upon this thorough review, the Court concludes that MRGCD's claims should be dismissed

because of the running of the statute of limitations, that MRGCD is judicially estopped from

asserting these claims, and that in the alternative judgment should be entered in favor of the

Federal Defendants on the merits of all claims in the Second Amended Cross-Claims.

**II. Court's Findings of Fact.**

**A. Findings Regarding Factual and Historical Background of the Middle Rio Grande Project.**

MRGCD serves irrigable lands located in the river valley of the middle Rio Grande,

including the lands of six Indian Pueblos. The Pueblo Indians migrated to the river valley

centuries ago and began irrigating. Irrigated acreage was brought to a peak in about 1880 by

Europeans who had moved into the area. Irrigation conditions deteriorated after the turn of the

century, and eventually less flow and more sediment resulted in aggradation of the riverbed.

Aggradation, in turn, caused the water table to seep upward and ruin crops, and brought the

specter of floods. The MRGCD was created in 1925 in response to these problems in the

riverbed of the middle Rio Grande. MRGCD is a political subdivision of the State of New

Mexico, formed under the authority of the New Mexico Conservancy Act for such purposes as

irrigation and agricultural development, flood control, stream regulation, and drainage.

MRGCD originally constructed the major diversion dams along the middle Rio Grande in

the 1920s and 1930s. During that time, MRGCD consolidated water rights and irrigation systems

in the middle Rio Grande valley. Total construction costs were about $9.2 million, of which

MRGCD paid about $7.8 million. The federal government contributed about $1.4 million for

construction of the portions of the works that benefitted Indian lands. With a few minor

exceptions, ownership of the works of the MRGCD is based upon titles dating back to the 1920s

4

and 1930s when the MRGCD acquired the land needed for ditches, drains, dams, reservoirs, and other purposes in fee simple or through easement interests by purchasing from fee simple title owners.  By the 1940s, however, MRGCD was essentially bankrupt and in default on its bonds, with many of its facilities in disrepair.  This fact, coupled with flooding of the Rio Grande in the early 1940s, led to pressure for federal government involvement in the District and expansion of federal flood control and river management activities through development of the Middle Rio Grande Project.

The Middle Rio Grande Project was launched on November 21, 1947, when BOR and the Corps agreed to a unified plan for control of floods, irrigation, and use of water in the middle Rio Grande basin.  Under that agreement, the BOR and the Corps released detailed studies in 1947 and 1948, respectively, proposing the Middle Rio Grande Project Plan to reconstruct and expand irrigation facilities in the middle Rio Grande and to develop flood/sediment control facilities.  The August 1947 Plan for Development, Middle Rio Grande Project, Rio Grande Basin, New Mexico, Report by the United States Department of the Interior, Bureau of Reclamation ("1947 Plan"), Ex. 50, contemplates federal ownership of the irrigation works.  A cover letter transmitting the 1947 Plan states:  "An important and necessary part of the plan is the acquisition by the Government of the existing works of the Conservancy District, the proceeds accruing to the District from this purchase by the Government would be used to retire the outstanding indebtedness of the District which now amounts to $7,426,280."  Ex. 50, cov. ltr. at 2.[3]  The 1947 Plan also states:  "Rehabilitation of the Conservancy District would involve:  first, the

---

[3]  The 1947 Plan was modified by an April 19, 1948, letter from the BOR Commissioner to the Secretary of Interior such that the United States would pay off MRGCD's bonded indebtedness directly rather than require that MRGCD use federal funds to retire its debt.

acquisition of the existing works, free from indebtedness . . .; second, rehabilitation and

extensions of distribution and drainage works to restore maximum productive capacity to the

lands irrigated; and third, a development program consisting of adapting the land to irrigation and

construction or rehabilitation of farm laterals."  Ex. 50 ¶ 30 at 8.  The 1947 Plan further states:

"Acquisition of the existing irrigation, drainage, and flood control works of the Conservancy

District is an essential part of the plan and the total project cost includes a sum for this purpose."

Ex. 50 ¶ 54 at 15.  The 1947 Plan describes in detail the MRGCD works to be acquired by the

federal government, including El Vado Dam and Reservoir, Cochiti, Angostura, Isleta, and San

Acacia Diversion Dams, 767 miles of canals, acequias, and laterals, 342 miles of drains, 180 miles

of riverside levees, and many other works.  Ex. 50 at 32.  The Plan specifies that "no construction

will be initiated" until MRGCD conveyed its works to the United States, and that "such property

so conveyed to the United States shall be so held until Congress otherwise directs . . .."  Ex. 50 at

97.

     Congress authorized the federal Middle Rio Grande Project in the Flood Control Act of

1948, P.L. 858, 80th Cong., 62 Stat. 1171 (June 30, 1948), and the Flood Control Act of 1950,

P.L. 516, 81st Cong., 64 Stat. 163 (May 17, 1950).  Exs. 51, 56.  In so doing, Congress made

clear that it was adopting the Project plan set forth in the BOR and Corps reports.  Ex. 56 § 203.

The 1948 and 1950 Flood Control Acts authorized appropriation of $42,500,000 to the Corps

and $30,179,000 to the Department of Interior for work on the Middle Rio Grande Project.

Exs. 51, 56.

     On September 24, 1951, MRGCD and the United States executed Contract 178r-423

entitled "Contract Between the United States and the Middle Rio Grande Conservancy District

for Rehabilitation and Construction of Project Works, and Repayment of Reimbursable Construction Costs Thereof" ("1951 Contract"). Ex. 67. The 1951 Contract was executed "in pursuance of the Act of Congress of June 17, 1902 (32 Stat. 388), and acts amendatory thereof and supplementary thereto and particularly the Acts of Congress of June 30, 1948, (62 Stat. 1171) and Act of May 17, 1950 (64 Stat. 163)." Ex. 67 at 1. Acquisition of MRGCD's existing works and property interests by the United States was contemplated in the 1951 Contract. Article 9(a) of the 1951 Contract obligated the United States to acquire directly and retire MRGCD's outstanding bond indebtedness as a reimbursable cost of the Middle Rio Grande Project. Ex. 67 ¶ 9(a). The Project included rehabilitation and extension of works originally constructed by MRGCD. Ex. 67 ¶ 9(b). MRGCD agreed to repay the costs incurred by the United States in acquiring the bonds, "not exceeding a maximum of $7,560,000." Ex. 67 ¶ 11. Article 26 of the 1951 Contract states that "[t]he District shall convey to the United States with title satisfactory to the Contracting Officer such of the District works now owned by the District, as shall be required to be conveyed to the United States as determined by the Contracting Officer." Ex. 67 ¶ 26.[4] Article 26 anticipates that conveyance of title would occur both by operation of the contract itself and by way of future conveyance instruments, as it refers to title conveyed to the United States "under the terms of this contract or by any separate instruments executed pursuant to its terms." Ex. 67 ¶ 26.

In addition to requiring conveyance of pre-existing MRGCD works to the United States, the 1951 Contract in Article 29 provides that the United States owns all works that it

---

[4] The Secretary of the Interior designated the Regional Director of BOR to execute the 1951 Contract on behalf of the United States. *See* Ex. 66 at 1.

"constructed" as part of the Middle Rio Grande Project.  Ex. 67 ¶ 29.  The contract defines

"construction" broadly to include not just construction of new facilities, but also all the repairs

and improvements undertaken by the BOR on existing works – including work done on El Vado

Dam, diversion dams, irrigation ditches and canals, and drains.  Ex. 67 ¶ 8.  Article 27 of the 1951

Contract provides that "[t]he United States shall not commence construction of any feature of the

project within the boundaries of the District until all necessary rights of way therefor have been

secured, or satisfactory contracts entered into for the purchase thereof."  Ex. 67 ¶ 27.

During contract negotiations, the Honorable Sam Bratton suggested a provision whereby

title conveyed to the United States would automatically revert to MRGCD upon MRGCD's

repayment of its financial obligations under the contract.  Lawyers for MRGCD proposed that

language be added to Article 29 so that no congressional action would be required to return the

works to MRGCD after repayment was completed, but no such provision was included in the

1951 Contract.  Instead, Article 29 of the Contract states that "title" to all Project works

constructed by the United States and all works conveyed to the United States by MRGCD "shall,

as provided in Article 26, be and continue to be vested in the name of the United States until

otherwise provided for by Congress," even after the transfer of operation and maintenance of any

works to MRGCD.  Ex. 67 ¶ 29.

Article 28 of the 1951 Contract calls for MRGCD to assign its water filings "for storage

and use of water in the El Vado Reservoir" to the United States.  Ex. 67 ¶ 28.  Accordingly, on

May 28, 1963, MRGCD conveyed to the United States Water Rights Permit 1690.  Ex. 226.  The

conveyance contains no termination or reverter clauses, and specifies no conditions under which

the water rights would be reconveyed to MRGCD.  MRGCD informed the New Mexico State

Engineer Office of this transfer on June 27, 1963.  Ex. 228.  BOR acknowledged this transfer on

July 11, 1963.  Ex. 229.

A "Grant of Easement" executed by MRGCD on November 24, 1953 states:

[MRGCD] assigns and conveys to the United States of America all District works
and real property required for accomplishment of the purposes set forth in [the
1951 Contract], together with the right, privilege and easement to construct,
replace, operate, and maintain any structure the United States of America may
deem necessary or desirable for the construction, operation and maintenance of the
Middle Rio Grande Project and the right, privilege and easement to remove from
or place on earth or rock, with the right of ingress and egress for men, materials
and equipment for the purposes of carrying out the provisions of [the 1951
Contract] in and upon the real estate described in the official maps of [MRGCD],
together with all structures on said real estate necessary to the operation of the
irrigation and drainage system.

Ex. 82 (bracketed material added).  This 1953 Grant of Easement contains no reverter or

termination clauses.   The terms of the 1953 Grant of Easement are not limited to conveying an

easement.  Rather, the document conveys title to all District works and real property needed to

carry out the 1951 Contract.  By its terms, this Grant of Easement is not conditioned on any

subsequent action by the United States; it is simply a conveyance of all Project works and real

property needed to carry out the 1951 Contract.  Other than the diversion dams and El Vado Dam

and Reservoir, most of the Project "works" consist of right-of-way easements for ditches, canals,

drains, and channels.

Numerous documents in the records of both MRGCD and the United States indicate that

the Contracting Officer specified Project properties that MRGCD conveyed to the United States

under Article 26 of the 1951 Contract, including the properties identified in Count III of

MRGCD's Second Amended Cross-Claims (El Vado Dam and Reservoir, San Acacia Diversion

Dam, Angostura Diversion Dam, and properties associated with the Albuquerque Main Canal and

9

Riverside Drain).  For example, during the construction phase of the Project, BOR and MRGCD were in almost constant communication about work BOR was planning to undertake.  These communications included identification of the property interests that MRGCD would need to acquire from third parties and assign to the United States in addition to properties conveyed by operation of the 1951 Contract and the 1953 Grant of Easement.  *See, e.g.,* Exs. 64, 78, 85, 95, 96, 97, 99, 102, 126, 131, 132, 133, 151, 154, 165.

Even before the 1951 Contract was executed, BOR advised MRGCD in a letter dated August 10, 1951 that it was going to proceed with channelization on a stretch of the Rio Grande above Elephant Butte Reservoir at a cost of approximately $4 million, and that "certain lands, easements, or rights-of-way will be required by the United States to permit construction and utilization of floodways, levees, channels, drains, and related facilities for regulating river waters." Ex. 64 at 1.  This letter includes a reference to a plat identifying the location of the properties "that must be conveyed to the United States prior to the start of the work on the channel," and indicates that the "character of the title obtained shall be at [MRGCD's] option, so long as it permits all proposed operations, etc., without liability, with the exception of the approximate 10-acre tract identified on the plat for use as a maintenance headquarters site, which must be conveyed in fee simple." Ex. 64 at 1-2.  On October 22, 1951, BOR provided MRGCD with additional maps and descriptions of the properties required for the Project and reminded MRGCD that "[b]efore any of this contract work can be started, the title must be conveyed to the United States." Ex. 69 at 1.  In accordance with BOR's request, MRGCD acquired title to numerous rights-of-way from the State Tax Commission of New Mexico for required channelization work above Elephant Butte Reservoir and assigned that title to the United States.  *See* Exs. 73, 74.

10

Similarly, on September 8, 1953, BOR wrote to MRGCD concerning the construction of "approximately 3.3 miles of drain and low water dike in the Escondida area on the east side of the Rio Grande." Ex. 78 at 1. The letter specifically refers to drawings identifying the work to be accomplished, to MRGCD maps "showing the 300' strip of right-of-way required," to a "right-of-way description," and to a "Form for 'Grant of Easement.'" Ex. 78 at 1-2. The letter further notes that BOR "recently discussed the details of this work and the rights-of-way requirements with [MRGCD]." Ex. 78 at 1. Part of MRGCD's acquisition activities for this early feature of the Project included a condemnation action in state district court, in which MRGCD used the United States' interest in the Project as the basis for its need to acquire the properties at issue. *See* Ex. 91. The works and real properties that were necessary for the Middle Rio Grande Project are further identified in numerous documents in the records of both MRGCD and the Bureau of Reclamation. *See, e.g.,* Ex. 403 (Gorbach Decl. summarizing some of BOR's documents, primarily construction specifications and construction reports).

**B.  Findings Regarding MRGCD's Knowledge of and Acquiescence in United States' Title, and Reliance by United States.** MRGCD understood that it was required to convey title to property interests in Middle Rio Grande Project properties to the United States as a necessary prerequisite to the initiation of BOR's construction and rehabilitation of the Project under federal reclamation law. Not only is this requirement set forth in Article 27 of the 1951 Contract, signed by MRGCD, *see* Ex. 67 ¶ 27, but the record indicates that on January 29, 1951, the MRGCD Board discussed whether Project properties needed to be conveyed to the United States. Ex. 61 at 3. The Board was informed that conveyance of Project properties to the United States was a necessary prerequisite to initiation of construction by BOR under federal reclamation

11

law, and that properties so conveyed could not be reconveyed to MRGCD without the consent of Congress.  As noted above, during contract negotiations with BOR, MRGCD proposed that the requirement of Congressional approval before title would revert from the United States to MRGCD be replaced by a clause providing for automatic reverter upon repayment of the contract.  That amendment was not adopted; the United States never abandoned its plan to acquire MRGCD's assets and to retain them until Congress had approved their return to MRGCD.

In 1956 the MRGCD Board adopted a resolution reaffirming MRGCD's conveyance to the United States of title to Project properties, Ex. 135.  On December 9, 1958 the MRGCD Board approved and gave to the United States a written "Certification of Channelization Right-of-Way" certifying both that it had any rights-of-way needed for channelization and flood control work under the Middle Rio Grande Project and that it had assigned such rights-of-way to the United States by way of the 1953 Grant of Easement.  Ex. 169 at 1.

In reliance on the November 24, 1953 Grant of Easement, BOR officially initiated construction of the reimbursable aspects of the Middle Rio Grande Project less than a week later, on November 30, 1953.  Ex. 139 at 1.  Contemporary BOR internal memoranda noted the necessity of securing all necessary rights-of-way from MRGCD prior to initiation of construction, and the 1953 Grant of Easement was settled upon as an interim solution and the only practical means of compliance with that requirement.  Exs. 88, 89, 90.

The 1953 Grant of Easement was never recorded.  In 1955 a BOR acting field solicitor, A.V. Rascoe, opined in an internal memorandum that recording the 1953 Grant of Easement would not provide effective notice to third parties.  He recommended that additional documents

with more specific descriptions be prepared and recorded in lieu of recording the 1953 Grant of Easement in order to validate the conveyance as between MRGCD and the United States. Ex. 116.  At the same time, MRGCD's counsel expressed a contrary view in writing to both the MRGCD Board and BOR, opining that the 1953 Grant of Easement was sufficient to put third parties on notice of the United States' interests in Middle Rio Grande Project properties and thus should be recorded:  "The recordation of this transfer of title would serve notice upon the public that the United States is now the owner of the works, which is absolutely necessary in order to relieve the District from any liability to third parties for damages flowing from the operation of the works of the District."  Ex. 100 at 1.  MRGCD requested that the 1953 Grant of Easement be recorded.  Exs. 103, 104, 105, 112.

A July 28, 1955 BOR memorandum indicates that the Regional Director was seeking the Commissioner's "views with respect to accepting title to El Vado Dam and Reservoir, and as to whether fee simple title or an easement should be taken to District works."  Ex. 111 at 1.  The memorandum is entitled "Grant of Easement conveying all District works and real property required for accomplishment of the purposes set forth in [the 1951 Contract]."  Id.  The memorandum requests the compilation of descriptions of the properties that had been conveyed via the 1953 Grant of Easement so that BOR "will be in a position to propose to the District that we be given a more appropriate conveyance for recordation."  Id.  Another BOR memorandum on the same date from the project manager notes that "Reclamation regulations require a statement by the Project Manager that title to the land upon which construction is to be initiated has been secured by the United States before construction contracts are awarded."  Ex. 112 at 1. Because preparing separate deeds containing adequate descriptions of all properties necessary for

the Middle Rio Grande Project would take more than a year, "as an interim arrangement it was suggested that the District provide the United States with a blanket conveyance of all its properties wherever located in order that the Project Manager could correctly inform the Denver office that he had obtained the necessary title to all real property involved in the construction program." Id. The project manager stated that the 1953 Grant of Easement "conveys all of the District works, including El Vado Dam and Reservoir" on which BOR "had already performed extensive rehabilitation." Id. at 2.

BOR needed additional rights-of-way from third parties before initiating construction or rehabilitation on various Project features, and MRGCD acquired and assigned to the United States all of these third-party property interests in accordance with Article 27 of the 1951 Contract. See, e.g., Ex. 136 at 3; Ex. 67 ¶ 27. In 1958 BOR estimated that approximately 10,000 easements needed to be acquired by MRGCD and then transferred to the United States. Ex. 157. At that time, a total of 1750 easements had already been acquired by MRGCD and conveyed to the United States, and BOR was processing acquisitions at about 1500 per year. Ex. 157.

The typical process for identifying and acquiring these third-party interests involved several steps. First, BOR identified the area needed to construct a particular Project feature. See, e.g., Ex. 148. Second, BOR advised MRGCD of the proposed construction and the necessary additional rights-of-way that MRGCD would need to secure from third parties. See, e.g., Ex. 102. Appraisals would be completed, and MRGCD would then acquire the necessary property interest, usually title to an easement, and assign it to the United States. These conveyances often used fee simple title language even when they assigned easements. See, e.g.,

14

Ex. 214 (assignment for several easements stating that MRGCD "assigns to the United States of America . . . with full warranties all its right, title and interest in and to those certain easements hereinafter described").  Once MRGCD made the assignment to the United States and BOR verified the sufficiency of the title, MRGCD was reimbursed for its expenses in acquiring the property interest.  *See, e.g.*, Ex. 101 (stating that MRGCD "could not be repaid until satisfactory title to the easements had been assigned to the United States").  MRGCD was an active participant in this process and was always aware of what features were necessary for the Middle Rio Grande Project, where and when BOR was going to be working on these features, and what additional rights-of-way were necessary for the work.  *See, e.g.*, Exs. 153 at 2, 154 at 1, 170 at 3-6, 165, 166.

Because of the complexity and effort that would be required to acquire all of these rights-of-way, the Department of Justice approved an abbreviated process for the acquisition of rights-of-way appraised at less than $500.  Ex. 136 at 3.  As part of this process, MRGCD executed an "Indemnity Agreement" with the United States whereby MRGCD agreed that it would "warrant and defend the title to all such easements and interests in land so conveyed by it to the United States."  Ex. 137 at 4 ¶ 1.

On March 15, 1957, counsel for BOR sent counsel for MRGCD a new proposed form for assigning newly acquired property interests to the United States, with language that MRGCD "assigns to the United States . . . with full warranties all its right, title and interest in and to the aforesaid easement . . .."  Ex. 146 at 1.  On March 18, 1957, counsel for MRGCD accepted the proposed form, stating that "this short form of Assignment and Conveyance is sufficient for the purposes of transferring title from the District to the United States Government."  Ex. 147 at 1.

After each assignment of title to easements was made from MRGCD to the United States, it was reviewed by BOR to determine whether it met the requirements of the "Indemnity Agreement." *See, e.g.*, Ex. 170 (January 21, 1959 memorandum from acting field solicitor to project manager approving "title to the easements" and stating that because of "the warranties described therein, it is unnecessary to obtain additional assurances of title.").

The United States' acquisition and retirement of MRGCD's bonded indebtedness was considered to be a important aspect of the 1947 Plan for making the Project financially solvent over the long term.  In July 1955, MRGCD lobbied Congress for $5.2 million for the United States to acquire and retire MRGCD's bonded indebtedness (while MRGCD would use $1.4 million of its own funds to help acquire these bonds).   Ex. 92 at 7.  In his testimony before Congress, the Chief Engineer of MRGCD stated that construction of the works of the District had already begun and that "the United States, as security for the repayment of [the reimbursable] part of the construction costs, acquired and now holds title to all of the works of the District . . .." Ex. 92 at 10.  He went on to note that "[o]ne of the main objects [of the Project] was the acquisition by the United States of the outstanding bonded indebtedness of the District [so that] the present method of assessments . . . could be discarded and a more equitable method of assessments adopted [and that] savings would be made to both the contracting parties by the elimination of interest payments on the outstanding bonds."  Ex. 92 at 11.  On December 9, 1955, MRGCD was informed that Congress had approved $5.3 million for the acquisition and retirement of MRGCD's bonds.  Ex. 128.  After the bonds were acquired and retired, on July 1, 1957 the United States and MRGCD executed a supplemental agreement to the 1951 Contract allowing MRGCD to restructure its methods of collecting assessments.  Ex. 149.

16

A 1959 financial audit of the Middle Rio Grande Project by the U.S. Department of the

Interior Office of the Comptroller recognized the inherent link between the 1953 Grant of

Easement and the United States' expenditure of $5.3 million to retire MRGCD's bonds:

> Pursuant to Article 26 of the repayment contract entered into with [MRGCD], the
> latter agreed to transfer title to the District Works to the United States.  The
> instrument of conveyance was executed by the District in November 1953.  The
> recorded value of the works involved in this conveyance is $5,300,000
> representing the amount of Federal funds, expended to extinguish the bond holders
> lien thereon.

Ex. 409 at 7.

In reliance on the conveyance by MRGCD to the United States of title to and ownership

of all works, facilities, easements, rights-of-way, and other property interests that make up the

Middle Rio Grande Project, BOR has performed construction and rehabilitation of the Project

works and facilities, has retired MRGCD's bonded indebtedness at a cost of more than $5 million

(in 1950s dollars), and has infused more than $231 million into the Project.  Ex. 401.  Of this

amount, MRGCD was obligated to reimburse the United States for only approximately

$15 million, interest-free, and with payments spread out over 40 years since the end of major

construction of the Project.

**C.  Findings Regarding Federal Ownership of El Vado Dam and Reservoir.**  As

noted above, the 1953 Grant of Easement conveyed title to El Vado Dam and Reservoir to the

United States, and BOR subsequently performed substantial construction at that site.  Amendment

No. 2 to the 1951 Contract, dated January 4, 1955, called for the United States to assume

operation and maintenance of all Project works -- except El Vado Dam and Reservoir -- effective

February 1, 1955.  Ex. 93.  Amendment No. 3, dated May 22, 1956, called for the United States

to assume operation and maintenance of El Vado Dam and Reservoir.  Ex. 138.  On February 9, 1960, MRGCD executed a grant of easement to the United States for El Vado Dam and Reservoir.  Ex. 177.  The execution of the easement was not necessary for BOR to carry out the operations at El Vado, because BOR had been operating El Vado since 1956 under Amendment No. 3 to the 1951 Contract, and had begun rehabilitation of that facility shortly after the United States acquired title in 1953.  The purpose of the 1960 grant of easement for El Vado Dam and Reservoir, as both BOR and MRGCD understood it, was not to convey a new interest to the United States, but rather (1) to provide an adequate description of the approximately 4,930 acres making up the El Vado site in a recordable instrument to put third parties on notice as to the boundaries of the federal interest in El Vado Dam and Reservoir, and (2) either to recognize that MRGCD had not conveyed its mineral interests in the site when the United States acquired title through the 1953 Grant of Easement, or to return the mineral interests to the District.  *See, e.g.,* Exs. 171 at 1 (objective of easement is to "leave minerals with the District"); 175; 178 at 2 ("easement . . . returns to the District the mineral rights").

Other contemporaneous documents in the 1960s and 1970s reinforce the finding that the parties understood that the United States held more than just easement interests in El Vado that would automatically revert to MRGCD upon completion of MRGCD's repayment obligation. *See, e.g.*, Ex. 184 at 2 (recognizing that El Vado and other facilities would be returned to MRGCD after repayment "as provided for in Articles 26 and 29 of the basic contract (178r-423)"); Ex. 223 at 1 (stating that the El Vado site was "purchased in fee simple by [MRGCD] and assigned to the Bureau of Reclamation"); Ex. 198 at 1 (reciting that "the United States owns and controls lands or interests in lands in the El Vado Reservoir Area . . .."); Ex. 199 at 1 (same);

18

Ex. 292 at 1 (recognizing that "the works of the District at El Vado have been transferred by the District to the United States Government and are now operated and maintained by the United States Bureau of Reclamation under contract with the District.").

In 1983, the United States represented to the Federal Energy Regulatory Commission ("FERC"), MRGCD, and the County of Los Alamos that the El Vado Dam was owned by MRGCD and that the facility should be licensed as a private facility.  Exs. 322, 318, 323.  FERC granted a license to MRGCD for El Vado to survey small hydro-electric potential at the El Vado Dam.  Ex. 332.  The license states that MRGCD holds title to El Vado Dam.  Ex. 332 at 55.  However, an April 22, 1994 contract between MRGCD and Public Service Company of New Mexico regarding storage of water at El Vado states that "the works of the District at El Vado Dam have been transferred by the District to the United States Government and are now operated and maintained by the United States Bureau of Reclamation under contract with the District."  Ex. 352.  These inconsistencies in later years do not negate federal acquisition of ownership of El Vado Dam and Reservoir that occurred in the 1950s.

**D.  Findings Regarding the 1962 County-by-County Grants of Easements.**  In the early 1960s, grants of easements, containing detailed legal descriptions of the properties that had been conveyed in the 1953 Grant of Easement, and including new rights-of-way that had been purchased by MRGCD after 1953, were prepared, executed, and recorded for Project properties in the four counties in which the Project is located:  Sandoval, Bernalillo, Valencia, and Socorro.  The grants of easement initially prepared in 1961 for the properties in the counties of Sandoval (Exs. 192, 193) and Bernalillo (Exs. 195, 196) were considered to be "not in an acceptable form and not considered legal" by the BOR field solicitor because the instruments identified properties

only by feature and map number.  Ex. 215 at 1 (Sandoval); Ex. 221 (Bernalillo).  Therefore, they

were replaced by instruments prepared and recorded in 1962.  Ex. 217 (Sandoval); Ex. 222

(Bernalillo).  There was no such confusion for the grants of easements in Valencia and Socorro

Counties; they were executed and recorded without incident.  Exs. 210, 211 (Valencia), 212

(Socorro).  The intent of these county-by-county grants of easement was to supplement and/or

complement the 1953 Grant of Easement, to provide express confirmation and clarification that all

those easements and rights-of-way acquired by MRGCD after 1953 for the Project were

conveyed by MRGCD to the United States, and to provide notice to third parties of the United

States' ownership of the specific properties.  *See, e.g.,* Ex. 197 at 1, Ex. 191 at 2, Ex. 210, Ex.

213.

  **E.  Findings Regarding Administration of the Project After 1962.**  Since 1962,

administration of the Middle Rio Grande Project has continued under the same understandings as

to ownership as those that existed before.  On May 14, 1963, MRGCD and the United States

executed Amendment No. 4 to the 1951 Contract.  Ex. 227.  Amendment No. 4 pertains to

MRGCD's acquisition of a supplemental source of water through the construction of the San

Juan-Chama Project.

  In accordance with Article 13 of the 1951 Contract, on July 29, 1974, BOR transferred

operation and maintenance of the Middle Rio Grande Project back to MRGCD, effective

February 1, 1975, with the exception of the "reserved works," which included El Vado Dam and

Reservoir, San Acacia Diversion Dam, and certain channelization and flood protection works.

Ex. 282 at 1.[5]  In anticipation of the actual transfer, BOR completed an "Examination of Irrigation

Facilities" report on January 15, 1975.  Ex. 285.  This report identifies the "principal project

works" as including El Vado Dam and Reservoir; Angostura, Isleta, and San Acacia Diversion

Dams; and "approximately 830 miles of canals and laterals, 400 miles of drains, and 150 miles of

channelization works."  Ex. 285 at 3.

As of November 1953, MRGCD possessed only rights-of-way for Angostura and San

Acacia diversion dams, not deeds.  Exs. 27-39, 305, 325-327.  As of November 1953, the only

deed that MRGCD possessed for any property which is the subject of its cross-claims was a deed

for the land underlying El Vado Dam and Reservoir.  Exs. 9-10, 12, 14-49, 305, 325- 27.  The

only other deeds later obtained by MRGCD for the property subject to the cross-claims were a

1984 quitclaim deed for the San Acacia Dam site and a 1984 warranty deed for the land just south

of that site.  Exs. 326, 327.  At the trial, the United States clarified that it does not  claim

ownership of the 20-acre tract of land underlying the San Acacia Dam; it claims title only to the

dam.  After the deed in 1984 conveying the land to MRGCD, there was no subsequent

conveyance to the United States.

On January 28, 1977, BOR notified MRGCD that the operation and maintenance

functions for San Acacia Diversion Dam would be transferred to MRGCD, effective September 1,

1977.  Ex. 295.  The United States has never transferred operation and maintenance of El Vado

Dam and Reservoir and certain other "reserved works" back to MRGCD; the United States

---

[5]  Under the 1951 Contract, Project works, the "operation and maintenance of which are retained in the
United States," are known as "reserved works," and those works for which "operation and maintenance are turned
over to the District" are known as "transferred works."  Ex. 67 ¶ 8.  Congressional approval was not required for
transfer of operation and maintenance functions from BOR to MRGCD.

continues to operate and maintain these works and is reimbursed by MRGCD under Article 13 of the 1951 Contract.

From time to time MRGCD requested that the United States release its interests in Project properties. Quitclaims and releases of the United States' interests in Project properties were accompanied by a finding that the particular property was never conveyed to the United States or that the property interest was surplus to the needs of the Project. *See, e.g.*, Exs. 164; 357. These actions are authorized by and consistent with the Federal Property and Administrative Services Act of 1949, 63 Stat. 377, as amended, 40 U.S.C. § 471 *et seq.* (authorizing disposal of surplus real property). There have been hundreds of such transactions over the years. *See* Aff. Griego, Ex. 569 ¶ 8 (and Griego's trial testimony). Conversely, where BOR concluded that a particular property interest -- even title to an easement -- was necessary for Project purposes, it rejected MRGCD's request for a release or quitclaim. *See, e.g.*, Ex. 337; Ex. 345 at 1 (explaining that BOR "would be unable to return our interest to you without an act of Congress specifically authorizing such"); Ex. 349 at 1 (explaining that BOR has determined that all easements and rights-of-way "are needed for Middle Rio Grande Project purposes, . . . [and that such] transfers require congressional authority").

MRGCD has repaid its basic repayment obligations under the 1951 Contract, as amended by the 1963 San Juan-Chama Project Amendment No. 4. In its December 13, 1999 letter conveying the final payment for the reimbursable expenses of the basic contract, MRGCD recognized that some action would have to occur before title to Middle Rio Grande Project properties could be reconveyed to MRGCD. *See* Ex. 375 ("We hope to have a smooth transition in the transfer of titles.").

**F.  Additional Findings Regarding MRGCD's Knowledge of the United States'**
**Ownership.**  The record is replete with convincing proof that MRGCD had full knowledge that

the United States claimed title to all Middle Rio Grande Project properties, including the

properties identified in Count III of MRGCD's Second Amended Cross-Claims.  In addition to

the findings already made, many more details regarding MRGCD's knowledge are set forth in

Federal Defendants' and Plaintiffs' Proposed Findings of Fact Regarding MRGCD's Second

Amended Cross Claims (Doc. No. 639).  The Court has reviewed the proposed facts, the

documents of record that support them, MRGCD's detailed disputes of those proposed findings

contained in Doc. No. 647, the testimony at the trial, and other arguments of counsel.  The Court

adopts all the proposed findings of fact in ¶¶ 97-143 of Doc. No. 639 as fully supported by the

record.

MRGCD understood that title for Project properties would be conveyed to the United

States in at least three ways:  (1) by direct conveyance by MRGCD of its existing property

interests; (2) by acquisition from third parties of title to additional property interests necessary for

Project purposes and assignment of them to the United States; and (3) by operation of the 1951

Contract upon construction of Project works.  When it suited MRGCD's purposes, MRGCD

recognized the 1951 Contract as an effective conveyance of works to the United States.  For

example, MRGCD did this when it attempted to avoid liability for paving assessments to the City

of Albuquerque in 1953.  Ex. 79.

In the mid-1950s, MRGCD was informed and understood that it should not issue any

easements, rights-of-way, leases, or other property interests for Project property it formerly

owned because title had been transferred to the United States.  This included title to all Project

23

works, including ditches, rights-of-way, and El Vado Reservoir.   The Board of MRGCD even requested that the United States record the 1953 Grant of Easement to indicate that title to all works of MRGCD had been transferred to the United States, in order to protect MRGCD from liability claims by giving notice to the general public that title to all works of MRGCD was now vested in the United States.

Again and again, through the granting of numerous agreements and licenses by the United States in the late 1950s, MRGCD was made aware of and sometimes expressly acknowledged the United States' continued reliance on the 1953 Grant of Easement and the United States' claim of title to various properties formerly owned by MRGCD.   After 1962, in executing various licenses and agreements, MRGCD and the United States continued to rely on the 1953 Grant of Easement as an instrument conveying to the United States title to Middle Rio Grande Project works and properties after the execution and recording of the 1962 county-by-county grants of easement that MRGCD now argues "replaced" the 1953 Grant of Easement.

In the late 1960s and early 1970s, MRGCD used the United States' title interest in the Project properties to deflect public and political pressure for additional fencing of the ditches to prevent accidents, such as drownings.   In other dealings contemporaneous with the 1953 Grant of Easement and the 1961 and 1962 county-by-county grants of easement, both BOR and MRGCD consistently indicated to local governments and third parties that the United States held title to or owned all Middle Rio Grande Project properties.   In later years, in regard to such matters as closing roads along Project structures to the public, fencing of ditches, and construction of other fences, MRGCD recognized and affirmed the United States' title to most of the property in the District.

**G.  Findings Regarding MRGCD Assertions of Federal Ownership of Project Works and Property in Judicial Proceedings.**  In multiple judicial proceedings, MRGCD consistently advocated to its advantage that the United States held title interests in the Middle Rio Grande Project.  The parties have sought dismissal of several lawsuits on the ground that, because of its ownership of the properties, the United States is an indispensable party.  The first such lawsuit was Texas v. New Mexico, U.S. Supreme Court Original Action No. 9, in which Texas alleged that the MRGCD facilities were being managed in violation of the Rio Grande Compact.  In briefs filed in the 1950s, both MRGCD and the United States argued that MRGCD had transferred ownership to the United States of all the works of the District, including El Vado Dam and Reservoir, and that the United States was an indispensable party to the suit.  Federal ownership was premised on the 1951 Contract and the 1953 Grant of Easement.  The Supreme Court dismissed the Texas v. New Mexico litigation in a 1957 *per curiam* decision "because of the absence of the United States as an indispensable party."  352 U.S. 991 (1957).  Although the Supreme Court did not enunciate the precise interests that made the United States indispensable, it is reasonable to conclude that federal ownership of the works of the Project was the basis of the Supreme Court's ruling.

In the 1970s, MRGCD again asserted the United States' ownership of Middle Rio Grande Project properties in judicial proceedings, and thereby succeeded in gaining dismissal of two nuisance claims against MRGCD.  The suits alleged a number of drownings in Middle Rio Grande Project ditches and canals, and sought to require fencing by MRGCD.  Dismissal was granted by the state district court, and upheld by the New Mexico Supreme Court, based on indispensability of the United States.  State of New Mexico ex rel Norvell v. Middle Rio Grande Conservancy

District, Civ. No. 3-72-2666 (N.M. State Dist. Ct., Bern. Cty. 1972) (Ex. 259), and State of New Mexico ex rel Albino Escamilla v. Middle Rio Grande Conservancy District, Civ. No. 3-72-03901 (N.M. State Dist. Ct., Bern. Cty. 1972) (Ex. 277).[6]  In its motion to dismiss filed in the consolidated cases, MRGCD stated that "the United States is an indispensable party for the reason that it owns fee simple title to all ditches and canals formerly owned by [MRGCD]," Ex. 261; the state district court dismissed both lawsuits on this basis, and the New Mexico Supreme Court affirmed.  See Exs. 276, 279, 280, 283, 284, 286, 289.  See also Standifer v. The Middle Rio Grande Conservancy District, Civ. No. 8-76- 03640 (N.M. State Dist. Ct., Bern. Cty. 1976) (lawsuit seeking damages for flooding from Corrales main canal dismissed because United States indispensable party) (Exs. 290, 293).

　　In several other court cases, MRGCD asserted that title to the Project works had been conveyed to the United States.  See, e.g., Torres v. Olguin de Torres, Civ. No. 13-310 (N.M. State Dist. Ct., Soc. Cty. 1955) (Ex. 113); Bamert v. Adelmann, Civ. No. 13-315 (N.M. State Dist. Ct., Soc. Cty. 1955) (Ex. 125); Escamilla v. Middle Rio Grande Conservancy District, Civ. No. 9547 (D.N.M. 1972) (Exs. 269 - 275); Tracey v. Board of Directors and Officers of the Middle Rio Grande Conservancy District, Civ. No. 17219 (N.M. State Dist. Ct., Val. Cty. 1972) (Exs. 263, 264); City of Albuquerque v. U.S. Dept. of the Interior, Civ. No. 89-1198 JP (D.N.M. 1989) (Exs. 341, 343).  Although in these cases the courts did not rely on these assertions to grant relief to MRGCD, they indicate a consistent pattern by MRGCD in attempting to gain

---

[6]  The Escamilla case was removed to federal court, where MRGCD used the United States' title in successfully having it remanded back to state court.  Relying on MRGCD's assertions that MRGCD had conveyed title to all its works to the United States, and that title would remain in the United States until an act of Congress authorized reconveyance to MRGCD, Judge Mechem dismissed the United States from the case, finding that the United States held legal title to the Project works and that there had been no waiver of sovereign immunity against the United States' interests.  He remanded the case to state court for a decision on indispensability.  Exs. 262, 267.

advantages in litigation by endorsing the United States' claim to title in judicial proceedings.

### III.  Discussion - Conclusions of Law.

### A.  Statute of Limitations

Under the Quiet Title Act, an action seeking to quiet title to real property as against the United States is barred unless it is commenced within 12 years after the party or its predecessor in interest first "knew or should have known of the claim of United States" in the property. 28 U.S.C. 2409a(g).  The timeliness of filing a claim under the QTA is "a jurisdictional prerequisite to suit under section 2409a."  Knapp v. United States, 636 F.2d 279, 282 (10th Cir. 1980).  The 12-year rule must be strictly construed in favor of the United States.  Id. (citing Stubbs v. United States, 620 F.2d 775, 779 (10th Cir. 1980)).  See also Block v. North Dakota, 461 U.S. 273, 287 (1983) (stating that conditions waiving sovereign immunity of United States "must be strictly observed, and exceptions thereto are not to be lightly implied").  For a party's action to accrue under this statute of limitations, "[k]nowledge of the claim's full contours is not required.  All that is necessary is a reasonable awareness that the Government claims some interest adverse to the plaintiff's."  Knapp, 636 F.2d at 283.

MRGCD argues first that the statute of limitations did not begin to run until 2000 because before that the United States's claim was too ambiguous, citing Patterson v. Buffalo National River, 76 F.3d 221, 224 (8th Cir. 1996) (finding "restrictions in the 1976 deed were at best too ambiguous to place the [grantors] on notice of the government's claims").  MRGCD points to conflicting evidence as to whether the United States was claiming fee title or an easement interest, and says it was not on notice of the United States's unambiguous claim of title.  The Court rejects this argument.  A similar argument was made and rejected in Knapp, under which only a

27

"reasonable awareness" of the government's adverse claim is necessary.  That standard is clearly

met in this case.  <u>Patterson</u> is distinguishable on its facts, and to the extent <u>Patterson</u> is contrary,

the Tenth Circuit standard is controlling.

In <u>Knapp</u>, heirs of a landowner sued the United States under the QTA some 19 years after

they were first alerted that some of the 48 acres of land they thought they owned may belong to

the federal government.  Efforts to clear up the matter informally had come to naught because

Congress failed to act, even though the intent of the original landowner had been to transfer only

about 20 acres to the United States as an easement, not all 48 acres in fee simple.  The Tenth

Circuit rejected the notion that the limitations period began to run only when the government

"definitively asserted an interest greater than a right-of-way."  <u>Knapp</u>, 636 F.2d at 282.  Here,

MRGCD has known of the United States' interest, and has actively endorsed that interest, since

the early 1950s.

MRGCD also contends that as a political subdivision of the state, it is entitled to the more

demanding test under section 2409a(k) for accrual of an action when a party is a "State."[7]

Although Congress provided different limitations provisions for states in the QTA, it did not

include political subdivisions of states in the special provisions governing states.  <i>See</i> <u>Calhoun

County, Tex. v. United States</u>, 132 F.3d 1100, 1103 (5th Cir. 1998) ("Calhoun County is not a

state; therefore, it is subject to this twelve year limitations period [applicable to non-States].").[8]

---

[7]  This section provides a 12-year limitation that accrues "after the date the State received notice of the
Federal claims to the lands."  28 U.S.C. 2409a(h).

[8]  If MRGCD were a State, its claims would be barred by the QTA for failure to provide the United States
with specific notice <i>prior</i> to bringing its quiet title claims in accordance with the QTA. See 28 U.S.C. § 2409a(m)
("No less than one hundred and eighty days before bringing any action under [the QTA], a State shall notify the
head of the Federal agency with jurisdiction over the lands in question of the State's intention to file suit, the basis
therefor, and a description of the lands included in the suit.").

Moreover, even under the more demanding test applicable to states, which requires notice "by public communications with respect to the claimed lands which are sufficiently specific as to be reasonably calculated to put the claimant on notice of the Federal claim to the lands," 28 U.S.C. 2409a(k)(1), MRGCD had such notice.  For example, on June 28, 1955 the MRGCD Board publicly addressed BOR's request that MRGCD discontinue issuing easements on what was formerly District property by passing a resolution acknowledging that "title to all the works of [MRGCD] has now vested in the United States of America."  Exs. 100 at 1, 103 at 2. Additionally, MRGCD had public notice of the federal claim of ownership in the Texas v. New Mexico litigation, and it expressly concurred in such ownership.  See, e.g., Exs. 143 at 8-9, 145 at 2-3; Fed. Defs. SOMF 47A-47H[9] and exhibits referenced therein.

MRGCD also argues that even if it had notice of the United States's claim of title to Middle Rio Grande Project properties, the United States abandoned that claim before the 12-year period expired by accepting and recording the 1962 county-by-county grants of easements as replacements for the 1953 Grant of Easement.  To stop the QTA's 12-year statute of limitations from running, the United States's abandonment of its claim of title must be "clear and unequivocal."  Spirit Lake Tribe v. North Dakota, 262 F.3d 732, 739-41 (8th Cir. 2001).  This standard is not met.  The United States continued to rely on the 1953 Grant of Easement and to claim title to Project properties even after execution of the 1962 easements.  See, e.g. Exs. 231 at 1-2, 243 at 4, 296.  Likewise, MRGCD never understood the United States to have abandoned its claim of title to Project properties by virtue of the execution of the 1962 grants of easement, as

---

[9]  "Fed. Defs. SOMF" refers to the "Statement of Undisputed Material Facts" in the Federal Defendants' Brief in Support of Motion for Summary Judgment, filed 1/20/04 (Doc. No. 554).

demonstrated by its own public, official statements thereafter.  *See, e.g.*, Exs. 246 (p.1 of stmt. attached to letter), 256 at 1-2.

MRGCD's next argument, that the Court should not apply the QTA statute of limitations because of a "cooperative relationship" between the United States and MRGCD from 1951 to 2000, is at odds with controlling case law.  A party who fails to contest the United States' interest until a disagreement has arisen may not avoid the running of the statute of limitations.  Rosette, Inc. v. United States, 141 F.3d 1394, 1397 (10th Cir. 1998); *see also*, Vincent Murphy Chevrolet Co. v. United States, 766 F.2d 449, 452 (10th Cir. 1985) ("To hold that the twelve-year statute of limitations did not begin to run until conditions began changing would give rise to an interpretation of the term 'claim' under § 2409a([g]) which could extend the limitations period indefinitely.  We cannot extend the waiver of immunity under the quiet title act beyond that which Congress could have intended and we refuse to do so without a clear expression of legislative intent.").

Counts I, II, IV, and V of MRGCD's Second Amended Cross-Claims are also time-barred.  When a party's claim depends on quieting title against the United States, the QTA provides the exclusive source of the court's jurisdiction, even if that claim is not couched as a claim under the QTA.  *See, e.g.*, Block v. North Dakota, 461 U.S. 273 (1983) (holding, on reviewing North Dakota's attempt to establish control to a river bed as against US under APA, that "Congress intended the QTA to provide the exclusive means by which adverse claimants can challenge the United States' title to real property," and stating that QTA "expressly 'forbids the relief'" sought under APA); United States v. Mottaz, 476 U.S. 834, 847 (1986) (holding that claims brought under various federal statutes and Fifth Amendment, but that depended on

resolution of dispute with US over property interest and that "could also seriously disrupt ongoing federal programs," were subject to strictures of QTA); Rosette, Inc. v. United States, 141 F.3d 1394, 1397 (10th Cir. 1998) (in addressing claims by owner to surface estate questioning US' authority to regulate geothermal resources under estate, holding that "[i]nsofar as [the plaintiff's] current claims are all linked to the question of title, the Quiet Title Act provides the exclusive remedy").

Counts I, II, IV, and V of MRGCD's Second Amended Cross-Claims request declaratory judgments concerning the 1951 Contract, the 1953 Grant of Easement, the 1962 county-by-county grants of easement, the 1963 amendment to the 1951 Contract pertaining to the San Juan-Chama Project, and the transfer of State Water Rights Permit 1690 for El Vado Reservoir. Because these claims are inextricably linked to the question of whether title to Middle Rio Grande Project works and facilities and other properties rests with the United States or MRGCD, the statute of limitations bar against MRGCD's direct quiet title claims under the QTA also bars these derivative claims.

In the same vein, MRGCD's position that title to Project works and properties automatically reverted to MRGCD upon fulfillment of MRGCD's repayment obligations does not revive a claim that MRGCD never conveyed title to those works and properties in the first instance. *See, e.g.*, Rosette, 141 F.3d at 1397 ("Regardless of what prompted [a party] to file suit . . . [t]he fact that it decided not to contest [the US'] interest until a disagreement arose cannot defeat the workings of the statute of limitations."); Vincent Murphy Chevrolet Co., 766 F.2d at 452.

MRGCD's claims to quiet title to Middle Rio Grande works and other properties identified in Count III, and its derivative claims in Counts I, II, IV, and V, are barred by the 12-year statute of limitations of the QTA because MRGCD knew and should have known that the United States claimed title to the properties in the 1950s.

**B.  Judicial Estoppel.**

Judicial estoppel protects the integrity of the judicial process by prohibiting parties from deliberately changing positions according to the exigencies of the moment.  New Hampshire v. Maine, 532 U.S. 742, 749-50 (2001).  Under the doctrine of judicial estoppel, a party is prohibited from "asserting a claim in a legal proceeding that is inconsistent with a claim taken by that party in a previous proceeding."  New Hampshire v. Maine, 532 U.S. at 749.  Although "the circumstances under which judicial estoppel may appropriately be invoked are probably not reducible to any general formula or principle," the Supreme Court has identified three factors a court may consider:  (1) whether a party's later position is "clearly inconsistent" with its earlier position; (2) whether the party succeeded in persuading a court to accept the party's earlier position "so that judicial acceptance of an inconsistent position in a later proceeding would create the perception that either the first or second court was misled;" and (3) whether the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped.  New Hampshire v. Maine, 532 U.S. at 750-51. "Additional considerations may inform the doctrine's application in specific factual contexts."  Id. at 751.

Although the Tenth Circuit repeatedly rejected the judicial estoppel doctrine prior to New Hampshire v. Maine, it recognized recently that the Supreme Court's decision is now binding

precedent.  Johnson v. Lindon City Corp., 405 F.3d 1065, 1068-69 (10th Cir. 2005).  In Johnson, the Tenth Circuit considered whether the plaintiffs' prior judicial admissions that they were guilty of assault on an arresting officer should bar their civil rights actions for wrongful arrest.  Finding that the three-part test of New Hampshire v. Maine was easily satisfied, the Tenth Circuit affirmed the summary judgment in favor of the arresting officers on the basis of judicial estoppel.  Johnson, 405 F.3d at 1069-70.

Applying the New Hampshire v. Maine factors, the Court finds first that MRGCD's current position that title was never transferred to the United States is clearly inconsistent with the position it took in numerous earlier judicial proceedings in which MRGCD asserted that it had conveyed the Middle Rio Grande Project works and other properties to the United States.  The prior litigation forced the parties to take a position after looking carefully at all the existing legal documents; one party should not be allowed to change its position at this late date, after receiving the benefits of judicial rulings in its favor.

Second, MRGCD succeeded in persuading the courts in several of those earlier cases to accept the fact that the United States owned the works and other properties of the Project, thereby securing the benefit of dismissal of the lawsuits based on the indispensability of the United States.  Thus, this Court's acceptance of the inconsistent position that the United States did not own Project properties would create the perception either that the courts in those cases were misled, or that this Court is being misled.

Third, MRGCD would derive an unfair advantage and impose an unfair detriment on the United States if not estopped.  MRGCD received a substantial benefit from the previous dismissals.  The parties whose cases were dismissed because of the indispensable party status of

the United States were not afforded relief based upon the position of MRGCD.  Now, MRGCD

seeks to regain title to the properties through court action, bypassing Congressional approval,

taking a position directly opposed to the one by which it gained the dismissals.  This is simply

"too much to take."  *See* Johnson, 405 F.3d at 1070 (*quoting* Lowery v. Stovall, 92 F.3d 219,

224 (4th Cir. 1996)).

Additionally, the Court considers it significant that in several other cases, MRGCD took

the same inconsistent position from the one it takes here, even though the courts in those cases

did not rely on that position to grant relief to MRGCD.

MRGCD argues that judicial estoppel should not bar it from taking a new position

regarding title because the earlier cases are unrelated to the present case.  Even though the earlier

cases are not related to the present case, the central issue in the present litigation is whether title

vested in the United States, and this issue was central to the dismissal of the previous cases as

well.

MRGCD also asserts that as a "government body," it cannot be estopped on the same

basis as other litigants, and that estoppel is inappropriate when there have been shifts in public

policy, or a change in the underlying facts and law, citing New Hampshire v. Maine, 532 U.S. at

755-56.  It contends that there have been significant changes in the contractual relationship

between the United States and the MRGCD.  One such change is that the United States

determined that the 1953 Grant of Easement was not legally sufficient to convey any property

interest and thereafter required new easements in 1962.  Another supposedly "significant change"

is "the final repayment of the contract, leading to the need for a reevaluation of the property

interests of the respective parties."  MRGCD Resp. at 46 (Doc. No. 572).  MRGCD is not a state,

but rather a political subdivision of the State of New Mexico.  Nonetheless, I will assume without deciding that it is a "government" within the meaning of <u>New Hampshire v. Maine</u>.  However, there are no intervening changes in facts or law weighing against judicial estoppel.  The United States never took the position officially that the 1953 Grant of Easement was insufficient to convey title as between itself and MRGCD.  The 1962 easements were prepared and recorded to give notice to third parties of the United States' interest in Project properties, not to effect a change in ownership.  Furthermore, repayment of the 1951 Contract provides no justification to avoid judicial estoppel; instead it brings into play the contract's requirement of Congressional approval to return title to MRGCD.

MRGCD argues that the balance of equities favors the District, the City of Albuquerque and the thousands of New Mexican residents and municipalities that have relied on the United States not being considered title holder of the MRGCD works.  It contends that the United States is guilty of laches because it should have made its claim of title over 40 years ago, "rather than waiting until political expedience required that it suddenly adopt a stale legal claim."  MRGCD Resp. at 47-48.  The "political expedience" charge is more appropriately leveled against MRGCD.  Moreover, there is no evidence that any party relied on the 1962 county-by-county easements as the only valid binding conveyance documents, or that MRGCD ever took the position before this litigation that the 1953 Grant of Easement did not convey title to the Untied States.  In <u>New Hampshire v. Maine</u>, the Supreme Court held that because New Hampshire in an earlier Supreme Court proceeding agreed, without reservation, that Maine held property to the middle of the Piscataqua River, "New Hampshire is estopped from asserting now that the boundary runs along the Maine shore."  532 U.S. at 745.  MRGCD has taken the position not in one lawsuit, but in

many, without reservation, that the United States held title.

The Court concludes that to allow MRGCD to accept the benefit of the dismissals of the previous cases based on MRGCD's assertion of title in the United States, and then to sue to quiet title as against the United States, would "undermine the integrity of the judicial system."  Johnson, 405 at 1070.  Barring MRGCD from asserting title to the subject properties furthers the principle behind the doctrine of judicial estoppel of protecting the integrity of the judicial process by prohibiting a party from deliberately changing positions according to "the exigencies of the moment."  New Hampshire v. Maine, 532 U.S. at 749-50.  Having used its conveyance of title to the United States to its advantage in many judicial proceedings, MRGCD is now estopped judicially from taking the opposite position in this case.

**C.  Merits.**  Despite the dual bars of the statute of limitations and judicial estoppel, the Court proceeds, in the alternative, to decide the merits of the quiet title and related claims.  This procedure acknowledges the extensive discovery, research, and presentations by the parties, as well as the complex historical background of the case.

The United States must follow state law requirements for acquisition of real property; hence, New Mexico property law applies.  *See generally* United States v. Burnison, 339 U.S. 87 (1950); United States v. Fox, 94 U.S. 315 (1876).  In New Mexico, the party seeking to quiet title bears the burden of proof establishing that its title is superior to the title of the opposing party.  Tres Ladrones, Inc. v. Fitch, 127 N.M. 437, 442, 982 P.2d 488, 493 (Ct. App. 1999).  In construing instruments of conveyance, the objective is to effectuate the intent of the parties.  Peyton v. Browning, 34 N.M. 246, 248, 280 P.2d 253, 254 (1929).  In New Mexico, "the intention of the parties, particularly the grantor, is an essential and controlling factor in

determining whether there has been valid legal delivery" of a deed.  Den-Gar Enterprises v. Romero, 94 N.M. 425, 428, 611 P.2d 1119, 1122 (Ct. App. 1980).  The parties' intent is to be ascertained from the language employed, viewed in light of the surrounding circumstances, and deeds are to be upheld as valid if possible.  Martinez v. Martinez, 101 N.M. 88, 91, 678 P.2d 1163, 1166 (1984); Garry v. Atchison, Topeka, and Santa Fe Railway Co., 71 N.M. 370, 373, 378 P.2d 609, 611 (1963); see Cox v. Hanlen, 124 N.M. 529, 953 P.2d 294, 1998-NMCA-015.

The circumstances surrounding the Middle Rio Grande Project reveal the intent of the parties.  The 1947 Plan for the Project specified that the first and essential part of the plan was federal acquisition of MRGCD's existing works.  The 1951 Contract specified that MRGCD was required to convey to the United States title to all Project works and all necessary rights-of-way before BOR began construction on the Project.  The 1953 Grant of Easement meets this requirement by conveying title to Project works from MRGCD to the United States.  Construction on the Project began immediately following execution of the 1953 Grant of Easement, and construction and rehabilitation of the Project works by BOR continued over the next decade and beyond.  MRGCD acquired and assigned to the United States hundreds of additional rights-of-way after 1953.  The county-by-county grants of easements were executed and recorded in 1962.  Public pronouncements by BOR and MRGCD consistently proclaimed that title to all Project works and real property had been conveyed by MRGCD to the United States, often relying on the 1953 Grant of Easement as the instrument conveying that title.  All these circumstances indicate conclusively that the mutual intent of the parties was for title to be conveyed to the United States.

Title to the works and properties that are the subject of Count III (including El Vado Dam and Reservoir, Angostura Diversion Dam, San Acacia Diversion Dam, and the Albuquerque Main Canal and Riverside Drain) passed from MRGCD to the United States by several means.  First was by operation of the 1951 Contract, which required MRGCD to convey title to all Project properties to the United States and transferred to the United States title to all Project works constructed or rehabilitated by the United States.  A performed contract may operate to vest title in the transferee of a property, even if a formal conveyance is not executed.  Garcia v. Garcia, 111 N.M. 581, 588, 808 P.2d 31, 38 (1991).  Next, MRGCD conveyed title to the United States by means of the 1953 Grant of Easement, which contains language of conveyance in the present tense, that MRGCD "assigns and conveys" its works and real property to the United States.  Title also passed by means of the 1960 grant of easement for El Vado Dam and Reservoir, and by means of the 1962 county-by-county grants of easements.[10]  To the extent that the United States had reservations about the quality of the 1953 Grant of Easement to convey title, the United States took actions to strengthen that conveyance, rather than disavow it, as seen in BOR's request that MRGCD furnish a resolution regarding conveyance of the New Belen Ditch on April 10, 1956, in BOR's request that MRGCD execute the Certification of Channelization Right-of-Way on December 9, 1958, and in the April 24, 1956 Indemnity Agreement to defend title to all easements and interests in land conveyed by MRGCD to the United States.

MRGCD argues that the 1951 Contract did not convey title because it was conditional on selection of the properties needed by the United States for the Project, and on actual performance

---

[10]  Additionally, the United States occasionally acquired title directly from third parties by condemnation actions.

under the contract, which did not occur until after 1953.  MRGCD further argues that the 1953

Grant of Easement did not convey any property interests because it was an interim document

drafted simply to allow BOR to commence construction, it failed to contain any legal descriptions

of properties, and it was never recorded by the United States.  MRGCD contends that only in

1962 when the specific easements were executed and recorded did any interests in property

transfer from MRGCD to the United States, and those interests were only easement interests or

security interests that reverted to MRGCD upon repayment under the 1951 Contract.

The lack of detailed legal descriptions of the properties conveyed in the 1951 Contract and

the 1953 Grant of Easement is of no consequence.  Where a grant of property is ambiguous,

extrinsic evidence may be relied upon to determine a description of the property conveyed.

Hughes v. Meem, 70 N.M. 122, 125-27, 371 P.2d 235, 238-39 (1962).  In addition, an indefinite

description in a deed may be clarified by subsequent acts of the parties to the deed.  Sternloff v.

Hughes, 91 N.M. 604, 606, 577 P.2d 1250, 1252 (1978); Garcia v. Garcia, 86 N.M. 503, 505,

525 P.2d 863, 865 (1974); Ames v. Robert, 17 N.M. 609, 614, 131 P. 994, 995 (1913) ("[W]here

the property conveyed is described in general terms . . . the deed upon its face shows that we must

look to extraneous evidence and facts to apply such description to the property conveyed.").

Both MRGCD and BOR were fully aware of the exact properties being conveyed; those

properties were specified in the numerous documents referenced above in the Court's findings.

These include written communications between MRGCD and BOR, maps, plats, construction

specifications, and the like.  Further, there is no requirement in New Mexico law that a

conveyance be recorded in order to be legal and enforceable against a grantor.  *See, e.g.*, Armijo

v. Armijo, 4 N.M. 57, 65, 13 P. 92, 95 (1887) (unrecorded deed is valid and passes title to

property as against grantor).

Title once vested in the United States cannot be transferred from the United States without the consent of Congress. Reclamation law requires title to all works and real property necessary for irrigation projects to remain in the United States until otherwise directed by Congress. 43 U.S.C. § 498 ("[T]itle to . . . the reservoirs and the works necessary for their protection and operation shall remain in the Government until otherwise provided by Congress."). *See also,* Utah Power & Light Co. v. United States, 243 U.S. 389, 404 (1917) (holding that Congress possesses exclusive control to regulate and dispose of property belonging to US); Royal Indemnity Co. v. United States, 313 U.S. 289, 294 (1941) ("Power to release or otherwise dispose of the rights and property of the United States is lodged in the Congress by the Constitution. Art. IV, § 3, Cl. 2. Subordinate officers of the United States are without that power, save only as it has been conferred upon them by Act of Congress or is to be implied from other powers so granted.") (citations omitted). Therefore, even if the intent of the parties had been that title would revert automatically upon repayment of MRGCD's obligation, Congress would still have to approve the reversion. The requirement of congressional action to return the properties to MRGCD is specified in all the operative documents, and was well known by MRGCD, which failed in its effort to remove this written requirement from the 1951 Contract.

MRGCD points to language in Middle Rio Grande Water Users Ass'n v. Middle Rio Grande Conservancy Dist., 57 N.M. 287, 258 P.2d 391 (1953) where the New Mexico Supreme Court, in approving the 1951 Contract, stated that the conveyance of legal title under the contract was "as security" for the money to be spent by the United States for the benefit of the District. Id. at 300, 258 P.2d at 399. "No one can doubt but that the Congress of the United States will

40

authorize the reconveyance of all such property to the District if, as and when its debt is paid."
Id.  This pronouncement by the New Mexico Supreme Court, in *dicta*, does not relegate the
United States' title to a mere security interest, and it recognizes the necessity of Congressional
authorization to reconvey the property.  Middle Rio Grande Project properties conveyed to the
United States by MRGCD were not merely "security interests" that were extinguished upon
repayment of MRGCD's financial obligations under the 1951 Contract.  None of the conveyance
documents provided to the Court contain any language stating that the conveyance or easement
terminates upon completion of MRGCD's repayment obligations.  To the contrary, the
conveyance instruments indicate that the conveyances are permanent, subject to reconveyance
only by congressional action.

MRGCD also argues that State Water Rights Permit 1690 for storage and use of waters in
El Vado Reservoir was conveyed to the United States solely as a "security interest" that
automatically reverted to MRGCD when it met its repayment obligations under the 1951
Contract.  MRGCD assigned Permit 1690 to the United States in 1963.  The assignment
instrument expressly quotes Article 28 of the 1951 Contract, states that the conveyance is being
made in accordance with that provision "and in consideration of the privileges derived from the
repayment contract."  Ex. 226 at 1.  The instrument further says that the conveyance is of "all of
the rights, titles, and interests in and to the water rights hereinabove specifically described, unto
the United States, and its assigns, forever."  Ex. 226 at 2.  Permit 1690 is not a security interest
for a loan, and it does not provide for automatic reversion to MRGCD upon repayment.  It was
intended to allow the United States to use the permit as necessary in administration of the Project,
not to hold as a piece of collateral to secure MRGCD's repayment obligation.  Like the other

central aspects of the Project, Permit 1690 must remain in the name of the United States until Congress authorizes the Secretary to convey the Project to MRGCD.

MRGCD asserts that if the United States does "not have a deed to real property that contains an ascertainable legal description for a specific parcel, [it] cannot be the titleholder to that property." MRGCD Proposed CL No. 6. MRGCD points out that there are only a few deeds in which it conveyed title to the United States, including the deeds to MRGCD offices, and a deed to Heron Reservoir. Thus, it reasons, the lack of similar deeds means that title was never conveyed to the United States for any of the other properties in the middle Rio Grande. The fact that the 1953 grant is entitled "Grant of Easement" does not control the nature of the conveyance. The title of an instrument is not determinative of the property interest conveyed by that instrument. Atlantic Refining Co. v. Beach, 78 N.M. 634, 637, 436 P.2d 107, 110 (1968) ("Never does the title [of a conveyance document] prevent a construction that the court thinks is correct and rarely does it impel a court to a construction it would not otherwise make.") (citation omitted).

In its arguments MRGCD uses "title" as synonymous only with "fee title" which in turn can only be conveyed by a document labeled "deed". However, MRGCD and the United States did not rely on such a restrictive use of the term "title" when they were acquiring and assigning property interests for the Project. On the contrary, "title" was commonly used in reference to easements. In most instances, the United States did not acquire "fee simple title" to the various properties necessary for the Project. Rather, in most of the documents the interest of the United States is referred to as "title to easements." This language is not a significant matter because the 1951 Contract only requires that "title" be conveyed, not "fee simple title," Ex. 67 ¶ 26, and it

42

provides that "title" remains with the United States until Congress acts, Ex. 67 ¶ 29.[11]  Unless the conveyances, whether they be grants of easements and rights-of-way or grants of fee simple title, provided for automatic termination, they would not terminate when MRGCD completed its repayment obligations.

MRGCD claims that the 1953 Grant of Easement was subsequently rescinded by the 1962 county-by-county easements.  However, there is no evidence that was the intent of the parties.[12] Rather, the evidence confirms that the 1962 easements were intended to supplement the 1953 Grant of Easement by providing detailed legal descriptions for the properties previously conveyed, and to convey rights-of-way that were acquired by MRGCD after 1953.  Also, the 1962 county-by-county easements could be recorded in each county in order to give notice to third parties of the United States' ownership.

In summary, the record before the Court demonstrates that MRGCD knew before entering into the 1951 Contract that it was required to transfer title to all Middle Rio Grande Project properties to the United States, and that title to those properties would remain with the United States until Congress provided otherwise.  MRGCD executed the 1951 Contract, the 1953 "Grant of Easement," hundreds of additional conveyance instruments including the 1960 grant of easement for El Vado Dam and Reservoir and the 1962 blanket county-by-county grants of

---

[11]  References to "title to easements" are found in contemporaneous New Mexico judicial decisions.  *See, e.g.*, Ritter-Walker Co. v. Bell, 46 N.M. 125, 128, 123 P.2d 381, 383 (1942) (holding that "[t]itle to an easement passes like title to any other real estate"); Southern Union Gas Co. v. Cantrell, 56 N.M. 184, 186, 241 P.2d 1209, 1210 (1952) (referring to "title to the right-of-way easement").  *See also* L.C. Collins v. City of Wichita, 225 F.2d 132 (10th Cir. 1955) (stating that "[t]itle and the right of exclusive possession to the easements and rights of way condemned were vested in the city"); Brown & Root, Inc. v. United States, 116 F.Supp. 732, 733 (Ct. Cl. 1953) (stating that the United States "acquired title to an easement for a 50-foot right-of-way").

[12]  The only rescissions were of the two easements for Sandoval and Bernalillo Counties that had been approved in 1961 but had been found to be in improper form.

easements, with the understanding and intent of conveying title to Project properties to the United States.

From 1951 through 1999, MRGCD almost invariably recognized that the United States held title to Project properties and that the United States would hold such title until Congress authorized conveyance of that title back to MRGCD. MRGCD acknowledged and promoted the United States' interests in title to its advantage in numerous court cases all the way to the United States Supreme Court, in dealings with the public and with federal agencies including BOR, and in testimony before Congress and the New Mexico State Legislature.

Likewise, the United States also intended to acquire title to Middle Rio Grande Project properties in accordance with federal reclamation law, the United States Constitution, the Acts of Congress creating the Middle Rio Grande Project, and the 1951 Contract. The United States requested that MRGCD convey title to existing works and real property to the United States prior to beginning the reimbursable portions of the Project, and the United States understood the 1953 Grant of Easement to be that conveyance instrument. The United States relied on the 1953 Grant of Easement throughout the construction phase of the Project to expend tens of millions of dollars on the Project, even after execution of the 1962 county-by-county grants of easement that MRGCD argues replaced the 1953 Grant of Easement.

MRGCD has failed to carry its burden of establishing that it has title to any of the Middle Rio Grande Project properties at issue in Count III of its cross-claims. Title to all such properties vested in the United States in the 1950s, and must remain with the United States until Congress directs otherwise. The cross-claims are otherwise devoid of factual and legal merit. Therefore, Federal Defendants are entitled to judgment in their favor on all MRGCD's claims.

44

IT IS ORDERED that the Second Amended Cross-Claims filed on March 25, 2002 by Defendant-Intervenor Middle Rio Grande Conservancy District (Doc. No. 366) are dismissed as untimely;

ALTERNATIVELY IT IS ORDERED that the Second Amended Cross-Claims filed on March 25, 2002 by Defendant-Intervenor Middle Rio Grande Conservancy District (Doc. No. 366) are dismissed as barred by the doctrine of judicial estoppel;

ALTERNATIVELY IT IS ORDERED that the Federal Defendants are entitled to judgment on all claims in the Second Amended Cross-Claims filed on March 25, 2002 by Defendant-Intervenor Middle Rio Grande Conservancy District (Doc. No. 366).  A separate Judgment will be filed contemporaneously with this Memorandum Opinion and Order and Findings of Fact and Conclusions of Law.

_____

SENIOR UNITED STATES DISTRICT JUDGE